Vol. 1 - 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,    )
                                 )   Case No. 2:13-cr-423-JCM-GWF
4              Plaintiff,        )
                                 )   Las Vegas, Nevada
5         vs.                    )   April 4, 2016
                                 )   1:21 p.m.
6   DANIEL JAMES BARNES,         )
                                 )   Day 1
7              Defendant.        )
    _____)

8                   PARTIAL TRANSCRIPT OF PROCEEDINGS

9               BEFORE THE HONORABLE JAMES C. MAHAN
            UNITED STATES DISTRICT COURT JUDGE AND A JURY

10

11  APPEARANCES:

12  For the Government:

13          ALLISON HERR
            CHRISTINA SILVA
14          Assistant U.S. Attorneys
            District of Nevada
15          333 Las Vegas Boulevard So.
            Las Vegas, Nevada 89101
16

    For the Defendant:

17
            LUCAS GAFFNEY
18          JAMES A. ORONOZ
            Oronoz, Ericsson & Gaffney LLC
19          1050 Indigo Drive, Suite 120
            Las Vegas, Nevada 89145
20

21

22

23  Court Reporter:  Katherine Eismann, CSR, CRR, RDR

24                  (702)431-1919  eismann.csr@gmail.com

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

1     (Monday, April 4, 2016, 1:21 p.m.)

2                    --oOo--

3           P R O C E E D I N G S

4     (Jury impaneled and sworn.  Opening statements made but

5  not transcribed.)

6           THE COURT:  All right.  Thank you.  You may be

7  seated.

8           Do the parties stipulate to the presence of the jury

9  and the alternates?

10          MS. SILVA:  Yes, Your Honor.

11          MR. ORONOZ:  Yes, Your Honor.

12          THE COURT:  All right.  Call your first witness.

13          MS. HERR:  Your Honor, the government calls Anthony

14  Petrulli.

15          THE COURT:  Come forward and be sworn, sir.  Right up

16  here on your left, my right.

17                    ANTHONY PETRULLI,

18  having been duly sworn, was examined and testified as follows:

19          COURTROOM ADMINISTRATOR:  State your full name and

20  spell it for the record.

21          THE WITNESS:  Anthony Petrulli, P-E-T-R-U-L-L-I.

22          THE COURT:  Whenever you are ready.

23                    DIRECT EXAMINATION

24  BY MS. HERR:

25  Q.   All right.  Thank you for coming in, Detective.

Anthony Petrulli - Direct

1              Can you tell us a little bit about your background?

2    What is it that you do for a living?

3    A.   I'm a detective for the Las Vegas Metropolitan Police

4    Department.

5    Q.   How long have you been in law enforcement?

6    A.   I have been in law enforcement 16 years and currently

7    assigned in the vice unit for the past 10 years.

8    Q.   Are you also a member of a task force?

9    A.   Yes.

10   Q.   And tell me about that task force?

11   A.   I belong to the LVMPD FBI Child Exploitation Task Force,

12   and I am on a team that is responsible for investigating

13   nothing but juvenile prostitution related cases.

14   Q.   Explain to me what a typical day for you entails?

15   A.   Our day is involving following up on juvenile

16   investigation cases.  They come in from various sources.

17   Sometimes we receive tips from school teachers, nurses.

18            Sometimes a girl will maybe come into the juvenile

19   hall, and the intake staff will alert us.  Sometimes the

20   juvenile turns themselves in and declares that they have been

21   sex trafficked.

22            So there's a multitude of reasons.  We also have vice

23   enforcement officers that work the Las Vegas Strip and certain

24   areas of town where prostitution is in high activity, and they

25   also end up arresting offenders.  And sometimes they turn out

Anthony Petrulli - Direct

1    to be juveniles, and we get involved in those cases as well.

2    Q.   When you use the particular phrase "sex trafficking," what

3    are you talking about?

4    A.   Sex trafficking is essentially prostitution.  They have

5    changed the term now to sex trafficking, realizing that a lot

6    of these women and children, especially, are victims in these

7    cases of prostitution.

8              Once it was thought that many of these people were

9    willing participants.  And sometimes, in the beginning, that is

10   true.  But during the process, they start to realize that

11   they've made a bad choice and try to get out.  And that's when

12   they start having problems with the offender.

13   Q.   Now, about how many contacts a year would you say that

14   your task force has with these juvenile victims of sex

15   trafficking?

16   A.   Just contacts alone, we probably have somewhere in the

17   neighborhood 220 a year.

18   Q.   And of those 220, about how many of those do you actually

19   investigate?

20   A.   I probably see about 25 or 30 contacts a year.

21   Q.   Now, what kind of education does it take to become a

22   police officer?

23   A.   To become a police officer, they require you to take

24   tests; psychological background, physical tests, background

25   checks.  Then you go through the academy.  There's a process of

Anthony Petrulli - Direct

1    a training period, and then there's also a field training

2    period where you're paired with an experienced veteran officer.

3    And that lasts for a while.

4            And then when you are done with field training, you

5    are also on probation for another period of time.  And then

6    once -- then you became a -- on your own, patrol officer.  And

7    once you've been in patrol for a short time -- well, at least

8    usually two years, you can start to move on to other fields.

9            I did five years on the streets before I started

10   looking into detective work.

11   Q.   Now, when you joined vice and then subsequently became a

12   member of a task force, was there additional training that you

13   had to go through?

14   A.   Yes.  The -- we -- first, when I went to vice, I -- I was

15   working in the general what we call vice enforcement area,

16   which is going out and looking for prostitutes, pimps, and even

17   sometimes customers of prostitution referred to as johns.

18           So we would complete operations, whether it be in the

19   street, a hotel, or from tips that we've received.  So I have

20   done every aspect of vice except for dressing up as a female

21   and trying to get a pimp to pimp me out.

22   Q.   Okay.

23   A.   And then I was asked to join the juvenile sex trafficking

24   team in 2006.  I'm sorry.  2007.  And I joined that for a

25   little bit more longer-term investigation which interested me.

1    Q.   And in terms of training, did you have special training in

2    techniques for --

3    A.   Yeah.

4    Q.   -- dealing with juveniles?  How to question them?  Things

5    like that?

6    A.   Yeah.  Initially, they send to us the National Center for

7    Missing & Exploited Children in Virginia.  And it's a course

8    there where they go over all of the various disciplines of

9    investigating these types of cases.  They tell you what's

10   involved.  They have some other people to speak to us, from

11   doctors, police officers, judges, attorneys, to kind of give

12   you a broad overview of what type of investigations you will be

13   getting into.

14   Q.   And do you continue to go to some of these national

15   trainings?

16   A.   Yes.  We were -- somebody from our team usually goes at

17   least once -- once or twice a year to some type of federally

18   sponsored training or sometimes a state training that someone

19   else is putting on concerning sex trafficking.

20   Q.   About how many hours of training would you say you have

21   undergone specifically dealing with juvenile prostitution?

22   A.   Probably around 800 hours.

23   Q.   Did these trainings deal specifically with the subculture

24   that's developed between pimps and prostitutes?

25   A.   Yes.  About the subculture, definition of words and terms,

Anthony Petrulli - Direct

1   some of the interactions, some of the hierarchy, the structure

2   of these -- these enterprises.

3   Q.   Have you done any lecturing yourself on that subject?

4   A.   I have recently -- in December of 2015 was my last public

5   speaking in front of a group that -- in town here called the

6   Congo Justice Group.  And their mission is to try to await --

7   raise awareness of sex trafficking in the Las Vegas area,

8   whether it be juvenile or adult.

9   Q.   You mentioned that was the last one.  Had there been other

10  speaking engagements that you have taken part in?

11  A.   There's been some previous.  I was also -- when we first

12  started the Southern Nevada Human Trafficking Task Force back

13  in 2002, I believe it was, I was initially the person from Las

14  Vegas Metro who would be involved in that meeting every month

15  and have to speak in front of everybody and tell them about the

16  sex trafficking and what cases we were looking into without, of

17  course, divulging too much information.

18  Q.   Do you also read literature or do things to try and

19  increase your knowledge in that area?

20  A.   Yes.  I have read some books, some documentaries on the

21  cultures.  *Mickey Royal* is a book.  *Iceberg Slim* is a book.

22  And these were written by pimps themselves explaining what the

23  pimp subculture is and how it works.

24  Q.   How do you stay current on new investigative techniques as

25  they evolve?

Anthony Petrulli - Direct

1   A.   We also are afforded webinars from various organizations

2   whether they be federal or Justice Department related.

3   Q.   Focusing now specifically on what you are doing with child

4   prostitution, how many cases have you investigated all together

5   would you say?

6   A.   Myself, I have done over 220 cases.

7   Q.   And were all of those cases involving juveniles or were

8   some of those adults?

9   A.   Those were strictly juvenile cases.

10  Q.   And in those cases, how many of the children did you

11  actually get an opportunity to interview?

12  A.   If we -- if we have a viable case, there, of course, has

13  to be a child to speak to.  So we do get tips where they are --

14  it's a very nonspecific tip that we have to look into, but the

15  majority of those are actual contacts with a victim.

16  Q.   Have you also had an opportunity to interview any pimps?

17  A.   Yes.  Whenever we develop a case where we can effect an

18  arrest, we typically have an interview a pimp.

19  Q.   And what sorts of things do you learn from these

20  interviews?

21  A.   The sex traffickers or pimps would generally speak to you

22  because they -- they believe that they can speak their way out

23  of anything.  They believe that they have the power or the gift

24  of gab to talk their way out of anything.

25            In many of my interviews, some -- some of these guys

Anthony Petrulli - Direct

1    will talk, and they will just talk your ear off and not tell

2    you anything.   Sometimes they will provide some tidbits of

3    information.

4    Q.    What does that tell you about this thing that we are

5    calling the subculture?   How does that help you increase your

6    knowledge about it?

7    A.    From speaking with the sex trafficker?

8    Q.    The pimps.   Yes.

9    A.    It just gives you a better insight into their -- their

10   mindset and how they may perceive things.

11   Q.    Have you won any awards as a result of the work that you

12   have done in this area?

13   A.    Not awards, per se, but -- well, I take that back.   We did

14   have a Victim Witness Advocate Award.   I believe that was 2008.

15   But we have commendable actions.   We have letters of

16   commendation we have received from our superiors.

17   Q.    Have you ever testified as an expert witness before?

18   A.    Yes, I have.

19   Q.    And can you tell me approximately how many times you have

20   testified in that capacity and where you testified?

21   A.    I testified previously twice in Clark County justice

22   system and also once here in the federal court system.

23   Q.    Were you qualified as an expert in those cases?

24   A.    Yes, I was.

25   Q.    Have you ever been precluded from testifying as an expert?

1    A.    No, I haven't.

2              MS. HERR:  Your Honor, pursuant to Rule 730, I would

3    tender the witness as an expert in the area of pimp and

4    prostitute subculture.

5              THE COURT:  Mr. Gaffney.

6              MR. GAFFNEY:  Your Honor, we already submitted a

7    motion on it.  I understand the Court's ruling, so I will

8    submit it on that.

9              THE COURT:  He'll be permitted to give his opinion as

10   to matters arising within his area of specialization.

11   BY MS. HERR:

12   Q.    Now, Detective, you've not actually had any contact with

13   the defendant in this case or any of the witnesses; is that

14   correct?

15   A.    No, I haven't.

16   Q.    What we wanted you to be able to testify about today is to

17   help us understand this concept of a subculture and to explain

18   to us why that's different than what all of us do on a regular

19   basis.

20              Specifically, I wanted to talk to you a little bit

21   about the kind of language that we are likely to be hearing

22   from some of the witnesses.

23              There are some words that we hear a lot.  Pimp.

24   Sometimes it's call Mack.  Sometimes I see Playa.  Sometimes I

25   see Daddy.  What is that and what's the difference between

Anthony Petrulli - Direct

1   those things?

2   A.   In general terms, that is specifying just a pimp in

3   nature.  They all refer to some -- some types of different,

4   maybe, types of pimps.  There are some other categories of

5   pimps that you didn't mention in there.  But sometimes Mack is

6   considered a higher grade pimp than just maybe just somebody, a

7   street-level pimp.

8         They like to try to, of course, always present

9   themselves that they are bigger and better than anybody else.

10  And so some of those terms just have some different meanings.

11        Player is -- player sometimes is often referred to --

12  there's a Player's Ball that they have, where a pimp is awarded

13  a trophy for having the best -- maybe the best "ism" is a word

14  they use, pimpism.  Maybe they consider that he's the most

15  well-spoken and eloquent, and he's in control of his girls.

16  And he is recognized as the best for that year.

17  Q.   How about the terms "bitch" or "ho" or sometimes even the

18  word "bottom"?

19  A.   Bitch refers to any of the girls that might be working for

20  the sex trafficker or pimp.  Ho is also the same -- same

21  meaning.

22        A bottom is a -- specifically to a -- the most

23  trusted girl that that pimp is working with.  So she would be

24  the one that would be closest to him and may have a little bit

25  more knowledge of some of his goings-ons exclusive to --

Anthony Petrulli - Direct

1  excluding the other girls.

2  Q.   How about when we hear the term "I want to tell you about

3  the lifestyle."  What is that referring to?

4  A.   Lifestyle or game -- it's also referred to as the "game."

5  The game is very common in our region here.  Lifestyle, I have

6  heard that reference before.  Sometimes people just call it

7  "the life."

8          But it's all referring to the pimp and prostitute

9  subculture and what they do.  And sometimes these sex

10 traffickers or pimps will -- will break it down for a girl he's

11 talking to in hopes of getting them to work for them.

12         He won't tell her everything, but he will tell them

13 all the good things that can happen if she goes along with his

14 ideas.

15 Q.   How about the "rules"?  What does that refer to?

16 A.   There's -- there's various rules for the prostitution

17 subculture.  Some -- some sex trafficker pimps have -- they may

18 have a little different, but there are a core set of rules that

19 they all tend to follow.

20         And that is the girl has to go out and get the money,

21 and get the money first, before there's any sex.  They all

22 suggest that they use protection.  They all suggest that they

23 stay away from any other black men because of the fear that

24 that black male may be another pimp, who may try to take the

25 girl away from them.

Anthony Petrulli - Direct

1            They also tell them to be aware of law enforcement.

2    "Don't trust law enforcement."  And ways that they may be able

3    to detect law enforcement.  Those are just some of the rules.

4    Q.   Okay.  What does it mean for a girl to "choose up"?

5    A.   Choose up is a term used for -- in the pimp prostitution

6    subculture as a girl that would choose to go with that sex

7    trafficker or pimp.

8            So he may be talking to this girl for a little bit.

9    There's almost like a courting period sometimes when they are

10   trying to convince this person to come with them and work for

11   them in the prostitution field.  And once she does or he does,

12   sometimes, it's called a "choosing up."

13   Q.   And have you ever heard of -- after a girl chooses up that

14   she has some sort of an exit fee she has to pay?

15   A.   Some -- some sex traffickers, pimps will have an exit fee

16   where they will -- if the girl says, "You know what?  I have

17   had enough of you.  I'd like to leave.  I'm done."

18           They will say, "That's fine.  You can leave if you

19   pay me X amount of dollars."  Sometimes they are allowed to

20   take their items, their clothing with that.  Sometimes they are

21   not.

22   Q.   How about "knocking" a girl?

23   A.   "Knocking girl" is -- is the predecessor to the girl

24   choosing up.  So when someone is trying to knock a girl,

25   whether it be a pimp or one of the pimp's girls, knocking girl

1   is trying to get that -- that person to come with them and come

2   into the group, the family with the pimp and work for that

3   pimp.

4   Q.   Now you mentioned the term "family."  Tell me how this

5   idea of a prostitute calling her pimp "Daddy."  How does that

6   fit into this idea of a family?

7   A.   It's essentially the need -- they are preying -- the pimp

8   sex traffickers are preying on the needs of these -- these

9   people to feel wanted and feel needed.  So that's why the term

10  it -- commonly will insist -- some of them insist that they --

11  the people that they are dealing with call them Daddy.  They

12  insist that the female calls them Daddy to create that tighter

13  bond, if you will, a sense of family.

14          Because the other girls in the stable or in the group

15  are often referred to as "wifeys."  So they try to concoct this

16  family relationship to make everybody a tighter bond.

17  Q.   And this idea of the family, does that impact the

18  likelihood of a girl deciding to come forward and talk to the

19  police about the fact that she might have become a victim?

20  A.   Yes.  The -- many times when we speak to girls, they

21  are -- they are very apprehensive about telling us everything

22  that's going on and giving us true and correct information,

23  just because -- based on the trust principle, that they've been

24  told, "You can't trust the police.  The police are going to lie

25  to you.  They are not there to help you.  They are trying to

1   hurt you.  They are trying to hurt me.  They are trying to

2   arrest the pimp.  They are trying to take away everything that

3   I'm doing for you.  I give you a roof over your head.  I buy

4   you food.  I buy you clothes.  I do everything for you.  All

5   you have to do is provide the money."

6   Q.   What does it mean for a girl to be "out of pocket"?

7   A.   Out of pocket is when a girl is not following the rules.

8   She may be talking to another black male, which would be

9   considered a violation of the rules.  Anything violating the

10  rules is a term meaning that she's out of pocket.

11  Q.   What does it mean when you see the phrase "purse first ass

12  last"?

13  A.   That refers back to the money first before any acts are

14  done.  Also, it refers to not only between customers that the

15  prostitutes are having sex with, but also with the pimp.  The

16  pimp will always make sure that business is taken care of first

17  before he shows any affection or has any sexual relations.

18  Q.   And is that common for the pimps to have some sort of a

19  sexual relationship with the girls that work for him?

20  A.   Yes.  They -- they have -- there's nothing better that

21  they could do than to have a child with that -- with that

22  female to create even a stronger bond.

23  Q.   Have you ever heard of the phrase "stacking money" or

24  "stacking bands"?

25  A.   Stacking money is exactly what it means, saving money,

Anthony Petrulli - Direct

1  piling up money.  Bands refers to -- some people refer to it as

2  the -- the little bands that come from the bank around the

3  money.  Other people refer to it as just wrapping the money in

4  rubber bands.

5  Q.   Okay.  Now, when we look at ads for prostitution, and we

6  see something advertised that says "full-service," what does

7  that mean?

8  A.   Full-service means everything is available from that

9  person.  So whatever type of sex act is -- is available,

10  meaning from oral, to anal, to -- and sometimes these terms

11  are -- they are specify that they do not do anal or Greek.  But

12  full-service means that you are going to have everything.

13  Usually vaginal intercourse.

14  Q.   And did I understand you to say that "Greek" usually

15  refers to anal sex?

16  A.   Yes.

17  Q.   How about the term "john"?  What does that reference?

18  A.   John is a prostitution client or customer.  That refers to

19  the person who is paying the prostitute for that service.

20  Q.   What does it mean if I'm "catching a date"?

21  A.   Catching a date is exactly what it means.  It sounds like

22  the -- the prostitute is out there.  She's not trying to catch

23  a date.  She's trying to find a client or a john to have sex

24  with for money.  So --

25  Q.   What does it mean to "walk the track"?

Anthony Petrulli - Direct

1    A.    Walk the track is commonly referred to a street that there

2    is a lot of prostitution activity going on.  Some people call

3    it the -- we typically refer to it in this region as the

4    "track."  Some other people call it the "blade."  There's

5    various terms for it.

6    Q.    Do we have those kinds of areas here in Las Vegas?

7    A.    Yes, we do.

8    Q.    Tell me what are sort of the more common areas that are

9    known for prostitution?

10   A.    The Tropicana corridor from Dean Martin running west up to

11   Decatur and even sometimes past Decatur.  There's also --

12   Boulder Highway is a high prostitution activity area on the

13   street for a track.  And then, of course, you have Las Vegas

14   Boulevard with the hotels, but that's -- that's a different

15   term.

16   Q.    Now how does the concept of "walking the track" differ

17   from being "on the circuit"?

18   A.    Circuit more -- more refers to having some different

19   locations you may be going to.  Usually interstate is what

20   that's referring to.

21   Q.    Okay.  Now, based upon your experience and training in

22   these various things that we have discussed, can you tell us,

23   in general terms, what's the relationship typically like

24   between a prostitute and a pimp?

25   A.    Sometimes more than likely it's perceived as a

Anthony Petrulli - Direct

1   boyfriend/girlfriend loving relationship.  Other times it's

2   not.  It's just more of a -- you know, the girl needs somewhere

3   to stay, but she's not really -- she doesn't really like the

4   guy, but she's just kind of almost kind of like in a survival

5   mode where she's just trying to survive.

6   Q.   Now are these relationship typically partnerships or is

7   there one person who is really the dominant person?

8   A.   The pimp is usually always in control.  You'll have some

9   lesser pimps who may be trying to barter with a girl and may

10  actually give her some proceeds, but that's not very common.

11  Q.   Can you tell me what the difference is between a "Romeo

12  pimp" and a "gorilla pimp"?

13  A.   A Romeo pimp is someone who is going to -- just what it

14  sounds like, Romeo.  He's going try to finesse the girl.  Try

15  to be very sweet and nice and loving like a boyfriend, and

16  everything you can imagine, to writing notes to being just that

17  guy that's their everything.

18          The flip side of that would be a gorilla pimp, who

19  would be very forceful.  Just using force upon her, beatings,

20  in cases of being stuffed in a trunk until -- and guns held to

21  their heads until these -- these girls acquiesce and go out and

22  work for these gentlemen.

23  Q.   Now, based on your experience, can you describe what some

24  of the recruiting techniques are that pimps use to try and get

25  juveniles?

Anthony Petrulli - Direct

1  A.   The recruiting techniques, they will try to -- typically,

2  it is more of a boyfriend/girlfriend kind of relationship where

3  they will talk with the girl.  It's a grooming process where

4  they are not going to just come out and first meet the girl and

5  say, "Hey, do you want to prostitute for me?"  You know,

6  because usually a girl is not going to agree to that right

7  away.

8          So sometimes it can be a longer process where they --

9  they kind of are looking to probe that girl and see what she's

10  missing in her life.  See what's going on with her family.

11  Does she like her father?  Does she like her mother?  Does she

12  like her parents at all?

13          He's going to try to exploit her and find out every

14  little weakness that she has, and then he's going fill those

15  weaknesses.  And that's how he's going attract her to him.

16  Q.   Is there any kind of a typical juvenile background or does

17  it just vary?

18  A.   It varies widely.  But a lot of the victims in these cases

19  have had runaway issues in their life.  They may have some

20  prior child abuse or sexual abuse in their lives.

21          But then again, we've had -- we've had girls from FBI

22  families, firefighter families, Las Vegas Police Department

23  families all become involved in this.

24  Q.   Is there something different about the juveniles that make

25  them more or less vulnerable than an adult?

Anthony Petrulli - Direct

1  A.   Well, the juvenile mind is a -- is a very complex thing.

2  There's a lot of hormones going on there, so they -- they are

3  not perceiving the consequences of that risk-taking.

4       They think there are no consequences and that they

5  are pretty much indestructible.  So they just think that they

6  can do anything and everything.

7  Q.   What does the pimp get out of this kind of a relationship?

8  A.   The pimp is looking for one thing and that's money.

9  That's his primary driver.  That's his goal.

10 Q.   And what does the prostitute typically get out of having a

11 relationship with a pimp?

12 A.   She is believing the things that he's saying.  And he is

13 selling the dream, and she's believing it.  As far as

14 physically, the only thing she may get is some clothing, her

15 nails, her hair done, and some food.  And maybe some medical

16 things that she may need, but she's going to get everything

17 that she needs just to keep her working.  Is she going to see

18 any of that money?  Not typically, no.

19      Now the pimp is going to tell her, "Hey, that money

20 is all saved up.  It's for you.  It's not going anywhere.  I

21 have it for you."  But in the end, it's not there.

22 Q.   Is this -- I know we talked a little bit earlier there's

23 oftentimes a sexual relationship that will develop.  Is it

24 common for particularly juvenile prostitutes to think that they

25 are in love with their pimp?

Vol. 1 - 21

Anthony Petrulli - Direct

1   A.   Yes.

2   Q.   Why is that?

3   A.   Just because that pimp is providing and trying to provide

4   for that female, and they -- a lot of them believe that these

5   guys are in love with them.  And that's a pretty strong bond.

6          Those are some of the harder cases for to us to -- to

7   bring to justice, just because that girl sometimes is so in

8   love with the guy.  Even if she sees a picture of him, she's

9   just going to not cooperate with you.

10  Q.   Okay.  Now, what is the relationship then -- I know you

11  mentioned a stable where there's usually more -- several girls

12  and maybe there's going to be designated somebody as the

13  bottom.

14         What is typically then that relationship between the

15  bottom and these other girls that are working in the stable?

16  A.   The bottom is almost like a manager.  You can equate it to

17  the pimp being the owner of this business.  And the bottom you

18  can equate to being a manager.

19         So she's going to be given tasks by the pimp, and she

20  will have to carry out those tasks or there will be

21  repercussions for her.  It could be anything from -- sometimes

22  we've seen where bottoms are instructed to discipline the

23  girls, and they are actually the ones that go and beat the

24  other girls.

25  Q.   So clearly these bottoms have more perks, but do they have

 1   more control or are they still really answering to the pimp?

 2   A.   No, they are -- they are answering to the pimp, and they

 3   are carrying out his -- his deeds.  And they are also trying to

 4   protect him at any cost.  So, many times, they will try to

 5   divert attention from him and try to take all the blame.

 6   Q.   Do pimps ever trade their girls?

 7   A.   Yes, they can trade their girls.

 8   Q.   Why would they choose to do that?

 9   A.   Sometimes they may be thinking that, you know, this girl

10   is a little bit of a problem for me.  She's taking a lot more

11   time and attention that I need to give to this girl, so maybe I

12   can trade her for another girl.  It's not something that you

13   see a lot, but it does happen.

14           Same for buying a girl, which is like a -- almost

15   kind of like another choosing up fee.  If a girl wants to go to

16   another guy, there can be an X amount of dollars involved in

17   that transaction also.

18   Q.   So sort of like we talked earlier about the exit fee,

19   there's also sometimes maybe an entrance fee --

20   A.   Right.

21   Q.   -- to join a new group?

22   A.   Yes.  And sometimes even in a new relationship -- and it's

23   usually more with girls that have been around a little longer

24   and kind of are already educated in the pimp/prostitution

25   subculture, where -- and if he -- if the sex trafficker or pimp

Anthony Petrulli - Direct

 1  knows that she's savvy enough to know the lifestyle, he may

 2  even just come straight out and tell her, "Hey, look.  To get

 3  with me, you got to choose up.  There's a fee, and it's X

 4  amount of dollars before you can come with me."

 5  Q.   Do these girls ever have quotas on how much money they

 6  have to earn?

 7  A.   Yes, it varies from sex trafficker to sex trafficker on

 8  what the quotas may be for a night.

 9  Q.   What happens if they don't meet their quota?

10  A.   Sometimes there will be a talking to and then it

11  progressively gets worse to beatings.

12  Q.   If we are thinking about sort of the typical day for a

13  prostitute, how many johns or dates, in your experience, might

14  they have in a night?

15  A.   It kind of depends on that sex trafficker and how hard

16  he's pushing them to work.  Some of these girls could do

17  anywhere from 10, 20 girls [sic] a night upwards.  They will

18  try to do as many as they can.  It depends also on what their

19  quota is.

20       Sometimes it could be a thousand dollars.  We had a

21  case where a pimp was telling her she had to make $5,000, which

22  is a pretty high quota.  But it depends upon -- this is in the

23  downtown area, which is a different classification of work

24  area, which they vary by prices around town depending upon

25  where you are.

Anthony Petrulli - Direct

1   Q.   Are these girls expected to work every single night?

2   A.   As one of the pimps said, "If you wanted a day off, you

3   should have become a secretary."  So -- and that's a quote from

4   one of them.  They don't expect their girls to be off unless

5   they give them -- that's almost treated as a reward.

6   Q.   What are the typical hours when people are out engaging in

7   this kind of behavior?

8   A.   Again, that's offender specific to when he wants the girls

9   to work.  There are girls in this area, in this town, that are

10  available 24/7.

11          Now, if there are -- some girls will only work maybe

12  during the daylight hours, because they feel it's safer.  Some

13  girls only work the early morning hours, late at night, because

14  they think that's -- it's just dependent upon what that pimp's

15  choosing is and how he lets them go about their business.

16  Q.   Okay.  What happens if they have got a cold or they just

17  don't feel well?

18  A.   Again, it's sex trafficker specific if he wants to allow

19  them to work or not.  Typically, he's going to try to make them

20  work no matter what.  There's -- there's girls online that are

21  pregnant and working, and sometimes they even charge more for

22  that.

23  Q.   What do these girls do about just taking care of basic

24  needs?  Maybe sanitary needs, clothing, shoes?

25  A.   The pimp is going to provide all of that for them, and it

Anthony Petrulli - Direct

1  may not be as lavish as some people think.  He's going to do

2  the bare minimum to do what he needs to do to make them feel

3  better.

4  Q.   Are they -- are these girls who are caught in this kind of

5  environment, are they typically able to call friends or

6  interact with family?

7  A.   Dependent upon the relationship with the sex trafficker.

8  Typically, early on, he's going to -- especially with a newer

9  girl or a younger girl, he's going to try to isolate them as

10  much as possible.  That's another reason they move around a lot

11  interstate-wise.

12         They are trying to make sure that that girl is

13  dependent on him and him only.  That way there is nobody else

14  to reach out to, there is nobody else to contact, and there

15  is -- they are isolated and solely dependent on that pimp.

16  Q.   Now, how -- how do you typically advertise services for

17  prostitution?

18  A.   They use a variety of means.  It can be just walking the

19  track, the street.  Walking up and down, trying to look in the

20  cars, nod at cars, wave at cars.  It can be the Internet.  They

21  will place ads on the Internet to make various places, parking

22  lots, hotels.  They will even use some escort agencies

23  sometimes as a means to get businesses.  There's a variety of

24  ways they can do that.

25  Q.   Now, based on your current experience, what are you seeing

Anthony Petrulli - Direct

1   as sort of the hot Internet places to place ads?

2   A.   Well, some of the most common ones that everybody, I

3   think, would know are *Craigslist* and *Backpage* are some of the

4   most well-known ones.

5   Q.   Are you familiar at all with disclaimers that are

6   sometimes seen on web advertising that will say something to

7   the effect of "if you -- by contacting me, you agree you are

8   not part of law enforcement"?

9   A.   Yes.  Yes.  A lot of -- a lot of -- a lot of people

10  placing those prostitution advertisements will put that on

11  there and feel that that's protecting them or somehow excluding

12  them from law enforcement coming into contact with them.

13  Q.   I know you mentioned just a few minutes ago that often

14  part of this isolation process is part of the reason why we're

15  constantly moving these girls around and maybe moving them from

16  one city to another.

17         Have you, in your experience, seen any kind of maybe

18  regular circuit coming from girls in California to here in Las

19  Vegas and back?

20  A.   A lot of our victims are from California just because it's

21  so close in proximity.  But the Las Vegas area does see victims

22  from all over the United States as well as Canada and Mexico.

23  Q.   When these girls travel, who typically pays their

24  expenses?

25  A.   Usually the pimp is providing all that.  In the juvenile

1   realm, you don't see a lot of air travel.  There are some

2   instances of that, but it's more on or less a bus, or a car, or

3   a friend of a friend who has a car or something like that.

4   Q.   In your experience, what effect does all that travel and

5   sort of these crazy working conditions have on that juvenile's

6   ability to recall specific events?

7   A.   Well, it goes back to the idea --

8            MR. ORONOZ:  Your Honor -- I am sorry, counsel.  I

9   would object.  I believe that that sort of testimony would go

10  beyond the notice and what the Court's order was as well.

11           MS. HERR:  I will withdraw the question.

12           THE COURT:  All right.

13  BY MS. HERR:

14  Q.   Now, in your experience, I know you've mentioned this a

15  little bit, but I want to talk about it just a little bit more.

16           You mentioned that when you interview these girls,

17  some of them are very forthcoming and some of them are not so

18  much forthcoming.

19           In your experience, what is the difference between

20  why some of the girls will cooperate and some of the girls

21  won't?

22  A.   It has to do with where they are at personally at that

23  time.  They may have been doing it for a while.  They may have

24  received a few beatings.  It may not be as attractive as it

25  once sounded.

Anthony Petrulli - Direct

1          They are starting to realize that this isn't

2    everything that it was cracked up to be or what I was told it

3    was to be.  "I wasn't told about going to jail.  I wasn't told

4    about, you know, all the things that can happen to me while I

5    am out there, from diseases to -- to beatings from customers,

6    being raped, et cetera."

7          So, those -- those victims, sometimes they come in

8    and -- even though they are still out there, once they get

9    caught, they come in and are very cooperative.  They have just

10   had enough.  They are just done.  It's almost like the drug

11   addict hitting bottom and realizing, "I need help."

12         Other girls, newer girls may still be in love with

13   this guy, and it takes a while.  If we can at all, it takes a

14   while for us to develop a rapport and -- with them to where

15   they will start trusting us and opening up a little bit more.

16   Q.   Now you mentioned building a rapport.  Is that typically

17   something you can do in one session, or do you have to meet

18   with these girls multiple times?

19   A.   Well, the FBI behavioral analyst's unit actually did a

20   study on that with our type of victims.  And they found that

21   average is three -- three speaking engagements before they will

22   actually start opening up to us.  And I have found that to be

23   true.

24   Q.   What makes it so challenging to build that kind of rapport

25   and start that investigation going?

Anthony Petrulli - Direct

1   A.   Well, we are starting at a huge disadvantage.  Number one,

2   we are law enforcement, so there's already -- they are already

3   looking at us at a sideway view.

4           Number two, we -- we can't -- we don't have the

5   capability to do everything that that pimp is doing; providing

6   drugs, providing love, providing a house, providing food.  You

7   know, we just are totally building our relationships on trust.

8           And sometimes it's something as simple -- because

9   these girls that are -- that have been in the system for a

10  while, sometimes it's something as simple as, "Hey, you know

11  what?  I'm going come back and talk to you tomorrow."  And when

12  you show up tomorrow, sometimes that's enough right there.

13  She's like, "Wow.  Everybody says that, but they don't do it."

14  Q.   Now, in your experience, do these girls tend to minimize

15  at all the kind of trauma that they've experienced?

16  A.   Well, a lot of them don't even believe that they are

17  victims, you know?  They -- "Well, I chose to do this, because

18  he said we needed -- we just needed this money to help us out,

19  and we won't have to do it long.  And so I chose to do this, so

20  he didn't really make me do it."

21          You know, there's a lot of mind manipulation that

22  goes on with these -- this type of victim.

23  Q.   In your experience, how do these -- do these victims react

24  all the same way?

25  A.   No.

Anthony Petrulli – Direct

1  Q.   Is it uncommon for them to either show too little emotion

2  or maybe too much emotion?

3  A.   I have seen both.

4  Q.   Can you explain to us what some of the reasons might be

5  behind that kind of wide variance in behavior?

6  A.   I think it depends on the specific victim and where they

7  are at.  You know, a lot of these relationships are almost like

8  a domestic violence type of scenario, where -- where, you know,

9  people looking from the outside don't understand why that

10 person wouldn't leave that relationship.

11         But there's sometimes that bonding, that trauma

12 bonding or that relationship that they -- they want to leave.

13 They -- they struggle with it, and they realize that, you know,

14 this isn't good for me.  "But, God, I just love him so much."

15 But they are torn, and they have that battle going on.  So it's

16 very much like some of these domestic violence relationships.

17 Q.   Have you had experience with any situations where maybe a

18 girl has actually left the life but still stays in touch with

19 her pimp?

20 A.   That does happen on occasion.  More so those are -- those

21 are cases where is there's a huge bond, and those are the girls

22 that are very prone to falling back into the game, the

23 lifestyle.  Sometimes with even another person, but still

24 trying to maintain contact with that initial offender even

25 though he may be in prison.

Richard Leung - Direct

1  Q.   Is it difficult to get these girls to testify?

2  A.   Again, victim specific on where they are at that time in

3  their life.  Sometimes they -- they have -- they get cold feet,

4  like anybody would.  They are afraid of coming up here and

5  testifying in front of a bunch of strangers.  And those are

6  some of the battles that we face in getting these girls to talk

7  to us.

8          MS. HERR:  Thank you.  I don't have any more

9  questions.

10          THE COURT:  All right.  Cross-examination.

11          THE WITNESS:  Thank you.

12          MR. GAFFNEY:  No questions, Your Honor.

13          THE COURT:  All right.  Thank you for your time, sir.

14  You may step down.

15          THE WITNESS:  Thank you.

16          THE COURT:  All right.  Call your next witness.

17          MS. HERR:  Your Honor, we call Detective Richard

18  Leung.

19          THE COURT:  All right.

20                      RICHARD LEUNG,

21  having been duly sworn, was examined and testified as follows:

22          COURTROOM ADMINISTRATOR:  State your full name and

23  spell it for the record.

24          THE WITNESS:  Richard Leung.  That's L-E-U-N-G.

25

1                    DIRECT EXAMINATION

2     BY MS. HERR:

3     Q.    And Mr. Leung, what do you do for a living?

4     A.    I am a detective with Las Vegas Metropolitan Police

5     Department.

6     Q.    How long have you been involved in law enforcement?

7     A.    For 11 years.

8     Q.    And what is your current position?

9     A.    I currently work in the Vice and Sex Trafficking

10    Investigations Unit.  I primarily investigate children being

11    commercially sex trafficked.

12    Q.    How long have you been in that position?

13    A.    For about six years.

14    Q.    Are you also a member of a Child Exploitation Task Force?

15    A.    Yes, I am in the Child Exploitation Task Force with the

16    FBI.

17    Q.    How does that differ from or expand your role that you

18    already have with Metro?

19    A.    Well, there's only one squad that talks to girls that are

20    involved in prostitution, and there's six of us on that squad.

21    Q.    Can you describe what some of your current job duties are?

22    A.    Basically, when a juvenile is involved in prostitution, we

23    will go out.  We will respond right away, somebody from my

24    squad or myself.  And we'll investigate.  And the people that

25    we arrest are sex traffickers.

Richard Leung - Direct

1    Q.   And what kind of training have you had to get to this

2    position that you are currently in?

3    A.   I have had training with the FBI in Virginia for forensic

4    interviews.  We have also been -- attended several classes

5    throughout and just on-the-job training a lot.

6    Q.   Do you also attend either national or state conferences?

7    A.   I haven't personally attended one, but I have seen review

8    on, like, paperwork, and notes, and stuff like that that people

9    that have attended.

10   Q.   Come back and share with other members?

11   A.   Yes.

12   Q.   Now, focusing on your current experience, can you tell me

13   about how many cases you have investigated that involve child

14   trafficking?

15   A.   We average about 150 to about 170 cases a year as a team.

16   And so divide that by six.  I've -- and that's for about six

17   years that we have been investigating.

18   Q.   And I know you mentioned earlier that as part of your job

19   responsibilities, you actually go in and talk to these

20   juveniles, be they male or female.

21        Can you give us an idea of about how many of these

22   young people you've interviewed over the years?

23   A.   Probably over about 100.

24   Q.   In August of 2013, did you have an opportunity to

25   interview a girl by the name of Jasmin Madison?

Richard Leung - Direct

1    A.    Yes.

2    Q.    And do you recall how old she was at the time that you

3    interviewed her?

4    A.    15 years old.

5    Q.    Based on the interview that you conducted with her, were

6    you able to determine whether she was a victim of sex

7    trafficking?

8    A.    Yes.

9    Q.    And who did you believe was pimping her?

10   A.    Daniel Barnes.

11   Q.    Was she able to give you any sense of how long she had

12   been with Daniel?

13   A.    She said about several weeks.

14            MR. GAFFNEY:  Objection.  Hearsay.

15            THE COURT:  It is hearsay.  Out-of-court statement

16   offered for the truth of the matter asserted.

17            MS. HERR:  Understood.  It was a poorly phrased

18   question, Your Honor.  I apologize.  I will do better next

19   time.

20   Q.    As a detective with Metro, what is your role -- typical

21   role in these kinds of investigations, meaning juvenile sex

22   trafficking investigations?

23   A.    We basically serve -- we have like a multi-hat that we do.

24   We are part advocate, part counselor.  We talk to them.  Get

25   them to gain our trust, and we basically investigate

Richard Leung - Direct

1    information that leads us to certain people.

2    Q.   Once you get a statement from a girl, what actions do you

3    take to either confirm or refute the statement that you

4    received?

5    A.   We corroborate a lot of evidence that is given to us when

6    we obtain the information.

7    Q.   And can you give me an example of what you mean by

8    corroborating that evidence?

9    A.   If a person says they went to, like, a motel, we would be

10   able to get motel registration with that motel.  That would be

11   corroborating what somebody had told us.

12   Q.   Did you do that in this case involving Mr. Barnes?

13   A.   Yes.

14   Q.   I'd like you to just sort of start at the beginning of

15   that investigation and walk us through the evidence that you

16   uncovered.

17            The date of her interview, I believe, was on

18   August 26th.  Is that your recollection as well?

19   A.   August 2013.  I don't know the exact day.

20   Q.   The date -- was that the first time that you had met her?

21   A.   August 15th, I believe, is the first time that I had met

22   her.

23   Q.   Why did you meet with her multiple times?

24   A.   Because a lot of the times when the girls get arrested,

25   you know, they have a dislike for police.  And a lot of it is

Richard Leung - Direct

1   from their childhood growing up.

2           So a lot of times we'll try to build a rapport with

3   them and get them to understand where we are coming from and

4   get them to trust us, basically.

5   Q.   Can you give us some examples of things that you do to try

6   to build rapport?

7   A.   I talk to them a lot about life in general.  About their

8   past.  Just about God.

9   Q.   And typically, how long does that process take?

10  A.   It depends.  Each girl is different.  It can be one day.

11  It can be a week.  It can be two weeks.

12  Q.   I realize that in this case, your interview of Jasmin took

13  place almost two, three years ago.  Do you have any

14  recollection of about how much time you spent with her?

15  A.   Prior to doing the actual interview or just in general?

16  Q.   Uh-huh.  How long did the whole interview process take?

17  A.   That one took maybe about two weeks before we were able to

18  really -- for her to really trust me.

19  Q.   Where did the interview actually take place?

20  A.   Clark County Juvenile Hall.

21  Q.   And who was present during the interview?

22  A.   I believe it was just myself.

23  Q.   Do you remember anything about what her demeanor was like

24  during that interview?

25  A.   The very beginning or towards the end?  The first time,

Richard Leung - Direct

1   like, I met her, or are you talking, like, when I actually sat

2   down and did an interview?

3   Q.   By the time you got to this point of actually sitting down

4   and conducting an interview with her, what was her demeanor

5   like toward you?

6   A.   She was fine.  I mean, obviously, because we had spoke so

7   much before then, she basically trusted me with -- with going

8   through with the investigation.

9   Q.   There's a book in front of you, and I'd like you to take a

10  look at what's been previously marked as Government's Exhibit

11  No. 2.  And if you could just take a quick moment to identify

12  that exhibit -- or, excuse me.  Just take a look at it to see

13  if you recognize it.

14  A.   Yes.

15  Q.   Can you identify what that -- the exhibit represents?

16  A.   That's a picture of Jasmin Madison.

17          THE COURT:  What number is that?  What number is

18  this?  2?

19          MS. HERR:  Number 2.

20  Q.   Now, it's been obviously some period of time since you

21  interviewed her.  Can you tell me if the photograph accurately

22  reflects what she looked like in August of 2013 when you were

23  interviewing her?

24  A.   Yeah.  That's the picture that I physically took back in

25  August 2013.

Richard Leung - Direct

1   Q.   Based upon the dealings that you personally had with

2   Jasmin, in your opinion, did she appear to be emotionally

3   mature or emotionally immature for her age?

4   A.   She was emotionally immature for her age.

5   Q.   Can you give us some examples of what it was that you saw

6   that made you believe she was somewhat immature?

7   A.   A lot of it was her thought process.  We would go over,

8   like, the dangers of prostitution.  In the beginning, she

9   really didn't understand what the dangers were, you know, of

10  getting robbed, or raped, or catching diseases.  Stuff like

11  that.

12  Q.   Were there any behaviors that you saw in her that made you

13  think of her as being immature?

14  A.   No, it was pretty much just the demeanor.

15  Q.   Sort of this -- would it be fair to call it naiveté maybe?

16  A.   Yes.

17  Q.   Now, speaking in this sense more generally, when you have

18  someone that you suspect of being a victim of sex trafficking,

19  what types of things do you typically talk to that victim about

20  to try and get them to open up to you?

21  A.   A lot of it is just done seeing our way of why

22  prostitution is bad.  You know, when the girl comes to us, they

23  just see one thing, is this guy that helped me, you know,

24  obtain money.  And this is the way it's going go.

25          But we all know in the subculture of prostitution,

Richard Leung - Direct

1    that the money that is received is never given to the actual

2    female.  It's given to the pimp.  So we try to get them to

3    understand what the subculture is like, and that she's

4    basically is getting manipulated by a sex trafficker.

5    Q.   What was the reason that you decided to take a picture of

6    her?  Is that part of that standard protocol?

7    A.   It's standard protocol, and just so that three years or

8    four years down the road, when trial does hit, we have a

9    picture and a recollection of how she looked like back then.

10             MS. HERR:  Your Honor, I would like to move to admit

11   Exhibit No. 2.

12             THE COURT:  Any objection to Exhibit No. 2?

13             MR. GAFFNEY:  Your Honor, my only objection is I

14   don't believe the detective said that that was a fair and

15   accurate depiction of her back when he took the picture.

16             THE COURT:  I thought he did.  But is that a fair and

17   accurate depiction of her of what she looked like back then?

18             THE WITNESS:  Yes, absolutely.

19             MR. GAFFNEY:  No objection, Your Honor.

20             THE COURT:  All right.  I thought he testified to

21   that.

22             MS. HERR:  I thought I had asked the question, too,

23   but if I didn't, I will ask it again.

24             THE COURT:  Exhibit 2 will be admitted and may be

25   published to the jury.

Richard Leung - Direct

1           Understand, ladies and gentlemen, an exhibit has to

2     be authenticated before you can see it.  By publishing, that's

3     not like a book.  That means you can see it.  So that's a legal

4     term for publish.  So now you can see the exhibit, and

5     Exhibit 2 is admitted and published.

6           (Exhibit 2 admitted.)

7     BY MS. HERR:

8     Q.   And then this picture that we're showing to the jury, this

9     is the same picture that you are talking about having taken of

10    the victim?

11    A.   Yes.

12    Q.   Thank you.  Now, during the course of your investigation,

13    did you discover that there had been evidence that had been

14    removed from Jasmin and taken into police custody?

15    A.   Yes.  Back in May, she was arrested for prostitution, so I

16    know she had a prior case.  And then when I had spoken to her,

17    she told me that she had a prior case.  So that's when I

18    started reviewing information from back in May, too.

19    Q.   At some point, did you obtain those items out of evidence?

20    A.   Yes.

21           MS. HERR:  I apologize, Your Honor.  I didn't realize

22    I didn't have these up here with me.

23           THE COURT:  I'm sorry.  I can't hear you.  You need

24    to be by a microphone.

25           MS. HERR:  May I approach the witness to show him

Richard Leung - Direct

1    this exhibit, Your Honor?

2                THE COURT:  Yes, ma'am.

3    BY MS. HERR:

4    Q.   Detective, I'm handing you what's been marked as

5    Government Exhibit No. 4.

6    A.   Yes.

7    Q.   Can you tell me if you recognize that exhibit?

8    A.   Yes.

9    Q.   And what does that exhibit purport to contain?

10   A.   A condom, two room keys, and three receipts.

11   Q.   How do you recognize the exhibit?

12   A.   I'm sorry.  Can you -- can you ask that differently?

13   Q.   You indicated that you recognize it.  How do you recognize

14   it?

15   A.   Oh, it's through our evidence label, and it's our evidence

16   envelope.  And the person that impounded it works on my squad.

17   Q.   And when you collected it out, did you have to make some

18   sort of notation in that chain?

19   A.   Yes.

20   Q.   And is your signature then showing also on that evidence

21   log?

22   A.   The signature is not shown.  My signature is not on there,

23   no, because I didn't open it.  But once we open it, we have to

24   have a chain of who actually opened the actual envelope.

25   Q.   Was the envelope opened, at some point, in your presence?

Richard Leung - Direct

1    A.   No, it has never been opened since the original person has

2    impounded the evidence.

3    Q.   And at some point, were you given photocopies of items

4    that had been originally impounded?

5    A.   Yes.  Basically, my partner that works on my squad

6    photographed -- made a copy of all the evidence that was

7    actually in here, and then left it into his case folder.

8    Q.   Did you discuss those items with Jasmin?

9    A.   Yes.

10   Q.   Was she able to identify those items as being hers?

11          MR. GAFFNEY:  Objection.  Calls for hearsay.

12          MS. HERR:  You are correct.  Your Honor, I withdraw

13   the question.

14   BY MS. HERR:

15   Q.   Also handing you what's been marked as Exhibit No. 5.

16   A.   Okay.

17   Q.   Do you recognize that exhibit?

18   A.   Yes.

19   Q.   And again, I will ask the same question.  How do you

20   recognize the exhibit?

21   A.   The same thing.  It's our envelopes that we use and our

22   evidence label that we use for work.

23   Q.   Now, in the case of Exhibit No. 5, it appears that

24   envelope has been opened.

25   A.   Yes.

1   Q.   Were you the person who removed the item from the

2   envelope?

3   A.   I was the first person after it was originally impounded

4   to open the envelope.  Yes.

5   Q.   And how can you tell that it is any specific phone as

6   opposed to any phone that might have been turned into evidence?

7   A.    It gives me an event number that categorizes to that

8   specific event that's coordinated when you first open the case.

9   And then also, the serial number that was listed on there.

10  Q.   Now, these two items, Exhibit 4 and Exhibit 5, are they in

11  substantially the same condition as they were when you first

12  saw them in 2013?

13  A.   With Exhibit 5, there were more seals than which I

14  originally have seen.  That was with FBI Agent James Mollica

15  that had opened it after me.

16  Q.   Aside from whatever information may or may not be on that

17  phone, is there anything significant about the fact that a

18  juvenile girl was arrested with a phone, condoms, and hotel

19  keys?

20  A.   That's actually pretty common.  Based on my experience of

21  investigating these types of cases, it's very common that a

22  juvenile only has a phone and condoms.  A phone to communicate

23  with her sex trafficker and condoms to use for prostitution

24  activity.

25  Q.   What would be the significance of the hotel keys?

1    A.   When you have multiple hotel keys, it just kind of shows

2    the person being very transient.  That they go from hotel to

3    hotel, which is very common in the prostitution world.

4    Q.   And with regard specifically to this phone, did you obtain

5    permission to search the phone?

6    A.   Yes.  I got a written consent from Jasmin to allow us to

7    go into the phone.

8    Q.   If you could look at the book in front of you, you should

9    see Exhibit No. 6.

10   A.   Yes.

11   Q.   And can you take just a quick moment to look at that

12   exhibit and then tell me whether you recognize it?

13   A.   Yes, I recognize it.

14   Q.   And what do you recognize that exhibit to be?

15   A.   It's a consent to search card that I had Jasmin sign.

16   Q.   Is that a standard document that you typically use in your

17   investigations?

18   A.   Yes, we use it.  This is our consent to search card.  So

19   every time we get consent, we can do verbal or written, and

20   this time we just had a written.

21   Q.   Is this a true and accurate copy of the original consent

22   form that you had signed by Jasmin?

23   A.   Yes.

24   Q.   Why do you have her sign a consent form as opposed to just

25   having her verbally tell you it's okay?

Richard Leung - Direct

1   A.   It kind of depends on the situation.  But because this

2   happened so much at a later period, we just wanted to be

3   completely -- make sure that she was aware of what she was

4   consenting to and stuff like that.

5   Q.   Can you tell me the circumstances under which you talked

6   to her about this or you sought her permission?  Were there

7   other people present?  Were you by yourselves?  What were the

8   circumstances?

9   A.   I was by myself.

10  Q.   And I note that there is -- there are some initials at the

11  bottom of the page that appear to be a witness.  Can you

12  identify whose initials those are?

13  A.   That's mine.

14        MS. HERR:  Your Honor, I would move for admission of

15  Exhibit 6.  I am going to ask to publish that.

16        THE COURT:  Any objection to Exhibit 6?

17        MR. GAFFNEY:  Your Honor, our objection would be that

18  the detective is only able to authenticate it as to his

19  signature.  Not able to authenticate it as to the other

20  signature that's on the card, which is supposedly the victim.

21        She would have to come in and say, "This is my

22  signature on the card."  So on that basis, we would object.

23        THE COURT:  But I thought you testified she signed

24  this in your presence?

25        THE WITNESS:  Yes, she signed it in my presence.

Richard Leung - Direct

 1          THE COURT:  All right.  Objection overruled.  It will

 2  be admitted and may be published.

 3      (Exhibit 6 admitted.)

 4  BY MS. HERR:

 5  Q.  Looking specifically at this exhibit, who filled out the

 6  consent to search card?

 7  A.  I did.

 8  Q.  And is that your handwriting on the first line where her

 9  name is listed?

10  A.  Yeah.  Everywhere is basically my writing.  And then my

11  signature is on the bottom right.  On the bottom left, that's

12  Jasmin's signature.

13  Q.  Okay.

14          THE COURT:  Was the jury able to see that?

15          MS. HERR:  I apologize.  Did I move that too quickly?

16          THE COURT:  Just be careful.  That's all.  Is

17  everybody finished reading it?  All right.

18          LAW CLERK:  Your Honor, the very first screen here is

19  still black.  The rest of them are fine.

20          THE COURT:  Turn it off and on and see if that works.

21          LAW CLERK:  Not showing anything.

22          COURTROOM ADMINISTRATOR:  I will get Shawn up.

23          MS. HERR:  Your Honor, would it be easier if I -- I

24  could pass this around to the jury or --

25          THE COURT:  Just the first two.  I mean, so they can

Richard Leung - Direct

1   read it.  Just hold it up for them.  Go over and stand up in
2   front of them so they can read it.
3          The nice thing about the technology when it works, is
4   that everybody can see it at the same time.  We don't have to
5   say, "Okay.  Pass this around."
6          In the old days, we had to pass that around.  And the
7   judge would say, "Keep moving.  Keep moving.  Ask another
8   question."  And the jury would say, "Wait.  I am trying to read
9   this."  So this is a much better system.
10          All right?  So it's been published.
11   BY MS. HERR:
12   Q.   Now, after obtaining Jasmin's consent, what did you do
13   with the phone?
14   A.   I began to review it.
15   Q.   And how did you go about doing that?
16   A.   Just turned it on.  Began reviewing the text messages that
17   were contained inside the phone.
18   Q.   Did you, at any point, attempt to run a Cellebrite report?
19   A.   Yes.
20   Q.   And can you explain to the jury what Cellebrite is?
21   A.   Cellebrite is basically a machine that we use to be able
22   to make it into a more readable format on a cell phone.  Kind
23   of like if you go to AT&T Mobile, they use something similar to
24   it.
25          Basically, you have a device, and you have the phone

1   plugged in to one end, and you have the thumb drive plugged

2   into the next.  The phone basically automatically researches

3   what type of phone it is.  And you just select which stuff you

4   want downloaded.  For example, like text messages or phone

5   contacts, and it basically spits it out on the other end into a

6   thumb drive PDF format so it's easier for us to read.

7   Q.   And have you received any training on how to use

8   Cellebrite?

9   A.   Yes.

10  Q.   And when did you receive that training?

11  A.   I received it through Cellebrite.  I don't know the exact

12  date of when I received it though.

13  Q.   Can you give me a ballpark?  Like, has it been the last

14  five years, the last 10 years?

15  A.   Yeah.  It's about the last five years give or take.

16  Q.   Can you give me an approximate number of times that you've

17  used Cellebrite?

18  A.   Probably over about a hundred.

19  Q.   And have you generally found it to be reliable?

20  A.   Yes.

21  Q.   Now, in this particular case, when you used the Cellebrite

22  on this phone, were you able to download messages?

23  A.   No, I was not.

24  Q.   And why was that?

25  A.   It didn't allow me to.  It gives you options of what you

1  can and cannot download.  And on this particular text messages

2  on that phone, I wasn't able to download them.  It didn't give

3  me the option basically.

4  Q.   Okay.  And what would be some reasons why you wouldn't be

5  able to download that kind of information?

6  A.   Generally, if it's an older phone, it doesn't allow it.

7  Q.   I'd like you to flip to Exhibit 21.

8  A.   There's no 21.

9        Oh, I'm sorry.  I see it.  I just -- there is no tab

10  on it.

11  Q.   I apologize.  I don't think there is tab on it.  Were you

12  able to find it?

13  A.   Yes.

14  Q.   And can you take a few moments to look at that and tell me

15  what it is?

16  A.   Yeah.  It's a Cellebrite report that it comes out in.

17  Q.   And was this the report that you actually prepared?

18  A.   Yes.

19  Q.   Anyone else who assisted you with that report?

20  A.   No.

21  Q.   What kinds of information does a Cellebrite report

22  typically give you?

23  A.   Phone contacts, call logs, sometimes text messages, and

24  like pictures, videos, ring tones.  That's about it.

25  Q.   And looking specifically at Government Exhibit No. 21, you

Richard Leung - Direct

1   have indicated that you recognize it, and this was, in fact,

2   the report that you ran.

3           Is this copy that's been presented today a true and

4   accurate copy of that report that you did back in 2013?

5   A.   Yes.

6           MS. HERR:  Your Honor, we would move to enter

7   Exhibit 21 into evidence.

8           THE COURT:  Any objection?

9           MR. GAFFNEY:  No, Your Honor.

10          THE COURT:  Thank you.  Same will be admitted and may

11  be published.

12      (Exhibit 21 admitted.)

13          MS. HERR:  Thank you, Your Honor.

14          THE COURT:  Yes, ma'am.

15  BY MS. HERR:

16  Q.   I'm going to start here just at page 1.  And if you could

17  just briefly sort of explain to the jury what we are seeing and

18  what the significance is of some of this information?

19          THE COURT:  Can you look on somebody else's.  Maybe

20  look over somebody else's shoulder?

21  BY MS. HERR:

22  Q.   Now when we looked --

23          THE COURT:  Wait just a second.  David, go ahead and

24  bring the screen down, and we will use that.

25          I'm sorry.  It's just not as clear.  The screen in

Richard Leung - Direct

1    front of you is clear.  That's why we prefer that.

2              We will take a break in a few minutes, and we'll see

3    if we can get the IT people to correct that.

4              Did you try turning this off and on?

5              LAW CLERK:  We turned it on and off on a number of

6    times, Your Honor.  It must be on the wrong setting or

7    something, but --

8              THE COURT:  Okay.  All right.  Here it is now.  You

9    can see it.  It's up on the screen.  And you can see why I love

10   the screen.

11   BY MS. HERR:

12   Q.   All right.  When we look at this top section that's

13   entitled "phone examination report properties," can you tell me

14   basically what's the important information that you would want

15   us to see out of this?

16   A.   Basically gives you the -- the model and the manufacturer

17   and when it was basically downloaded.

18   Q.   And the information that it gives you about the make and

19   the model, did you match that up to the physical phone to make

20   sure that it accurately and appropriately identified what kind

21   of phone was attached to it?

22   A.   Yes.

23   Q.   And when it has the phone, date, and time, is that the

24   actual date and time that you conducted the examination?

25   A.   Yes, it was the date and time when I downloaded it.

Richard Leung - Direct

1    Q.   Okay.  Now, in this case, we did not make a copy of the

2    entirety of the report; is that correct?

3    A.   Yes.  This one is just the phone contacts.

4    Q.   And specifically looking at the phone contacts, what was

5    it in phone contacts that drew your attention?

6    A.   After reviewing the text messages, there were two phone

7    numbers that were obviously in question.  One of which is "YD,"

8    and the other one was Christy.

9    Q.   And YD is listed as number 14, which is actually on page 2

10   of 4?

11   A.   Correct.

12   Q.   And what number did you find associated with YD?

13   A.   (209)354-0792.

14   Q.   And then looking at the number Christy, is that the same

15   entry that's listed as entry number 15 at the top of page 3 of

16   4?

17   A.   Yes.

18   Q.   And what number did you find associated with Christy?

19   A.   (209)354-6449.

20        (Ms. Herr displaying exhibit to jurors.)

21   BY MS. HERR:

22   Q.   Concentrating for just a moment on this information that

23   you found about the contacts, can you tell me what you did with

24   this information?  With these two telephone numbers?

25   A.   Yes.  I basically ran them through Google.  I just did

Richard Leung - Direct

1    a -- you enter the number into Google Search, and then it pops

2    up anything that's related to those specific numbers.

3    Q.    And in this case, what kind of information did you find

4    when you ran the number associated with Christy?

5    A.    I found a prostitution advertisement of our victim Jasmin

6    Madison.

7    Q.    And when you ran the number that was associated with YD,

8    where did that lead?

9    A.    To also a prostitution advertisement with an unknown black

10   female that was on there.

11   Q.    And I know I cut you off a little bit earlier.  You

12   mentioned that you had started to look for messages.  And

13   because you couldn't find those messages, you looked for them a

14   different way.

15          Can you explain that process?  How did you actually

16   get messages off of the phone?

17   A.    I never lost any messages.  I am not sure exactly how you

18   phrased it, but I never not pound any messages.  I found the

19   messages.  I just couldn't select it to download to the

20   Cellebrite.

21   Q.    Okay.  Thank you for that correction.

22   A.    But in terms of finding the messages, I just basically

23   went into messages on the settings, you know.  And you are able

24   to pull up all the text messages that are listed.

25   Q.    So if you can go through that with us step-by-step.  Did

Richard Leung - Direct

1   you see the messages first, and then attempt to download them,

2   or did you find the message in the context of trying to do the

3   download?

4   A.   Well, once I wasn't able to download it, being that it

5   didn't allow me to, I just went into the physical phone itself

6   and looked for the messages.

7   Q.   If you could look at what's been marked as Government

8   Exhibit No. 7 in front of you.

9   A.   Yes.

10  Q.   Can you take a few minutes to look at that and see if you

11  recognize it?

12  A.   Yes.

13          THE COURT:   Is this a good stopping place for a

14  break?

15          MS. HERR:   Yes, Your Honor.

16          THE COURT:   We have been at it for an hour and half

17  now, so as I told you this morning, I don't believe in running

18  marathon sessions.   So let's take a break now.

19          During this recess, I again admonish you not to

20  discuss this case among yourselves or with anyone else, not to

21  listen to, read, or watch any report of or commentary on the

22  trial by any person connected with the trial or by any medium

23  of information, including without limitation newspaper,

24  television, radio or the Internet.

25          And you are not to form or express an opinion on any

Richard Leung - Direct

1   subject connected with this case until it's finally submitted

2   to you under instructions from me for your deliberations.

3           So we will be in recess, let's say, for 10 minutes.

4   You can leave your notebooks in the chair right there.  Yeah.

5   That will be good.

6           (Recess 2:43 p.m.  Resumed 2:57 p.m.  Jury out.)

7           THE COURT:  All right.  Thank you.  You may be

8   seated.  In session outside the presence of the jury.

9           You had something, Mr. Gaffney?

10          MR. GAFFNEY:  Yes, Your Honor.  This is in reference

11  to Government's Exhibit No. 7.  Before we took a recess, they

12  were starting to kind of get into the -- laying the foundation

13  to bring, I think, these text messages in.

14          And these text messages consist of communications

15  allegedly between Mr. Barnes, which essentially could

16  potentially come in as an admission, but they also contain

17  communications with the victim.

18          And it's our position that these are hearsay.  They

19  are out-of-court statements.  They are going to be asserted for

20  the truth of the matter.  And so we would object to bringing

21  these in through --

22          THE COURT:  You said -- what is the truth of the

23  matter?

24          MR. GAFFNEY:  Well, that if you start looking through

25  the text messages, she says things like, "I'm bleeding heavy."

1    Meaning that she was on her period when she was out

2    prostituting, and she actually corroborates that in a later

3    statement.

4             THE COURT:  I mean, how is that -- is it being

5    offered to prove that she was menstruating?  I mean, if she was

6    a young woman, I assume she was.

7             MR. GAFFNEY:  Well, it's going to be offered to

8    prove --

9             THE COURT:  I mean, I don't want to be graphic, but

10   you understand that -- so, it's halfway hearsay.

11            MR. GAFFNEY:  Right.  And --

12            THE COURT:  And Mr. Oronoz has had this problem with

13   me before.  I shouldn't put it that way.  I should say he's

14   experienced my definition of hearsay.  I'm a simpleton.

15            And so hearsay is an out-of-court-statement, which

16   this is, offered to prove the truth of the matter asserted.

17   Now, if it's being offered to prove the truth of the matter

18   that she was menstruating, then you may have something.  But

19   this is her statement, but it's --

20            MS. HERR:  Your Honor, at this point, I don't believe

21   the evidence will be offered in a manner that would be

22   violative of hearsay rules.

23            I am simply asking what my officer found and the

24   process by which he found it.

25            THE COURT:  All right.  But again, if you are saying

1  it's hearsay, you can make that objection in front of jury.

2  And I am not trying to cut you off at all.  But to me, it's not

3  hearsay.

4        MR. GAFFNEY:  Okay.

5        THE COURT:  And I will be glad to read the rule if

6  anybody says, "Boy, is this guy a dope."

7        MR. GAFFNEY:  And there's text messages --

8        THE COURT:  I mean, you are entitled to your opinion,

9  so God bless you.  You are entitled to think I'm a dope, and

10  I'm -- my feelings are not hurt.  That's why I get the big

11  bucks.  But --

12        MR. GAFFNEY:  And --

13        THE COURT:  But I also believe the rules mean what

14  the rules say.  You know as well as I know.  I can read it to

15  you.  We all went to law school.

16        You know, "offered to prove -- an out-of-court

17  statement," which this is, "offered to prove the truth of the

18  matter asserted."

19        And the simplest thing I always come up with is, "Is

20  it raining -- was it raining outside, Mr. Witness?"  And he

21  says, "Yes.

22        "How do you know?

23        "Well, Judge Mahan told me."

24        MR. GAFFNEY:  Sure.

25        THE COURT:  That's hearsay.  You don't know whether

Richard Leung - Direct

1    it was raining.  He doesn't know whether it was raining or not.

2              And so if you are offering it -- again, if you are

3    offering it to prove that she was having her period, you know,

4    it's hearsay.  But it's not being offered for that purpose, so

5    it's -- it's not hearsay.

6              MR. GAFFNEY:  And I'm just -- and I wanted to make

7    this record outside of the presence just because of the nature

8    of the things we are talking about.

9              THE COURT:  Which is fine.  That's fine.  I don't

10   have any problem with it.

11             MR. GAFFNEY:  And there are text messages that she's

12   talking about getting money and things other than the

13   menstruating.  That was just one example.  But I guess we can

14   deal with them as we --

15             THE COURT:  Well, again, you know, she got money.

16   And, I mean, you can argue that there is no -- it's just --

17   it's like I tell you.  "Do you know how much money I made?  I

18   hit the Keno ticket at breakfast this morning at the Golden

19   Nugget and won $40 million," or whatever.

20             I mean, so, "Okay.  If you say so."

21             MR. GAFFNEY:  I understand, Your Honor.

22             THE COURT:  You understand?  So it may be somebody

23   simply bragging.  "Look at all the money I won."

24             "Okay.  Good for you."

25             MR. GAFFNEY:  And no problem.  I just wanted to make

1   a record on that.

2           THE COURT:  And understand, I'm talking about

3   something in the blind.  So maybe I will look at the message

4   and say, "Now, wait.  This is -- this crosses the line

5   somehow."  I don't know.  But based on what's presented to me

6   so far, I've got to say it's not hearsay.  All right?

7           MR. GAFFNEY:  Okay.  Thank you, Judge.

8           THE COURT:  Why don't you show jury in.

9           LAW CLERK:  Yes, Your Honor.

10      (Jury in.)

11          THE COURT:  All right.  Thank you.  Do the parties

12  stipulate to the presence of the jury and the alternates?

13          MS. SILVA:  Yes, Your Honor.

14          MR. ORONOZ:  Yes, Your Honor.

15          THE COURT:  Thank you.  Okay.  Now you may resume

16  your examination.

17  BY MS. HERR:

18  Q.   Detective, I think I had just handed you or had you take a

19  look at Exhibit No. 7.

20  A.   Yes.

21  Q.   And did you have an opportunity to review that exhibit?

22  A.   Yes.

23  Q.   Can you identify the exhibit?

24  A.   These are the pictures that I took on Jasmin's cell phone.

25  Q.   Can you explain what you mean by you took pictures on her

Richard Leung - Direct

1    cell phone?  How did you -- how did that process work?

2    A.   I basically had the phone on, and I took a digital camera

3    and physically took pictures of each message.  Some of them,

4    because the message was so long, it had to be in -- it was too

5    big for the screen, but I had to take it in two separate ways.

6    That's why there's two photos in one.

7    Q.   During this process of photographing the messages, did you

8    modify or change any of the settings on the phone or modify the

9    messages themselves in any way?

10   A.   Absolutely not.

11   Q.   And I know you indicated earlier that you attempted to

12   conduct some type of forensic review.  And am I correct in

13   summarizing that you were unable to do so because of the age of

14   the phone?

15   A.   Well, I didn't do any forensic -- forensic review.  All I

16   did was basically just attempt to download the phone, so it's

17   in the more readable format.  But because the selection of the

18   text messages weren't able to -- I wasn't able to select it,

19   therefore I just took pictures of it instead.

20   Q.   Looking specifically at Exhibit No. 7, pages 1 through 17,

21   do the photographs that are represented there fairly and

22   accurately represent the messages that you found on the phone

23   back in August of 2013?

24   A.   Yes.

25             MS. HERR:  Your Honor, I would move to place Exhibit

Richard Leung - Direct

1  No. 7 in evidence.

2            THE COURT:  Any objection?

3            MR. GAFFNEY:  Just subject to our earlier objection,

4  Judge.

5            THE COURT:  All right.  Overruled, and it will be

6  admitted then.

7         (Exhibit 7 admitted.)

8            MS. HERR:  And can we publish that to the jury, Your

9  Honor?

10            THE COURT:  Now, did we get the screen fixed over

11  here?  That's good.  What did you hear?

12            COURTROOM ADMINISTRATOR:  Nothing.

13            THE COURT:  Did you get ahold of anybody?

14            COURTROOM ADMINISTRATOR:  No.

15            THE COURT:  That's terrific.  Okay.  We have got it

16  on the movie screen here.

17            For the record, is there any way you can kill the

18  lights on that side, David, to make the screen --

19            COURTROOM ADMINISTRATOR:  Is that too much?

20            THE COURT:  That's better, if we can do that.  Just

21  while we have got stuff up on the screen, if you can do that.

22  Is that agreeable with everybody?

23            Okay.  I'm sorry, Miss Herr.

24  BY MS. HERR:

25  Q.   Certainly.  Looking first at page 1 of 17, the telephone

Richard Leung - Direct

1  number that is listed there, this 236-3079, where does that

2  telephone number fit into your investigation?

3  A.   That's Jasmin's phone number.

4  Q.   And how did you obtain her telephone number?

5  A.   Through the phone itself.

6         THE COURT:  This looks like one photo on top, and

7  then like two photos on a page; right?

8         THE WITNESS:  Yes.  It's two photos on a page.

9         THE COURT:  And then is it the same -- same message?

10        THE WITNESS:  It's the same message, but because the

11 screen was so small, I had to do it --

12        THE COURT:  You had to blow it up.

13        THE WITNESS:  I had to take a picture of one, scroll

14 down to that same message, and then take a picture again.

15        THE COURT:  So the top screen -- for the jury, the

16 top screen is the message that appeared on the phone; correct?

17        THE WITNESS:  Correct.

18        THE COURT:  And then you enhanced it?  Is that a fair

19 statement?

20        THE WITNESS:  No, I scroll down.

21        THE COURT:  Just scroll down.

22        THE WITNESS:  And then to get the bottom part of the

23 text message --

24        THE COURT:  All right.

25        THE WITNESS:  -- because it didn't fit on the entire

Richard Leung - Direct

1    screen.

2              THE COURT:  Oh, I see.  It's just the bottom part.

3    So the important part of the message, ladies and gentlemen, is

4    that a fair statement?

5              THE WITNESS:  Would be on top.

6              THE COURT:  Okay.  Just so you can see.  All right.

7    Go ahead now.  I'm sorry.

8              Now, are these pages numbered at all?

9              MS. HERR:  Yes, Your Honor.  There should be numbers

10   at the bottom.  I apologize.  It's 2 of 17.

11             THE COURT:  I don't care as long as it's there, so

12   that you say page 2, and so the record is clear, we know --

13   okay.  Page 2 it is.  It's numbered page 2.  That's all.  So

14   that's fine.  And you don't need to show us that.  We will take

15   your representation.

16             Go ahead now.

17   BY MS. HERR:

18   Q.   Were you able to gain any investigative value out of the

19   dates that are shown on the telephone calls?

20   A.   Yes.

21   Q.   How are they helpful to you?

22   A.   It gives me a timeline of when the incidents occurred.

23   Q.   I'm looking specifically at page 3 of 17.  And the date,

24   can you read the date into the record when this message was

25   received?

Richard Leung - Direct

1              THE COURT:  It speaks for itself.  It's in evidence.

2  So it's April 30th; right?

3              MS. HERR:  Yes, Your Honor.

4              THE COURT:  And it speaks for itself.

5  BY MS. HERR:

6  Q.   And as to page 4 of 17, can you just generally go through

7  those pages and let me know what you found to be significant of

8  the information that you were able to take photos of?

9              THE COURT:  If you would, pull that down a little

10  bit, too, so we can see all of the first message.

11              Okay.  Thank you.  So that way we get to see both --

12  both images.  All right.  Go ahead.  I'm sorry.

13              THE WITNESS:  On page 4 of 17, she puts, "IDK,

14  Daddy."  Meaning, "I don't know, Daddy."  Daddy is a very

15  common term used in the prostitution subculture to refer to a

16  pimp.  On page 5 of 17 --

17              MR. ORONOZ:  Your Honor.

18              THE COURT:  Yes.

19              MR. ORONOZ:  I am sorry to interrupt.  Your Honor,

20  again, we would object.  And if we could have a continuing

21  objection to any screenshot that is attributed to the

22  out-of-court declarant.

23              THE COURT:  That's attributed to what?

24              MR. ORONOZ:  To the -- to what the detective is

25  representing would be coming from Jasmin as hearsay.  We would

Richard Leung - Direct

1     just like a continuing objection.

2           THE COURT: Oh, you want a continuing hearsay

3     objection. These -- you are saying that this is coming from

4     Jasmin.

5           MR. ORONOZ: Correct.

6           THE COURT: All right.

7           MR. ORONOZ: Thank you.

8           THE COURT: All right. You will have that objection.

9           Now, go ahead.

10           THE WITNESS: So page 5 of 17, it reads, "Ol girl

11     kinda flakie. Get my room money back and we out."

12           Page 6 of 17, it says, "letts get it." That's a very

13     common in terms of the prostitution subculture, just for

14     motivation purposes, to try to get the girls to get more money.

15           Page 7 of 17, "I am startin' to blood tho my close,

16     Daddy." Still referring to Daddy as a pimp.

17           On page 8 out of 17, "Don't worry. He a tirk." I

18     think she --

19           MR. GAFFNEY: Your Honor, speculation.

20           THE COURT: I'm sorry?

21           MR. GAFFNEY: I believe the detective is about to

22     speculate as to what this message means.

23     BY MS. HERR:

24     Q. Based on your training and experience, is there a term

25     that is typically used when you are talking about a customer as

Richard Leung - Direct

1    a "trick"?

2    A.   Yes.  All the time.  It's used very commonly.

3    Q.   Based on your experience and your training, about how many

4    of these phone messages do you typically have to look at in the

5    course of a month or a year?

6    A.   A lot.  I can't even count.

7    Q.   And is it typical or not typical to see misspellings

8    within the context of things that you find on phones?

9    A.   Yes, it is very typical.

10   Q.   Okay.  Moving on to page number 9.

11   A.   Nine of 17.  "Hey, I real went to get some money, but I am

12   not feeling gud at all, Daddy."

13        Page 10 of 17, "Tuff it out.  We need to touch the

14   room and gasdoe back.  Then we out."

15   Q.   And is there anything about the language of a response

16   that would say "tough it out" that would, to you, be indicative

17   at all of a prostitution relationship versus maybe a

18   girlfriend/boyfriend relationship or just a friendly

19   relationship?

20   A.   Well, just from reading the messages prior, it shows that

21   she was on her period.  So he's basically telling her to tough

22   it out, and they need to make enough money for the room and

23   gas.  And then they can leave afterwards and go somewhere else.

24   Q.   And in your experience, is it typical that a prostitute

25   would need to ask permission from a pimp in order to leave an

Richard Leung – Direct

1  area where she's working?

2  A.   Yes.  Everything is done through the pimp.  They control

3  pretty much everything from where to work, where to live, and

4  the prices.

5  Q.   Moving on now to page 11 of 17.

6  A.   Eleven of 17 says "The pigs is out hot."

7  Q.   And in your experience, again, as a detective

8  investigating these types of cases, references to "pigs"

9  usually refer to what?

10 A.   Police officers.

11 Q.   And is it again typical or atypical that someone working

12 as a prostitute would be trying to dodge or not be picked up by

13 the police?

14 A.   Yes.  And in general, too, it's very typical that they

15 constantly communicate this way just so that they know what's

16 happening between the two.

17         Page 12 of 17 basically says, "Duck'em."  So he's

18 telling her "duck'em."

19         Page 13 of 17, he sends her, "Let's get hoeing."

20 Basically, the term "hoeing" is for prostitution.

21         Page 14 of 17 is from a contact name of Christy.  And

22 Jasmin sends to her, "Hey look.  I am not leavin'.  I jut need

23 time to my self.  Please don't get mad.  But is it okay with

24 y'all if I get my things?"

25         Page 15 is just a bottom half of the page 14

Richard Leung - Direct

1  previous.  Because I wasn't able to get a full picture of the

2  bottom of the text message because the screen was so small, I

3  had to make it into three pictures.

4          Page 16 of 17, the phone contact, Christy.  The text

5  is, "Jasmin, how's it hittin'?"

6          And page 17 of 17, the phone contact YD writes to

7  Jasmin, "I take it you're non-receptive to game, so we out."

8  And the term "game" is a common street terminology used in the

9  prostitution subculture to refer to the actual prostitution

10 being done.

11 Q.   Can you tell us overall the dates that are encompassed by

12 these text messages?

13 A.   Yeah.  It started off from April 30th -- or, I'm sorry,

14 April 28th on to May 6.

15 Q.   And were those dates helpful at all in furthering your

16 investigation?

17 A.   Yes.

18 Q.   And in what way were they helpful?

19 A.   Again, it gives me a timeline of probably when they first

20 met, right around that same time frame, to when it ended.

21 Q.   And I know earlier we talked also about these two

22 telephone numbers that you found within contacts.  I want to go

23 back and talk about that a little bit and follow up with that.

24          Can you tell me, starting first with the number that

25 was assigned to this contact named Christy -- tell me what

Richard Leung - Direct

1   actions you took?

2   A.   I ran that phone number through our Google search engine,

3   and it basically gives you possibility ads.  Like if you've

4   ever looked it up through Google when you type in anything.

5   And with that specific phone number, it returned back to

6   several "myRedBook" prostitution advertisements.

7   Q.   And is this a typical step that you would take in all the

8   investigations that you do?

9   A.   Yes.

10  Q.   What is myRedBook?

11  A.   MyRedBook is a website used by pimps and prostitutes to

12  advertise their prostitution activities online basically.

13  Q.   Is that site still functioning?

14  A.   No, not anymore.

15  Q.   Did you specifically pick out myRedBook to run the

16  telephone number in, or did you just run a more generic search?

17  A.   I ran a more generic search through Google, and Google

18  will find possibilities within that phone number.

19  Q.   Do you have a personal recollection of the ad that you

20  found?

21  A.   Yes.

22  Q.   Was the ad typical of the kinds of ads that you would see

23  on myRedBook?

24  A.   Yes, they are pretty much fairly all the same.

25  Q.   Did the ad contain photos of Jasmin?

Richard Leung - Direct

1    A.   Yes, it did.

2    Q.   How positive are you that the photos are, in fact,

3    actually Jasmin?

4    A.   100 percent.

5    Q.   How are you able to make that determination?

6    A.   I recognize her in the actual photo.

7    Q.   Once you identified the ad, what did you do with it?

8    A.   With Christy's phone contact?

9    Q.   No.  Specifically, you find this ad -- wink on Google to

10   this ad.  You, as I understand it, went out, found the ad.  Did

11   you preserve it in any way?

12   A.   Well, there's really nothing to preserve.  So I'm not

13   understanding your question.

14   Q.   Did you print it out?

15   A.   Oh, yes.  I printed it out.  I'm sorry.

16   Q.   Okay.  If you look at the book in front of you to what's

17   been marked as Government Exhibit No. 8?  And can you take a

18   moment to review that particular exhibit?

19   A.   Yes.

20   Q.   And can you tell me if you recognize it?

21   A.   Yes, I do.

22   Q.   What do you recognize it to be?

23   A.   A prostitution advertisement of our victim, Jasmin

24   Madison.

25   Q.   Is this the same ad that you printed out?

Richard Leung - Direct

1   A.   Yes.

2   Q.   How can you recognize it as being the same ad?

3   A.   Because I'm the one that printed it out.

4   Q.   I'm sorry.  Say that again?

5   A.   I'm the one that printed it out.

6   Q.   Okay.  Is it -- does the printout that you have there

7   accurately depict the ad that you actually saw on the Internet?

8   A.   Yes.

9   Q.   Are there particular markers on it that you are able to

10  identify in any kind of a special way that you were the person

11  who printed it out, or are you doing that based on your

12  recollection of the ad?

13  A.   I'm doing it based on my recollection of the ad.

14          MS. HERR:  Your Honor, I would move to enter into

15  evidence Exhibit No. 8.

16          THE COURT:  Any objection to Exhibit 8?

17          MR. GAFFNEY:  No objections, Your Honor.

18          THE COURT:  All right.  It will be admitted and may

19  be published.

20       (Exhibit 8 admitted.)

21          MS. HERR:  Your Honor, these are images that do

22  contain child pornography.

23          So these are images that are, in fact, child

24  pornography or we are alleging are child pornography.  Because

25  of that, there's only one set of images.  I would like to get

1    those from the witness, and I will publish them briefly.

2             There are only, I believe, four images.  So we won't

3    put them on for more than a few seconds.

4             THE COURT:  All right.

5    BY MS. HERR:

6    Q.   Initially, I want to block the images and just concentrate

7    a little bit on what this ad says.

8             Can you explain to me, looking specifically at the

9    phone number that's listed on line 3, how is that relevant to

10   your investigation?

11   A.   That's the same phone number as the contact "Christy" on

12   Jasmin's phone.

13   Q.   And looking specifically at the text down towards the

14   bottom of the page, was there any information, within the

15   context -- within the body of that text that became relevant to

16   your investigation?

17   A.   Yeah.  It shows that the female is from Las Vegas, and

18   there's also a moniker of Christina Snow on there.

19   Q.   And I want to look up a little bit higher.  And there's

20   some verbiage that appears to have the number 60 and a dollar

21   sign.  "Special GFE Greek BB."  Can you tell me what that

22   means?

23   A.   Yeah, the GFE is "girlfriend experience," which includes

24   like kissing and things like that.  "Greek" is anal sex, and

25   "BB" is bareback, so no condoms.

Richard Leung - Direct

1   Q.   And what is the date that's associated with that ad?

2   A.   It May 2nd, 2013.  And the time was 2:24 p.m. when it was

3   posted.

4   Q.   And how is that particular date again relevant to your

5   investigation?

6   A.   It falls within the timeframe of the text messages.

7   Q.   And did the city where this was posted have any impact on

8   you?

9   A.   Yes.

10  Q.   And how was that?

11  A.   It's not in Las Vegas, so basically they're interstate

12  commerce, and they crossed over to California's line.

13  Q.   All right.  Now, showing you up at the top of the ad,

14  there are what appear to be four photos.  Are these photos of

15  Jasmin?

16  A.   Yes.

17  Q.   Now, when you click on those individual photos -- I'm

18  looking now at what's been marked as one of three.  Is that the

19  image that would come up when you would click on that

20  individual small photo within the website?

21  A.   Yes.  It enlarges the picture.

22  Q.   I'm looking now at page 2 of 3.  Is that again the same

23  thing that you got from the website?

24  A.   Yes.

25  Q.   And the girl down at the bottom, you can see her face?

Richard Leung - Direct

1   A.   Yes.

2   Q.   Is that how you were able to identify that that was, in

3   fact, the victim?

4   A.   Yes.

5   Q.   And finally, looking at page 3 of 3, again, same

6   questions.

7   A.   Yes.

8   Q.   I don't want to rush through that, but I assume everybody

9   has had enough time to look.

10         Now, based upon your training and experience, you

11  would consider those to be sexually explicit photos?

12  A.   Absolutely.

13  Q.   Tell me what step you took next -- after seeing that

14  particular ad?  How did you further your investigation?

15  A.   I also ran the phone number for YD and was able to obtain

16  more myRedBook advertisements.

17  Q.   And were those similarly graphic?

18  A.   They weren't as graphic as this one, but you can tell they

19  are definitely 100 percent prostitution advertisements.

20  Q.   I will have you put that back in the book.

21         If you would turn now to what's been marked as

22  Government's Exhibit No. 9.

23  A.   Yes.

24  Q.   Do you recognize the material in that exhibit?

25  A.   Yes.

Richard Leung - Direct

1   Q.   And what is it?

2   A.   It is a myRedBook prostitution advertisement.

3   Q.   And is this the same ad that you found that was associated

4   with the second number?

5   A.   Yes.

6   Q.   And how were you able to make that identification?

7   A.   Where the phone number is listed, (209)354-0792, it's the

8   same phone number as in Jasmin's phone under the contact YD.

9   Q.   And the exhibit, as it's laid out in Exhibit No. 9, same

10  questions.  Is this an ad that you actually initially saw on

11  the Internet?

12  A.   Yes.

13  Q.   And after seeing that ad, did you, in fact, attempt to

14  preserve it, for lack of another term, by printing it out?

15  A.   Yes.

16  Q.   And based on your recollection of what you viewed, does

17  this printout appear to be an accurate depiction of what you

18  saw initially back in August of 2013?

19  A.   Yes.

20          MS. HERR:  We would move into evidence Exhibit No. 9.

21          THE COURT:  Any objection to Exhibit 9?

22          MR. GAFFNEY:  No, Your Honor.

23          THE COURT:  Exhibit 9 will be admitted.

24       (Exhibit 9 admitted.)

25

1          MS. HERR:  And, Your Honor, we would ask to publish

2     this.  This does not contain any graphic images.

3          THE COURT:  All right.  You may publish it.

4     BY MS. HERR:

5     Q.   All right.  With regard to the first page of Exhibit

6     No. 9, again, would you walk us through what information you

7     focused on and found helpful to your investigation?

8     A.   Yeah.  So the phone number's obviously the first one, most

9     important, (209)354-0792.  Also the email address where it's

10    paydaboycash@gmail.com was very relevant to my investigation.

11    Q.   And looking at page number 2, again, the same question.

12    A.   It just has the same basic information on top with the

13    phone number and the email.  And they posted their location of

14    being in Las Vegas.

15    Q.   Tell me what steps you took next in your investigation?

16    A.   Yes.  With that email address, I then went to Facebook,

17    and I was able to enter that email address onto Facebook to see

18    if they have any Facebook account.  And I was able to locate

19    one.

20    Q.   What caused you to look at Facebook?

21    A.   Facebook is just used by millions to billions of people on

22    a daily basis.  So an average person would have a Facebook.  So

23    we try to do all our investigation and see if we can identify

24    them through Facebook.

25    Q.   And again, is that a common investigative technique that

Richard Leung - Direct

1  you use?

2  A.   Yes.

3  Q.   And what happened when you did that?

4  A.   It came up.  We were able to locate one specific account

5  tied to that email address.

6  Q.   And what did you do then?

7  A.   In my unit, we have an undercover Facebook account.  So we

8  basically befriended him to see if we can get any more

9  information that we were able to.  And he agreed to be our

10  friend.  So I was able to look into his profile.

11  Q.   And what types of things did you see when you looked at

12  that profile?

13  A.   There were -- stuff related to prostitution.

14  Specifically, he had one picture where it was a prostitution

15  advertisement on the computer screen, and he had money laid out

16  along with Trojan condoms.

17         He also has pictures of himself on there.  On the

18  first -- on the first profile picture and then also inside of

19  it, where he was posing with two other females.  And it's very

20  common for pimps to kind of show their status online.

21         MS. HERR:  Your Honor, could we possibly have a brief

22  conference?

23         THE COURT:  Yes, ma'am.  I will see counsel at

24  sidebar.

25         (Sidebar.)

1          MS. HERR:  I apologize, but I am listening to my

2     officer's response, and I realize that he made reference to

3     money that was spread out.

4          MR. GAFFNEY:  Right.

5          MS. HERR:  And I'm not quite sure how we can cure

6     that.  I don't want to draw extra attention to it.  But I

7     wondered if I might have an opportunity to briefly instruct my

8     officer not to make any further references to that money.

9          Quite honestly, I'm not sure -- I think that error

10    falls on my head.  Obviously, I saw your order.  I redacted the

11    exhibit, but I don't know that I shared that with my officer.

12         MR. GAFFNEY:  I am okay with just instructing him to

13    follow the order in moving forward.

14         THE COURT:  Yeah.

15         MR. GAFFNEY:  I don't see -- I mean, I really was

16    worried about was the pictures.

17         THE COURT:  Yeah.

18         MR. GAFFNEY:  I don't think anybody is going to make

19    a big deal about the reference, so I appreciate that.

20         THE COURT:  Let's move on.

21       (End of sidebar.)

22    BY MS. HERR:

23    Q.   All right.  Returning back to your earlier testimony, you

24    indicated that you had found a Facebook account that seemed to

25    be consistent with this email address you had found on the

Richard Leung - Direct

1    RedBook ad that was consistent with the telephone number you

2    found on a phone; is that correct?

3    A.    Yes.

4    Q.    Focusing just specifically on the girls that you found in

5    this Facebook account, were there any -- what was particularly

6    interesting or relevant to you in what you were looking at?

7    A.    The -- it contained a lot of prostitution activity that

8    appeared to be going on within that Facebook account.

9    Q.    And do you have a personal recollection of what was in

10   that particular account?

11   A.    I remember some -- I don't remember exactly to the "T" of

12   what's on it, but I do remember some of the main stuff that is

13   on there.

14   Q.    And again, at the time -- and I'm assuming this would have

15   occurred back in 2003?

16   A.    '13.

17   Q.    Or 2013?

18   A.    Yes.

19   Q.    Did you print out pages that you looked at?

20   A.    Yes, I did a print screen and was able to print out

21   several pages of what I located within that Facebook account.

22   Q.    I'd like you to look now at Exhibit No. 12.

23        Now, pursuant to Court order, there were certain

24   items in here that were not relevant to our investigation that

25   were redacted out.  So I don't want that to confuse you.

Richard Leung - Direct

1              But absent those particular redactions, can you take

2     a look at that particular exhibit and tell me if you recognize

3     it?

4     A.   On Exhibit 12 is a photo lineup.

5     Q.   I'm sorry?

6     A.   Is a photo lineup.  Is that what you --

7     Q.   I'm sorry.  It should be No. 10.

8              THE COURT:  Exhibit 10.

9              MS. HERR:  Yes, Exhibit 10.

10             THE WITNESS:  I'm sorry.  Can you repeat that

11    question?

12    BY MS. HERR:

13    Q.   Looking specifically as Government Exhibit No. 10, can you

14    tell me if you recognize this exhibit?

15    A.   Yes.

16    Q.   And what do you recognize it to be?

17    A.   The profile of "Pay Da Boy Kash."

18    Q.   And do the images that you see fairly and accurately

19    reflect the images that you originally saw online?

20    A.   Yes.

21             MS. HERR:  Your Honor, I would move to enter into

22    evidence Exhibit No. 10.

23             THE COURT:  Any objection to Exhibit 10?

24             MR. GAFFNEY:  No, Your Honor.

25             THE COURT:  Thank you.  Exhibit 10 will be admitted

Richard Leung - Direct

1    and may be published.

2    BY MS. HERR:

3    Q.   Looking first at what's been marked as page 1 of 12, if

4    you could just take us through page by page to tell us

5    specifically what information you found within these pages that

6    were of interest to you?

7    A.   The profile picture of Mr. Barnes is on -- is on there.

8    Obviously, having women pose the way they do, just sexually.

9         On the second page, the disclaimer that is put on

10   top.  That's a common disclaimer used in the prostitution

11   subculture that basically says that money exchanged is between

12   two consenting adults and something along those lines.  So,

13   that's a very huge disclaimer used in the prostitution

14   subculture.

15   Q.   Now, before you move to the next page, again, is there

16   anything specifically -- I note that your name is actually

17   listed up there in one of the paths up at the top of the page.

18   A.   Yes.

19   Q.   And is that again evidence that these were screenshots

20   taken from your computer?

21   A.   Yes, it was screenshots taken from my computer.

22   Q.   Thank you.

23   A.   On page 3, on some of the context that was written, it

24   says, "These niggas be acting like hoes nowadays.  Putting they

25   trust in the bitch.  But she really want a pimp.  One who's

1   secure and endure all the finer things.  That can make moves.

2   Solid dude to the core.  One who's plentiful not pitiful."

3   Q.   And again, how -- in what way, based on your training and

4   experience, did that cause you to believe that prostitution was

5   a subject?

6   A.   Just based on the context of the -- of the update status

7   post.  You know, just basically saying that he wants to be a

8   pimp, and this is -- these are common things that pimps do to

9   recruit other females.

10  Q.   Okay.

11  A.   Page 4 is -- page 4, there is no picture.  But on the --

12  on the right-hand side, it says, "Babe, call me pay da boy

13  young, pay the boy pimping.  Stacking money my intentions."

14          Page 5, on the right, it says, "Ladies, call me Pay

15  da Boy.  Young Pay da Boy Pimping.  Stacking money, my

16  intentions," and then with the money sign.

17          And then page 6 is a picture, which is the same as

18  the profile picture.  And it says, "Mr. Pay da Boy Mack'n.  A

19  real hoe attraction.  Standing firm on my deen.  Looking down

20  on everything."

21  Q.   Is there any significance to the word "mack'in"?

22  A.   Macking is just another term for pimping.  If you are

23  macking, you are pimping.  Same context.

24  Q.   Okay.

25  A.   And again, these are just update statuses that -- that the

 1   person put.  And it's just a recruiting tool that he uses

 2   that -- that he uses them for the update status.

 3   Q.   Now looking specifically at the second entry, it starts

 4   with "Babe you got options.  You can win or loose."

 5   A.   Yes.  Do you want me to read it?

 6   Q.   If you could read it and then explain to it me.

 7   A.   It says, "Babe, you got options.  You can win or loose.  I

 8   suggest you win.  All you gotta do is choose.  Let me serve yo

 9   dude the news.  Inform him bout his lose.  Let him know that

10   you've been moved.  And you fuck'n wit a boss."

11        Basically, there's a lot of prostitution terms that

12   are being used, one of which is "choose."  When a prostitute

13   chooses up with another pimp, the standard protocol of it would

14   be that the new pimp then serves the news to the old pimp to

15   let him know that the prostitute has chosen up with them.

16        Page 8 of 12 is pretty much similar, the context of

17   it.  You know, one of them being, "I got white girl for sale."

18   A lot of pimps look at girls in general as being property.

19   Q.   And that would be at the top of the page?

20   A.   On the top of the page, the very first update status.

21   Q.   And I notice in the next one, it says, "A pimp knocks

22   again."  What does that mean?

23   A.   "A pimp knocks again" is basically a pimp going after

24   another girl and getting her to choose up with him.

25   Q.   Okay.

Richard Leung - Direct

1   A.   Page 9 of 12, you see the box of Trojan condoms.  And then

2   on the website, it appears to be a prostitution website of

3   sorts.  Just from looking at numerous prostitution websites in

4   the past, that's kind of how they have their girls aligned, and

5   then you kind of pick your girls.  And then they will give you

6   further detail on the right-hand side.

7   Q.   Is there anything significant about the Trojan condoms?

8   A.   Yes.  When our victim was also arrested, Jasmin Madison,

9   she also had Trojan condoms on her.

10  Q.   And when we were looking earlier at Exhibit 4, was that

11  the Trojan condoms that we were referencing at that point in

12  time?

13  A.   Yes.

14  Q.   All right.  Moving on to page 10 of 12.

15  A.   Same thing.  You know, just showing off his girls.  It's a

16  huge recruiting tactic that pimps use to show the status that

17  they are in.

18        Page 11 of 12 is the profile picture that was

19  recovered.

20        And then page 12 of 12 is Daniel Barnes with two

21  females.

22  Q.   And the girl to the left, were you able to identify who

23  that was?

24  A.   Yes.  That was Amber Marquardt.

25  Q.   Tell me what steps you took then after finding this

Richard Leung - Direct

1   information?

2   A.   Once I looked into his profile page, I was able to

3   determine that he's from Merced, California.  So, because I

4   work on a task force with the FBI, we were able to contact our

5   counterparts to assist us in the case.

6         I relayed the information, and they were able to

7   match up his name with that specific telephone number, along

8   with -- during the investigation, we were able to determine

9   that they stayed at the Best Western.

10        So I directed him towards the Best Western, which

11  gave us more information regarding two room registrations and

12  rental car information -- or it was the license plate, in which

13  we were able to conduct records check on that license plate,

14  and it came back to a car rental place.

15        So we are were able to go to that car rental place,

16  get the information from them, and he emailed me everything

17  back.

18  Q.   So now with regard to this information that you were able

19  to obtain, is that how you made the connection between this

20  contact known as "YD" and ultimately identifying Daniel Barnes?

21  A.   Yes.  The phone number that Merced police has, was able to

22  match that up with Daniel Barnes.

23  Q.   Okay.  And how did you make the connection with the Amber

24  Marquardt?

25  A.   At the Best Western, they were able to identify who Daniel

Richard Leung - Direct

1    Barnes was, in turn, knew who the girlfriend was, Amber

2    Marquardt, and that's how we were able to obtain --

3              MR. GAFFNEY:  Objection.  Hearsay.  Hearsay.

4    BY MS. HERR:

5    Q.   Based on the information that you received, did you

6    receive motel records?

7    A.   Yes.

8    Q.   And did those records include registration information?

9    A.   Yes.

10   Q.   And did that registration information include information

11   about a car that had been registered along with the room?

12   A.   Yes.

13   Q.   And were you then able to use that car information to

14   identify it with a specific rental car agency?

15   A.   Yes.

16   Q.   Once you obtained information from that or were able to

17   identify that rental car agency, were you then able to use that

18   information to obtain records directly from the rental car

19   agency?

20   A.   Yes.

21   Q.   Turning your attention specifically to the rental car

22   information, how was that helpful in establishing a timeline

23   for you?

24   A.   It had a GPS inserted into the car.  So every day, it

25   automatically does what's called a ping, and it locates where

Richard Leung - Direct

1   the vehicle is on a 24-hour basis, unless they manually go in

2   and enter it themselves and ask to get updated information.

3   Q.   And based on your training and experience, is this a

4   fairly common technology that's now used for most rental car

5   agencies?

6   A.   Yes.

7   Q.   And once you obtained that information, did it give you a

8   more definite timeline in the case?

9   A.   Yes.  It gave me dates and areas of where they were at the

10  time of the ping.

11  Q.   Do you recall approximately what those dates were?

12  A.   They had quite a bit of dates.  If you can go into

13  specific of which day you are referring to.

14  Q.   Okay.  Do you recall if the dates that you found from the

15  rental car agency were consistent with the dates that you found

16  in the photos of the messages that you had?

17  A.   Yes.  The dates and the places were consistent from the

18  telephone along with the myRedBook advertisements.

19  Q.   Okay.  So, fair to say, as your investigation is

20  progressing, you are now able to link sort of these disparate

21  pieces of evidence that you had together?

22  A.   Yes.

23  Q.   Tell me what steps you took next?

24  A.   I basically presented the case to the assistant US

25  attorney afterwards with the information that we had gathered.

Richard Leung - Direct

1    Q.   At some point, did you attempt to confirm by lineup the

2    identification that you had made of YD and Christy?

3    A.   Yes.  I'm sorry.  With the information that we received,

4    we obviously identified a person whom we believed to be Daniel

5    Barnes.  We went down to -- or, I'm sorry.

6         I went down to Clark County Juvenile Hall,

7    reinterviewed the victim, and was able to do a photo lineup,

8    which consisted of six photos of persons resembling Daniel

9    Barnes, in which she was able to pick out Daniel Barnes

10   himself.

11   Q.   Without telling me anything about what the victim told

12   you, can you just tell me generally, when you do a lineup, who

13   puts that lineup together?

14   A.   I do.

15   Q.   And why do you use multiple photos?

16   A.   So that we can be sure that the victim, in fact, does

17   recognize the person that is claiming to have committed the

18   crime upon.

19   Q.   And in this case, did you conduct such a photo lineup?

20   A.   Yes.

21   Q.   Turning your attention to what's been marked as

22   Government's Exhibit No. 12, can you tell me if you recognize

23   that exhibit?

24   A.   Yes.

25   Q.   How do you recognize it?

1    A.    It has my writing on there along with Jasmin's.

2    Q.    Can you walk me through how a photo lineup is conducted?

3    A.    Yes.  There are instructions that we read to the person

4    that's conducting the photo lineup.  So, I basically read the

5    top portion to them.  They sign it to say that they understand.

6          I then show them the group of photographs, and then

7    they -- whichever one they pick, or if they don't pick, they

8    would write it in the statement of what number they picked and

9    stuff like that.

10   Q.    And if a person doing a lineup is able to successfully

11   pick somebody out, how do you document that?

12   A.    Once they pick out the actual person, we impound the photo

13   lineup, so that we have an original copy in evidence.  And

14   that's pretty much it.  That's the only way we document it.

15   Q.    How do you know or keep it straight which picture is

16   actually which?  In other words, you have got six photos in a

17   lineup.

18   A.    Oh, I'm sorry.

19   Q.    How do you know for sure which is the correct one?

20   A.    We have a public lineup and an internal lineup.  The

21   public lineup does not have names on them, and the internal

22   lineup has names on them.

23   Q.    And the internal lineup is looked at by whom?

24   A.    By myself.

25   Q.    Is that ever shown to the witness who is doing the

Richard Leung - Direct

1   identification?

2   A.   No.

3   Q.   And the public lineup, that I think you called it, that is

4   blank, who is that given to?

5   A.   The public lineup is only given to the person that's

6   picking out the photo.

7   Q.   Now, with regards specifically to Government's Exhibit

8   No. 12, is this a fair and accurate copy of the lineup that you

9   conducted on August 26th, 2013?

10  A.   Yes.

11  Q.   Was anyone else present with you?

12  A.   No.

13  Q.   Did you document, by your signature anywhere on the

14  document, that you were the person who had conducted it?

15  A.   Yes.  It's on the bottom.

16          MS. HERR:  Move to admit Exhibit No. 12.

17          THE COURT:  Any objection to Exhibit 12?

18          MR. GAFFNEY:  Yes, Your Honor.  If you look at

19  Exhibit No. 12, you will see that it's an out-of-court

20  statement that's being offered for the truth of the matter

21  asserted.

22          This is a statement made by the victim.  She would

23  have to come in and testify as to her identification.

24          MS. HERR:  Your Honor, I'm fine with just holding it

25  as identified, at this point.  And we'll have other witnesses

Richard Leung - Direct

1   that will -- I will move it into evidence at a later time.

2                   THE COURT:  All right.

3   BY MS. HERR:

4   Q.   While you're on the stand, I just want to ask you a few

5   more questions about it.

6                   Up at the top, there is an event number that is

7   listed.  What does an event number refer to?

8   A.   The event number is referred to the -- when I went out.

9   We create an event.  So the 13 is the year, 08 is the month, 15

10  is the day, and then the event that we went out on.

11                  But that's -- we stick to that event.  So once we

12  create that event, if we continuously go on to certain things

13  outside of that date, that's okay.  We can still use the same

14  event number.

15  Q.   And again, with -- on this photo lineup, does it indicate

16  who conducted the interview?

17  A.   Yes.

18  Q.   And that's your name; correct?

19  A.   Correct.

20  Q.   And is that listed both in the upper right-hand corner as

21  well as the bottom?

22  A.   Yes.

23  Q.   And does it document the location where this took place?

24  A.   Yes.

25  Q.   And where did this take place?

Richard Leung - Direct

1    A.    At Clark County Juvenile Hall.

2    Q.    And the date and time that it occurred?

3    A.    Yes.

4    Q.    And ultimately, when you conduct such a photo lineup, do

5    you have the interviewee sign the document?

6    A.    Yes.  They sign twice.  I'm sorry.

7    Q.    Sign twice?

8    A.    One to show that we read them the instructions, and the

9    second is what their statement was after they either chose or

10   did not choose the person in the photo lineup.

11   Q.    All right.  Thank you.  Now, turning your attention to

12   what's been marked as Government Exhibit No. 13.

13            I'm going to again ask you the same questions about

14   whether you recognize the exhibit and what you recognize it to

15   be.

16   A.    It's, again, a photo lineup done with Amber Marquardt --

17   I'm sorry.  With Jasmin Madison in regards to Amber Marquardt.

18   And those are the same thing.  The same instructions that are

19   read along with signatures of both.

20   Q.    And again, does that exhibit reflect your signature as

21   having been the party who conducted that interview?

22   A.    Yes.

23   Q.    And was anyone else present with you on the day that that

24   interview took place?

25   A.    No.

Richard Leung - Direct

1  Q.   And have you signed it to, again, indicate your

2  involvement?

3  A.   Yes.

4  Q.   And again, in this case, was it signed by the witness who

5  was involved?

6  A.   Yes.

7  Q.   And with respect to Government's Exhibits 12 and 13, was

8  an identification made?

9  A.   Yes.

10 Q.   Based on this timeline that you were able to put together,

11 based on these various pieces of evidence, did you draw any --

12 or did you form any opinion as to the length of time that

13 Jasmin was with Daniel Barnes?

14 A.   We just have an -- obviously, a rough estimate of the

15 exact times of when they were together.

16 Q.   How certain are you that this Pay Da Boy Kash Facebook

17 profile is the same person as Daniel Barnes?

18      MR. ORONOZ:  Objection as to the witness being asked

19 to quantify the degree of certainty.

20      THE COURT:  Yeah.  I'm not sure how you can -- he's

21 identified him as Daniel Barnes.

22      MS. HERR:  That's fine.  I will withdraw that

23 particular question.

24 Q.   Can you explain to me any other ties that you found, in

25 the course of your investigation, that tie together that

Richard Leung - Direct

1    Facebook page with other evidence that you found in the case?

2    A.   Obviously, the profile picture of Pay Da Boy Kash is that

3    of Daniel Barnes.  So we were able to compare that, along with

4    inside the profile, there were other pictures, along with the

5    activities that are being done that's involving prostitution.

6    Q.   Were you able to find -- as the investigation has gone on,

7    have there been any other items that matched up?

8            MR. GAFFNEY:  Objection.  Vague.  The question is

9    vague, Your Honor.

10           THE COURT:  Well, if he can answer it, I will let him

11   answer it.

12           THE WITNESS:  I can't answer that.

13   BY MS. HERR:

14   Q.   Fair enough.  Thinking back on all of the evidence that

15   you now have in this case, were you able to find links between

16   the cell phone that you recovered from evidence and the

17   Facebook page?

18   A.   Can you be more specific?

19   Q.   Did the number for YD that you found on the cell phone

20   match up with numbers associated with the Facebook page?

21   A.   The number never matched up with the Facebook and cell

22   phone.

23   Q.   Did the email match up?

24   A.   The email matched up with the account.

25   Q.   Between the RedBook ad and the --

Richard Leung – Direct

1    A.   Yes, through the RedBook ad and through Facebook itself.

2    Q.   Okay.  Did you have any involvement with an iPad that was

3    recovered later on in the investigation?

4    A.   I did not.  No.

5    Q.   All right.  Turning your attention back to Exhibit No. 4,

6    I think we gave you an envelope that was marked as Exhibit

7    No. 4.

8    A.   Yes.

9    Q.   And my recollection is that that envelope was sealed?

10   A.   Yes.

11   Q.   There should now be a pair of scissors available to you.

12   Could you please unseal that envelope?

13   A.   Yes.

14           THE COURT:  For the record, he's removing the

15   contents of the envelope.

16   BY MS. HERR:

17   Q.   Can you please, for the record, identify what you have

18   removed from the envelope?

19   A.   That there are two hotel room keys, receipts, a "Wild Wild

20   West" cashout voucher, and a Trojan condom.

21   Q.   And do the contents, that you have now removed from

22   Government Exhibit No. 4, match up with the photocopies that

23   you had originally received from one of your other team members

24   as representing items removed from Jasmin at the time of her

25   arrest?

Richard Leung - Direct

1    A.    Yes.

2    Q.    Looking now at Exhibit No. 5, that was item that was in a

3    bag?

4    A.    Yes.

5    Q.    But that bag, I believe, is open?

6    A.    Yes.

7    Q.    Can you remove that item from the bag as well.  And can

8    you identify that for the record?

9    A.    This is Jasmin's cell phone.

10   Q.    Are you able to see a serial number or some kind of

11   identification number on that phone?

12   A.    If I open up the back cover on the battery.

13   Q.    Can you please do that?

14   A.    Yes.  Do you want me to read you the serial number?

15   Q.    Yes, please.

16   A.    It only gives you an MEID hex, which is A0000040638C, as

17   in Charlie, "F" as in Frank and 5.

18   Q.    Can you compare that information with the identifying

19   information in Exhibit 21 which is the Cellebrite report?

20             MR. GAFFNEY:  Your Honor, may I approach so I can

21   take a look at the items that he's taken out of the --

22             May I approach, so I can take a look at the items

23   that he's looking at?

24             THE COURT:  Sure.

25             MR. GAFFNEY:  Thank you.  Thank you, Judge.

Richard Leung - Direct

1           THE COURT:  Yes, sir.

2           THE WITNESS:  Can you repeat the question one more

3   time?

4   BY MS. HERR:

5   Q.   Can you compare that identifying number, that you read out

6   for us, with the identifying information in the Cellebrite

7   report that also listed the identifying characteristics of the

8   phone, and tell us whether or not those match up?

9   A.   Yeah.  The MEID is this -- the same one as the one that's

10  listed on the Cellebrite report.

11          MS. HERR:  Your Honor, I would move to enter into

12  evidence Government's Exhibit No. 4 and Government's Exhibit

13  No. 5.

14          THE COURT:  Any objection to 4 and 5?

15          MR. GAFFNEY:  No, Your Honor.

16          THE COURT:  Thank you.  The same will be admitted.

17      (Exhibits 4 and 5 admitted.)

18          MS. HERR:  Your Honor, if I could just publish those

19  very briefly?

20          THE COURT:  Sure.  And you also will have all the

21  exhibits that are admitted in evidence when you go back for

22  deliberations.  If you have some question about one of the

23  exhibits, you can examine it yourself there.

24          Are you going to put those on the Elmo?  Is that how

25  you are going to do them?

1          MS. HERR:  Yeah.  I think that will be the easiest

2     way.

3          THE COURT:  All right.  So there is Exhibit 5.  Is

4     that correct?

5          MS. HERR:  This is Exhibit No. 5, which is the cell

6     phone -- a Samsung cell phone.

7          THE COURT:  All right.

8          MS. HERR:  And Exhibit 4, which is a Trojan condom, a

9     hotel key, and some receipts.

10    Q.   Now, during your investigation, you were obviously able to

11    identify that Jasmin was away from home.  Where was she --

12    where were her parents during this period of time?

13    A.   They were here.  They were in Las Vegas.  Jasmin was a

14    runaway, so she kind of went from place to place to place.

15    Q.   And was her -- based on your training and experiences, was

16    her status as a runaway unusual for someone who would become

17    involved in child prostitution?

18    A.   No, they are -- generally speaking, about 80 to 90 percent

19    of them are runaways, and the other 10 percent is, you know,

20    finding out from school teachers or stuff like that.

21         MS. HERR:  Your Honor, Court's indulgence.

22         THE COURT:  Yes, ma'am.

23         MS. HERR:  I believe that concludes my questions,

24    Your Honor.

25         THE COURT:  All right.  Cross-examination.

1              MR. ORONOZ:  Court's indulgence.

2              THE COURT:  Yes, sir.

3              MR. GAFFNEY:  No questions, Your Honor.

4              THE COURT:  All right.  Thank you for your time, sir.

5    You may step down.

6              MS. SILVA:  The government calls Jeff Henefent.

7              THE COURT:  All right.  Come forward and be sworn,

8    please, sir.  Right up here on your left, my right.

9                        JEFFREY HENEFENT,

10   having been duly sworn, was examined and testified as follows:

11             COURTROOM ADMINISTRATOR:  State your full name and

12   spell it for the record.

13             THE WITNESS:  My name is Jeffrey Henefent.

14   H-E-N-E-N-F, like Frank, E-N-T as in Tom.

15             MS. SILVA:  May I proceed?

16             THE COURT:  You may proceed.

17                       DIRECT EXAMINATION

18   BY MS. SILVA:

19   Q.   Good afternoon.  I want to make sure I am saying your name

20   right.  Is Henefent?

21   A.   Henefent.

22   Q.   If you could make sure you are speaking into that

23   microphone, this is being recorded.  And I have a tendency to

24   speak fast, so if I'm speaking too fast, please let me know.

25   A.   Okay.

Jeffrey Henefent - Direct

1   Q.   All right.  I have a few questions for you.  Where are you

2   employed?

3   A.   Courtesy Rent A Car in Merced.

4   Q.   And when you say Merced, is that Merced, California?

5   A.   Merced, California.  Yes.

6   Q.   How long have you been so employed?

7   A.   I have been there since September of 2011.

8   Q.   All right.  And what do you do for Courtesy Rent A Car?

9   A.   Currently now I am the owner.  I was manager originally

10  and then purchased it in June of '13.

11  Q.   June of 2013?

12  A.   Correct.

13  Q.   Okay.  During your work as a manager and now as an owner,

14  do you maintain records in the normal course of the business?

15  A.   Yes.

16  Q.   What sort of records do you maintain?

17  A.   We have a digital program to carry the rental agreements

18  and information about the rentals and the vehicles.  And then

19  we print hard copies, which the customer signs.  And we have a

20  copy of any identification, proof of insurance that they

21  provide in the rental agreement.  And we keep those locked for

22  seven years after the rental.

23  Q.   That was my question.  Seven years after the rental?

24  A.   Correct.

25  Q.   Okay.  And in the course of your employment and now

Jeffrey Henefent - Direct

1  ownership with Courtesy Rent A Car, did you send some documents

2  in response to a subpoena relating to a car rental in 2013 for

3  this case?

4  A.   Yes.

5  Q.   If you could please open the binder there in front of you

6  and turn to tab 11.  If you could take a moment and review

7  what's been premarked for identification as Government's

8  Exhibit No. 11.

9  A.   Okay.  I am there.

10  Q.   If you could go ahead and flip through the pages and look

11  at me when you are done.

12           MR. GAFFNEY:  Your Honor.

13           THE COURT:  Yes, sir.

14           MR. GAFFNEY:  We will stipulate to the admission.

15           THE COURT:  All right.

16           THE WITNESS:  Yes.

17           MS. SILVA:  All right.  He's going -- the government

18  would move to admit Government's Exhibit No. 11.

19           THE COURT:  All right.  Exhibit 11 will be -- easy

20  for you to say.  Exhibit 11 will be admitted and may be

21  published.

22           MS. SILVA:  Thank you, Your Honor.

23       (Exhibit 11 admitted.)

24  BY MS. SILVA:

25  Q.   I do have a few questions.  Upon review quickly of the

1    records in front of you, do they appear to be the type of

2    records you keep, as you said, for seven years?

3    A.    Yes.  These are the printed out copies that we have

4    available.

5    Q.    Is the first page of that exhibit actually a copy of your

6    business card?

7    A.    Yes, it is.

8    Q.    Okay.  Turning to page 2 of Government's Exhibit No. 11.

9    If you could, please, for the jury -- you can actually touch

10   the screen next to you -- circle where you could review

11   documents and find the in and out date for a particular

12   vehicle?

13   A.    Okay.  On the top right is the in, out, and due date.

14   Q.    Okay.  And when you say "in," what do you mean by that?

15   A.    When the vehicle was checked in.  Maybe they extended the

16   contract or swapped vehicles, but the "out" is when it was --

17   the keys were given to them.

18   Q.    Okay.

19   A.    And the "in" is when the rental agreement was closed out.

20   Q.    And what is the due date?

21   A.    Due date is when they paid to at that point or when we

22   thought the contract would be ending.

23   Q.    Okay.  And could you please circle for the jury where you

24   would find the name of the person renting the vehicle?

25   A.    On the left side is the personal information for the

Jeffrey Henefent - Direct

1  renter.

2  Q.   Okay.  When you find the personal -- excuse me.

3        When you rent out a vehicle, what is required for an

4  individual to do so with your company?

5  A.   Valid driver's license.  Can be international, but valid

6  driver's license that has identification and photograph.

7  And/or proof of insurance, if they have it, and/or debit card,

8  credit card, prepaid card as well if they have that.

9  Q.   If they do not have any of those, would you not rent them

10  a vehicle?

11  A.   Correct.  They have to have at least the driver's license.

12  Q.   Okay.  In this case, it appears the renter is an Amber

13  Marquardt?

14  A.   Correct.

15  Q.   Do you recall renting a vehicle to somebody who had at

16  least a driver's license by the name of Amber Marquardt?

17  A.   Yes.

18  Q.   Why do you remember that name?

19  A.   Actually, for three months, I believe, she came in

20  consistently paying and renting and changing cars.  So I

21  actually got to know her as a customer, repeat customer.

22  Q.   Understood.

23        Clear the screen?

24        MR. GAFFNEY:  Sure.

25

1    BY MS. SILVA:

2    Q.   All right.  And just for the record, on this page 2 of

3    Government's Exhibit No. 11, what is the out date for the

4    vehicle?

5    A.   This one is April 23rd, 2013.

6    Q.   And what type and what color vehicle is it?

7    A.   That is in the middle section.  It was a Chevrolet Malibu.

8    The top number is the vehicle number, the license plate number,

9    make, model -- excuse me -- is Malibu, white in color and the

10   VIN number.

11   Q.   Okay.  Looking at the same document, does it appear that

12   there is a clock in of the miles in and the miles out?

13   A.   Yes.  On the right side are the miles in/miles out.

14   Q.   And if you could, when you say "miles out," is that when

15   the vehicle leaves your premises for the rental?

16   A.   Correct.  The miles out at the time the contract was

17   written, and the miles in when the contract was closed out.

18   Q.   Thank you.  Turning to page 3 of Government's Exhibit

19   No. 11, what are the out and in dates for this rental?

20   A.   Okay.  So the first one is actually a month end closure,

21   because it was April 30th.  So -- sorry Exhibit 2 is the out

22   was 4/23.  Checking in was 4/30, end of month.

23   Q.   Okay.  And what sort of vehicle was that?

24   A.   It's still the same vehicle.

25          THE COURT:  She's talking now about the first, right?

Jeffrey Henefent - Direct

1    About the white Malibu?

2            THE WITNESS:  I'm sorry.  Yeah.  It's still the same

3    vehicle.  The second one, the page we are on right now, is out

4    on April 30th.  So it just means we recreated it end of month,

5    and this one was brought in on May 7th.

6    BY MS. SILVA:

7    Q.   And when you say May 7th, do you mean May 7th, 2013?

8    A.   Sorry.  2013.

9    Q.   That's okay.  All right.  Moving forward to the fourth

10   page of Government's Exhibit No. 11, what is the out and in

11   date and what sort of vehicle is this?

12   A.   Okay.  Now this changed vehicles.  In the middle it is

13   another white Malibu, different license plate, different VIN

14   number.  Out date was May 7th, 2013, and the in date was

15   5/21/2013.

16   Q.   Okay.  What about the miles out and the miles in?

17   A.   Yes.  They are listed on the right side as well.  I

18   circled them.

19   Q.   Turning to the next page, if you could, please, what type

20   of vehicle was part of this particular record and what are the

21   in and out dates?

22   A.   Okay.  This one was created May 21st, 2013, and checked in

23   May 28th, 2013.  And this one was a dark gray Chevrolet Impala,

24   and that's in the middle section.

25   Q.   Okay.  Thank you.  The next page, is it another rental

1    agreement with Amber Marquardt?

2    A.   Yes, it is.  And yeah, same Chevrolet Impala.  This one is

3    May 28th till the end of the month, May 31st.  Mileage in,

4    mileage out.  Actually, we kept the same, just because it was

5    clerical closing out of the contract end of month.  Same

6    contract dates.  I mean, same vehicle.  Sorry.

7    Q.   Thank you.  Moving forward to the next page.

8    A.   Okay.  On this one, same -- yeah, same Chevrolet Impala.

9    Out dates of 5/31/2013 and in June 20th, 2013.

10   Q.   And does this record reflect that there is a change in the

11   miles in and the miles out?

12   A.   Yes.  This one does have accurate mileage.

13   Q.   Okay.

14   A.   Showing driven miles for the -- for that period.

15   Q.   Is that -- when you stay the period, the entire rental

16   period?

17   A.   No, for the May 31st to June 20th, 2013.

18   Q.   Okay.  Moving forward to the next record, what are the in

19   and out dates for this vehicle?

20   A.   In and out dates, June 20th, 2013, to July 16, 2013.

21   Q.   And what sort of vehicle was rented on this occasion?

22   A.   This was a switched vehicle again.  A Malibu -- Chevrolet

23   Malibu silver in color with that license plate and VIN number

24   circled.

25   Q.   Okay.  What were the, at least, documented miles driven?

Jeffrey Henefent - Direct

1    A.   It's circled here for you.  They look probably accurate.

2    Yeah.  37,000 in -- going out.  Excuse me.  37722 out.  42722

3    in.

4    Q.   And finally this next document, what are the in and out

5    dates for this vehicle?

6    A.   Okay.  This was July 16, 2013, to July 30th, 2013.  Same

7    silver Malibu as the last one, and the miles in, miles out.

8    Q.   Mr. Henefent, if you could please describe for the jury or

9    explain to the jury what we are looking at here, which is the

10   third to last page of Government's Exhibit No. 11?

11   A.   Okay.  Internally, we do have access to a third-party

12   vendor called GoldStar GPS.  It can track the vehicle

13   locations.  And that's what this log is.  It's the vehicle

14   locations.  Every 25 hours the GPS automatically pings the

15   vehicle and logs an automatic location.

16   Q.   Back in 2013, specifically the spring and into the summer

17   of 2013, were all of your vehicles equipped with GPS tracking

18   devices?

19   A.   I believe they were.

20   Q.   Okay.

21   A.   Yeah.

22   Q.   Let me ask this question.  If it was not equipped with a

23   GPS tracking device, would you be able to get a report like

24   this?

25   A.   No.

Jeffrey Henefent - Direct

1  Q.   All right.  And I know it's a little bit difficult to

2  read, but does this report indicate one vehicle or is it a

3  combination of different vehicles?

4  A.   On the top left is the vehicle here circled.  So that's my

5  vehicle number 534, which is a Chevy Malibu.  And each line

6  shows the particular time, date, and location the auto report

7  occurred.

8  Q.   Okay.  So I'm going to start from the bottom and work our

9  way up.

10  A.   Okay.

11  Q.   We are starting at the bottom of the page.  What date is

12  reflected or date and time is reflected there?

13  A.   April 23rd, 2013.

14  Q.   And where does it indicate the location of the vehicle to

15  be?

16  A.   Looks to be my rental lot, 1055 West 15th Street, Merced,

17  California.

18  Q.   Okay.  Now, if we move up five spots to April 26th, 2013,

19  at 11:45:57 a.m., where does the report indicate the vehicle to

20  be?

21  A.   I'm sorry.  Which line?

22  Q.   About five lines up.

23  A.   What date?

24  Q.   April 26th, 2013.

25  A.   Okay.  That one is 1673 -- that's Las Vegas.

1   Q.   Yeah.  I know it's difficult to read.  Does it appear to

2   be Las Vegas, Nevada?

3   A.   Yeah.  So April 26, 2013, 11:45 a.m., East Flamingo Road,

4   Las Vegas, Nevada.

5   Q.   All right.  And if we go up to the next two entries that

6   also reflects Las Vegas, Nevada?

7   A.   Correct.

8   Q.   All right.  And at some point, does the vehicle appear to

9   return to Merced, California?

10  A.   Yes.  So, April 27th, 28th, and then the 29th.

11  April 29th at approximately 2:46 p.m., it is on N Street in

12  Merced, California.

13  Q.   All right.  And the next two entries, going back in time,

14  does that look like Delhi, California, and Fresno, California?

15  A.   Yes.  April 30th at approximately 3:45 p.m., it was in

16  Delhi, California.

17  Q.   Thank you.

18  A.   Which is near Merced.

19  Q.   Thank you.  Of course I am saying that incorrectly.

20       And moving -- continuing to move up the record, does

21  it appear the vehicle returns to Las Vegas at a certain point?

22  A.   Yes.  So May 3rd, 2013, at approximately 6:47 p.m., it is

23  back on Boulder Highway, Las Vegas, Nevada.

24  Q.   Okay.  And finally, does it return to Bakersfield,

25  California, on May 6th of 2013?

Jeffrey Henefent - Direct

1    A.    That's the top line.  Yes, May 6th.  Looks like time is

2    about 5:47 p.m.  It's on Sunset Avenue, Bakersfield,

3    California.

4    Q.    Thank you.  Turning to the second to last page of

5    Government's Exhibit No. 11, does this appear to be a GPS

6    report for a different vehicle?

7    A.    Yes.  So this one is vehicle 522, an Impala.

8    Q.    Okay.  And looking at this record, does it appear this

9    vehicle stays in California but travels to different cities?

10   A.    Yes.  So, backwards order, June 21st, 2013, was in Merced.

11   And then as you go up, it changes from Merced, Modesto,

12   Chowchilla, Modesto, Chowchilla, which are all near Merced,

13   California.

14   Q.    So, forgive me.  I am unfamiliar with that area of

15   California.  About how far away is -- if you know -- is Modesto

16   from Merced?

17   A.    Modesto is approximately 60 miles north of Merced.

18   Q.    And how far away is Chowchilla from Merced?

19   A.    Chowchilla is about 25 miles south of Merced.

20   Q.    Is it fair to say both cities are within a 100-mile radius

21   of Merced?

22   A.    Yes, they are.

23             MS. SILVA:  Okay.  Court's indulgence.

24             THE COURT:  Yes, ma'am.

25

Jeffrey Henefent - Cross

1    BY MS. SILVA:

2    Q.   I have just a few more questions for this witness.

3         Turning to page -- back to page 2 of Government's

4    Exhibit No. 11, what phone numbers are associated with Amber

5    Marquardt, if you could circle that for the jury?

6    A.   The three phone numbers we had available for her are

7    listed next to her name.

8    Q.   Okay.  And is one of those phone numbers (209)354-6449?

9    A.   Yes, it is.

10   Q.   Do you recall how Miss Marquardt paid for her various

11   rentals?

12   A.   I believe when we looked it up, it was a variety of

13   prepaid debit cards, maybe some cash as well some days.

14        MS. SILVA:  I have nothing further for this witness.

15        THE COURT:  All right.  Cross-examination.

16        MR. GAFFNEY:  Thank you, Judge.

17                     CROSS-EXAMINATION

18   BY MR. GAFFNEY:

19   Q.   Good afternoon.

20   A.   Hi there.

21   Q.   Mr. Henefent?

22   A.   Henefent.

23   Q.   Can I call you Jeff instead?

24   A.   Yes.

25   Q.   Jeff, I just have a few questions for you.  The timeline

1  in this case is very important, so I just kind of want to walk

2  you back through a couple of dates that are indicated on this

3  GPS readout.  Okay?

4  A.   Okay.

5  Q.   Looking at -- so, correct me if I am wrong.  But the car

6  was rented in Merced, California; correct?

7  A.   Correct.

8  Q.   And that was on April 23rd?

9  A.   The very first transaction, yeah, April 23rd, 2013.

10  Q.   And that's where your car rental company is located; is

11  that right?

12  A.   Yes.

13  Q.   Okay.  And then it appears as though the car travels from

14  Merced on -- perhaps it's April 25th and arrives in Las Vegas

15  on April 26th; is that right?

16  A.   Correct.  Yeah.  So it auto-pinged that it was in Merced

17  on April 25th, 2013.  And then it was in Las Vegas, April 26th,

18  2013.

19  Q.   And looking at this document, the times that are listed,

20  is that when the GPS was actually pinging the car?

21  A.   Yes.  It should be Pacific time.  And every 20 hours, it

22  auto-pings.

23  Q.   Okay.  So, on April 26th -- I'm sorry.  Yeah,

24  April 26th at 11:45 a.m., the car is pinged.  And it returns a

25  signal, I guess, from Flamingo Road here in Las Vegas, Nevada;

1    is that correct?

2    A.    Yes.

3    Q.    And then looking at the readout, or this document, it

4    appears that the car was here in Vegas for maybe three days

5    until -- or maybe two days until April 28th?

6    A.    Correct.  The last auto ping for Vegas was April 28th at

7    1:45 p.m.

8    Q.    Okay.  So the car was here in Las Vegas for about two

9    days; right?  Two, maybe three days?

10   A.    Three days.  Yes.

11   Q.    Okay.  And then from Las Vegas, it travels back to Merced,

12   California?

13   A.    At some point, yeah, between April 28th at 1:46 p.m --

14   1:45 p.m. to April 29th at 2:45 p.m. it is back in Merced.

15   Q.    Okay.  And the car -- once it's in California, it remains

16   in California for -- we have April 25th; right?

17   A.    So, it came back to California April 29th.  April 30th.

18   Q.    Excuse me.  April 29th.  You are correct.

19   A.    Yeah.  So April 29th, April 30th, May 1st, May 2nd, and

20   then May 3rd it's back in Vegas.

21   Q.    Perfect.  Okay.  So we've got about three days in Las

22   Vegas.  The car is here for about three days; right?

23   A.    And then -- okay.

24   Q.    It's here in Las Vegas for about three days; right?

25   A.    Of these dates, yeah.  So then April -- I'm sorry.  May

Jeffrey Henefent – Cross

1   3rd, and 4th, and 5th it's back in Las Vegas.

2   Q.   Okay.  So just to give a quick timeline of what we have

3   here, the car is in Las Vegas for about three days, then it

4   travels to California and remains in California for maybe four

5   days; right?

6   A.   Correct.

7   Q.   And then it comes back to California -- or it -- excuse

8   me.  It comes back to Las Vegas it looks like May 2nd?

9   A.   May -- yeah, at some point, May 3rd at 6:45 p.m.

10  Q.   Is that a "3"?

11  A.   Yes, that's May 3rd back in Las Vegas.

12  Q.   Thank you for clarifying that.  And then it returns to

13  California, at least Bakersfield or Bakersfield, California,

14  on -- it appears to be May 6th?

15  A.   Correct.  May 6th at approximately 8:45 p.m., 8:47 p.m.

16  Q.   Okay.

17  A.   Back in Bakersfield.

18  Q.   And so the periods of time that we've highlighted here,

19  this appears to be -- let's see.  If we count them up, one,

20  two, three -- excuse me.  One, two, three, four, five, six,

21  seven, eight, nine, about 10 days of travel; is that correct?

22  A.   Yes.

23          MR. GAFFNEY:  Okay.  Your Honor, I pass the witness.

24          THE COURT:  All right.  Anything on redirect?

25          MS. SILVA:  No, Your Honor.

Jeffrey Henefent – Cross

1          THE COURT:  All right.  Thank you for your time, sir.
2   You may step down.  You can leave that right there.  That's
3   fine.
4          THE WITNESS:  Thank you.
5          THE COURT:  All right.  Call your next witness.
6          MS. HERR:  Your Honor, we would call Brysco Baker.
7   She will be a fairly lengthy witness, and so I don't know if
8   you want to take a quick break before that or you want to just
9   plow ahead.
10          THE COURT:  How is the jury doing?  We doing all
11   right?  Need a break?
12          No break.  All right.
13          MS. HERR:  Okay.  We will move forward.  Thank you.
14          THE COURT:  We have got like half an hour to go and
15   then we will break for the day anyway.  So when we get close,
16   after another 20 minutes or so, tell me, "Now is a good place
17   to stop."
18          MS. HERR:  Okay.
19          THE COURT:  What I don't want to do is you are about
20   to reach the height of your examination, and I say, "Okay.
21   That's it."  I want to avoid that.  You understand?
22          MS. HERR:  Certainly.
23                          BRYSCO BAKER,
24   having been duly sworn, was examined and testified as follows:
25          COURTROOM ADMINISTRATOR:  State your full name and

Brysco Baker - Direct

1    spell it for the record.

2            THE WITNESS:  Brysco Baker, B-A-K-E-R.

3            THE COURT:  Whenever you are ready.

4                        DIRECT EXAMINATION

5    BY MS. HERR:

6    Q.   Brysco, how old are you?

7    A.   21.

8    Q.   And fair to say that you are related to one of the parties

9    here today; is that correct?

10   A.   Yes.

11   Q.   And that would be Amber Marquardt?

12   A.   Yes.

13   Q.   What is your relationship to her?

14   A.   I am her half-sister.

15   Q.   Okay.  Did the fact that Amber is your sister influence

16   your decision to come forward and testify today?

17   A.   No.

18   Q.   Has anyone promised you anything to get you to come

19   forward today?

20   A.   No.

21   Q.   Is it your intention to testify truthfully?

22   A.   Yes.

23   Q.   Has anyone, including myself, asked you to do anything

24   other than tell the truth today?

25   A.   No.

Brysco Baker – Direct

1   Q.   Is it true that you currently live in Stockton,

2   California?

3   A.   Yes.

4   Q.   And when did you get here to town?

5   A.   Yesterday.

6   Q.   And you met with me over the lunch hour; is that correct?

7   A.   Yes.

8   Q.   And is that the first time you and I had ever met?

9   A.   Yes.

10  Q.   Were you promised anything by me or anyone else to come in

11  and testify today?

12  A.   No.

13  Q.   What did I tell you about taking the stand today?

14  A.   Tell the truth.

15  Q.   Do you know a man by the name of Daniel Barnes?

16  A.   Yes.

17  Q.   Can you tell me if he's present today in the courtroom?

18  A.   Yes.

19  Q.   Can you point him out for jury and describe an article of

20  clothing that he's wearing?

21  A.   Right there, and he's wearing a white shirt.

22          THE COURT:  The record may show she's identified the

23  defendant.

24          MS. HERR:  Thank you, Your Honor.

25  Q.   Miss Baker, how is it that you know Daniel Barnes?

Brysco Baker - Direct

1   A.   When I was younger, I first met him.  He was with my

2   sister.

3   Q.   Where were you living at the time that you first met him?

4   A.   Stockton.

5   Q.   And --

6   A.   With my mom.

7   Q.   And can you describe those circumstances?  How it was that

8   you met him?

9   A.   He -- he was with my sister when I went out to the front

10  to take the mail or get the mail from mailbox.  And he came up,

11  and he picked her up.  And he just -- he was just there.  He

12  was picking her up at that time.

13  Q.   How old were you when this occurred?

14  A.   Seven.

15  Q.   Okay.  So this is -- would it be fair to characterize this

16  as kind of a fleeting childhood memory?

17  A.   Yes.

18  Q.   Now, at some point, as you got a little older, did the two

19  of you reconnect in some way?

20  A.   Yes.

21  Q.   Tell me how it was that you saw him again or made a

22  connection with him again?

23  A.   The first time was on Facebook before I realized who he

24  was, and the second time was over the phone when he called me.

25  I am not sure how he got my number, so --

1    Q.   Let's talk first about Facebook.

2    A.   Uh-huh.

3    Q.   When he initially contacted you on Facebook, did you

4    realize who he was?

5    A.   No.

6    Q.   And did you like the contact?  Were you -- did you find it

7    odd?  Tell me what your reaction was to it?

8    A.   Well, it was just a message.  He was just talking to me in

9    regular, just friendly conversation.  Saying, "Hi.  How are

10   you?"

11          And I asked him who he was, and it was just like

12   that.  And I asked him if I knew him.  And he said, "No."  And

13   it didn't really go on farther than that in the Facebook

14   messages.

15   Q.   Now, at that point in time in your Facebook profile, did

16   you list your age?

17   A.   Yes.

18   Q.   And how old were you at that point?

19   A.   17.

20   Q.   Now, you indicated that that Facebook contact was then

21   followed up by phone call?

22   A.   Uh-huh.

23   Q.   Where were you living by that point in time?

24   A.   In my foster home in Turlock.

25   Q.   How -- do you have any idea how Mr. Barnes got your phone

Brysco Baker - Direct

1   number?

2   A.    No.

3   Q.    And did you have a personal cell phone number or did he

4   contact you there at the group home?

5   A.    It was a personal cell phone.

6   Q.    What was your reaction to the phone call?

7   A.    At first I didn't know who he was.  And then he explained

8   who he was and the relationship he has with Amber.  And then we

9   hung up.  And I kind of freaked out.  I didn't know how he got

10  my number or anything.  I didn't know how he got in contact

11  with me.

12  Q.    Tell me what about that contact, as you explained, made

13  you freak out?  What made you uncomfortable about it?

14  A.    Because I never gave him my number.  I didn't know anybody

15  that would have gave him my number or how he even came in

16  contact with it.  So when he called me -- I don't just give my

17  number out.  And when he got it and called me, I was kind of

18  not -- I was kind of wondering how he got it, and it kind of

19  freaked me out then.  Because I don't usually just give my

20  number out.  And when he got it and he called me, I wasn't

21  really sure what to do.

22  Q.    Okay.  Tell me what happened after that?

23  A.    I called my sister.

24  Q.    Okay.  And did you have any other contact with Daniel

25  after that?

Brysco Baker – Direct

1    A.   Not for a while.  Not for a little bit.  Well, soon

2    after -- well, we -- he kept on calling or he would message me.

3    And then I figured out who he was on Facebook.

4              In the messages, he told me that I didn't know him.

5    And then when I figured out who he was, I figured out that we

6    were messaging before I got that phone call.  And I did, in

7    fact, know him.

8              And he just kept messaging me.  And then he told me

9    that he wasn't like how he used to be, and that he apologized.

10   And we got closer.  And it became a -- like a brother/sister

11   type of relationship, and I let him in.

12   Q.   I want to back you up just a little bit to have you

13   further explain, because I'm not sure I'm entirely following

14   you.  You say that initially you didn't recognize him on

15   Facebook?

16   A.   Uh-huh.

17   Q.   But then later on you realized you'd been talking to him

18   for longer than you thought.

19   A.   Uh-huh.

20   Q.   How did that happen?  Did he disguise himself in some way,

21   or you just didn't recognize his photo?

22   A.   I didn't recognize him.  The few times I saw him when I

23   was younger, I didn't really see him that much.  Not enough to

24   remember him.  Like I said, I was seven years old.  And then

25   when he messaged me, I was 17.  So it was quite some time.  And

Brysco Baker - Direct

1    it wouldn't just pop in my head that that's who it was.

2              And so I wasn't really sure that was him.  It didn't

3    pop in my head that was who it was.  And his name wasn't Daniel

4    on Facebook.

5    Q.   Okay.  And these initial contacts that you had, what was

6    sort of the flavor of those contacts?  Were they short?  Long

7    messages?

8    A.   They weren't really long, but it was just apologizing.

9    You know, telling me that he was sorry for how -- how stuff was

10   when I was younger and the impact that it had on us.  And just

11   saying that he's not -- he wasn't like that anymore, and he

12   wasn't a bad guy that people made him out to be.

13             MR. ORONOZ:  Your Honor -- I'm sorry, counsel.  I

14   would object to relevance at this point.  I'm not sure how

15   relevant this is plus --

16             THE COURT:  I'm not either, but I'm inclined to give

17   both sides a little bit of latitude, if you will, when it comes

18   to relevance.  And let's see where we are going.

19             MR. ORONOZ:  Thank you, Your Honor.

20             THE COURT:  But, I mean, your point is well-taken,

21   but we'll see.

22             MS. HERR:  Understood, Your Honor.  And we will speed

23   it up and get to the point.

24             THE COURT:  All right.

25

Brysco Baker - Direct

1   BY MS. HERR:

2   Q.   Do you recall approximately how many contacts of that

3   nature took place?

4   A.   No.

5   Q.   Any idea over what period of time those contacts took

6   place?

7   A.   About a month, month or two.

8   Q.   Now, at some point, is it fair to say that your attitude

9   towards him changed from maybe what had once been a chilly

10  reception to something that was more open?

11  A.   Yes.

12  Q.   And do you have any idea how old you were at that point in

13  time?

14  A.   I was 17.

15  Q.   Okay.  And at some point, did he make a request of you to

16  have sex with a third party for money?

17  A.   Yes.

18  Q.   What was your reaction to his request?

19  A.   At first I was hurt, because we developed a brother and --

20  type -- like I thought of him like an older brother.  And he

21  knew I was needing help.  And I was scared, and I wanted to be

22  able to provide for my son.

23  Q.   Now when you say that you needed help and you were scared,

24  tell me what your circumstances were at that point in time?

25  A.   I was in a foster home that wasn't really helping me

Brysco Baker – Direct

1    provide for my son.  And he was really young.  I didn't really

2    have enough diapers.  I didn't have enough clothes for him or

3    toys.  And I just kept on wanting him to have what he needed.

4    Q.   Now, in your mind, did this request come out of the blue

5    or was this something that you had been leading up to?

6    A.   I was talking to him about it, because I -- like I said, I

7    don't -- I didn't really have anybody back then, and I didn't

8    have any parents or anything.  So I was calling him to confide

9    in him, telling him my worries, and what's wrong, and that I

10   was just worried about my son, and just little things like

11   that.  It wasn't --

12   Q.   At that point in time, had you ever been paid for a sex

13   act?

14   A.   No.

15   Q.   Did you express to him your concern about the -- his

16   request?

17   A.   Yes.

18   Q.   And what was his reaction?

19   A.   That it wasn't as bad as I was looking at it.  That it

20   could be more of a date-type thing, a hookup more than sex for

21   money.

22   Q.   Do you recall what he told you to expect?

23   A.   Romance, and it would -- it wasn't going to be as easy --

24   I mean, as hard as I was thinking it was.

25   Q.   Tell me what happened after that?

Brysco Baker - Direct

1   A.   He -- we went to the room, and he -- he was sitting with

2   me.  And he was talking to me about his cousin, and trying to

3   make it seem like his cousin was a good guy, and a good friend

4   to have, and stuff that would make -- make it easy on me.  And

5   he wasn't a bad guy.

6         And when he left out of the room, I wasn't -- I

7   wasn't comfortable.  I wasn't -- it wasn't fun, or romance

8   or -- I didn't like it at all.

9         MR. ORONOZ:  Your Honor -- I apologize, counsel.

10         In addition to the relevance objection that I have, I

11   am also concerned about bad character evidence, propensity

12   evidence.  I am very concerned that these other unrelated acts

13   could have that effect.

14         And pursuant to 404(b), I would make that objection

15   as well.

16         THE COURT:  All right.  What about that?

17         MS. HERR:  Your Honor, we have filed a 404(b) notice.

18   With respect to this particular testimony, it's our belief that

19   this is not a prior bad act but rather goes to a pattern of

20   conduct and pattern of behavior to show that this was not due

21   to mistake or inadvertence.

22         And that, also, her testimony directly is intertwined

23   with the testimony of Amber Marquardt who will be testifying

24   tomorrow.

25         THE COURT:  That was my understanding, was that it

Brysco Baker - Direct

1    was the government's position this is a pattern.  This shows a

2    pattern.

3              MS. HERR:  Correct.

4              THE COURT:  How do you respond to that?

5              MR. ORONOZ:  Well, Your Honor, I would respectfully

6    disagree.  I -- I would think that under that reasoning, almost

7    anyone -- anytime someone was on trial for a specific charge,

8    similar crimes of that nature, that could be remote, would

9    still come in against that person to show that they were acting

10   in conformity with that sort of character to commit that sort

11   of crime.

12             THE COURT:  I don't want to discuss this necessarily

13   in front of the jury.  Why don't we take our break for the

14   evening then, ladies and gentlemen.

15             During this recess, I again admonish you not to

16   discuss this case among yourselves or with anyone else, not to

17   listen to, read, or watch any report of or commentary on the

18   trial by any person connected with the trial or by any medium

19   of information, including without limitation newspaper,

20   television, radio or the Internet.

21             And you are not to form or express an opinion on any

22   subject connected with this case until it's finally submitted

23   to you under instructions from me for your deliberations.

24             So we will be in recess until tomorrow morning.  Come

25   in about 8:30, if you would.  Make coffee and enjoy the

Brysco Baker - Direct

1    doughnuts.  And we will see you again at 9:00 o'clock.

2            If you want, just leave your notebook right there in

3    your chair, and nobody will disturb them overnight.  That way

4    you don't have to worry about "I left my notebook in the car"

5    or whatever.

6            All right?  Show the jury out, if you would, please.

7        (Jury out.)

8            THE COURT:  You can step down, ma'am.  Yeah.  Go

9    ahead and step down.  That's fine.  And thank you.

10           You all may be seated.  Step back to the spectator

11   section there.

12           This is in response to your objection, Mr. Oronoz.

13   This is -- this particular crime was one where I think the

14   pattern is important.  It shows -- the witnesses have testified

15   about the grooming process that goes on, you know, which is

16   part of the pattern.

17           So it's -- I think the pattern evidence is important

18   here.  I mean -- and I believe -- didn't I enter an order on

19   this?  I'm not trying to be critical.  I'm just -- but my

20   recollection is that was my thinking at the time, was it's a

21   pattern, in many respects, a pattern.

22           MR. GAFFNEY:  Well, I think you entered an order as

23   to --

24           THE COURT:  If I am not being clear, it's like I'm a

25   bank robber.  You know, well, bank robbers do whatever.  But if

1    I -- if I always wear a Howdy Doody mask and Bermuda shorts and

2    no shirt, and -- you understand?  There's a pattern there.  But

3    how is that relevant?  Well, it shows a pattern.

4            You know, and it's this same grooming process that

5    goes on that the witnesses have described.

6            Now, do you understand my point?

7            MR. ORONOZ:  Yes, I absolutely do.

8            THE COURT:  Okay.

9            MR. ORONOZ:  Your Honor, but, I mean, my concern is,

10   is what she's testifying to, I believe, would amount to some

11   very general, very common pimp/prostitute grooming techniques

12   and things that commonly occur.

13           There is -- in my opinion, there is nothing signature

14   about it or nothing distinctive about it, which would probably

15   then make it a little more compliant with 404(b).

16           I think as it stands, it's simply, "Hey, this is bad

17   character evidence, folks.  This guy acted in conformity in

18   this case, like he did with, you know, this poor Miss Brysco."

19           That's -- that's my concern.  I don't think there's

20   anything distinctive enough about it that would qualify it

21   under 404(b).

22           THE COURT:  All right.  I will give you a chance to

23   respond.

24           MS. HERR:  Well, Your Honor, in our notice, I think

25   we indicated that we believe the facts of this particular

 1 incident are actually inextricably linked with the testimony of

 2 a witness who will be testifying tomorrow.

 3             THE COURT:  Okay.

 4             MS. HERR:  Amber Marquardt was charged as a

 5 codefendant in this case.  She had -- I believe that what she

 6 will testify to is that she had worked as a prostitute for

 7 Mr. Barnes, left him for a number of years, and came back to

 8 him after she found out her sister was being recruited by the

 9 defendant, to effectively substitute herself for her sister.

10             THE COURT:  All right.

11             MS. HERR:  Because of that, we frankly did not

12 believe this qualifies as 404(b) evidence.  We think it's part

13 of the facts of the case, however.

14             THE COURT:  Well, now, I understand.

15             MS. HERR:  However, in an abundance of caution --

16             THE COURT:  But 404(b) is how you can characterize

17 it?

18             MS. HERR:  Certainly.

19             THE COURT:  I can say this is hearsay, you know, or

20 whatever.  I mean, so that's just a characterization.  So it's

21 not like it's a separate category or anything.  It's just how

22 do you characterize this evidence?

23             He's saying, "Well, it's bad act evidence under 404."

24 So, that's all right.

25             I am inclined to uphold the ruling.  I think that

 1  it's a pattern.  And like you said, it ties in to what
 2  Miss Marquardt is expected to testify to.  And so I am inclined
 3  to let it develop, and I will just see where we go.
 4              MR. ORONOZ:  Thank you, Your Honor.
 5              THE COURT:  All right.  Thank you.
 6              MS. SILVA:  Before we break today, I have one quick
 7  motion.  We do have the victim in custody pursuant to the
 8  material witness warrant.  We did file that warrant, because it
 9  was a tracking warrant, under seal.
10              And I would like, with the Court's permission, to
11  provide a copy of the tracking warrant and the material witness
12  warrant to the defendant because she will be testifying
13  tomorrow.
14              THE COURT:  All right.
15              MS. SILVA:  Thank you, Your Honor.
16              THE COURT:  That will be the -- I will permit that.
17              All right.  Then let's break then, and I will see you
18  at 9:00 a.m. tomorrow morning.
19              Yes, sir.  Mr. Gaffney, you had something else?
20              MR. GAFFNEY:  I'm sorry.  I had something that I hope
21  is very brief.
22              The Court had granted the government's motion to
23  exclude our expert.  And for appellate reasons, I just wanted
24  to make a record as to what he would have testified to had he
25  been allowed to testify.

1          Is that okay if I do that now?

2          THE COURT:  Well --

3          MR. GAFFNEY:  Mr. Oronoz is telling me to do it in

4    our case in chief.

5          THE COURT:  Yeah.  And I think that's appropriate.  I

6    mean, because I -- understand that these motions in limine,

7    it's like would you like to buy a pig in a poke?  And I say,

8    "What's in there?  That's a pig.  Trust me.  Maybe it is."

9          And I don't mean that the attorneys mislead the

10   Court, but sometimes I don't understand it, or you don't

11   explain it clearly, or whatever.

12          So I'd rather wait until we get down to that, and

13   then I make my final ruling.  What I am trying to say is a

14   motion in limine is really a temporary ruling, if you will.

15          And you have heard me say, probably, I have reversed

16   Judge Mahan more often than the Ninth Circuit, which is saying

17   quite a lot.  So I'm always willing to revert to revisit

18   motions in limine, because it's based on, "Look.  We think the

19   evidence is going to be this way.  That's what we think, you

20   know."

21          And so I make a ruling based on that, but that's not

22   like "That's written in stone, by golly.  And there is no way I

23   am going to revisit that, and you have got to make a motion for

24   reconsideration or whatever."

25          Motions in limine are always open to -- I renew my

1   motion in limine.  All right?

2         MR. GAFFNEY:  Okay.  On this particular subject, I

3   understand the Court's ruling, and I'm not quarreling with the

4   Court.  I just want to make a record as to what he would

5   testify to.

6         THE COURT:  I understand, and I will certainly give

7   you that opportunity.

8         MR. GAFFNEY:  Okay.

9         THE COURT:  But let's wait.  I think we are better

10  waiting until that point in the trial.

11        MR. GAFFNEY:  Thank you, Judge.

12        THE COURT:  All right?

13        So we will be in recess, and I will see you at

14  9:00 a.m. tomorrow morning.

15        MS. SILVA:  Thank you, Your Honor.

16     (Recess, 4:51 p.m.)

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF EXAMINATIONS

3    For the Plaintiff:

4    Witness Name              Direct  Cross    RD    RX    Voir Dire

5        Anthony Petrulli          2
         Richard Leung            31
6        Jeffrey Henefent         99     111
         Brysco Baker            116
7

8                        PLAINTIFF'S EXHIBIT INDEX

9    Exhibit No.                                Marked    Admitted

10   2                                                       40
     4 and 5                                                 97
11   6                                                       46
     7                                                       61
12   8                                                       71
     9                                                       75
13   11                                                     101
     21                                                      50
14

15

16

17

18

19

20

21

22

23

24

25

--oOo--

COURT REPORTER'S CERTIFICATE

I, KATHERINE EISMANN, Official Court Reporter, United States District Court, District of Nevada, Las Vegas, Nevada, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Date:  April 15, 2016.

/s/ *Katherine Eismann*

Katherine Eismann, CSR CRR RDR