1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF NEVADA

3   UNITED STATES OF AMERICA,     )
                                  )   Case No. 2:13-cr-423-JCM-GWF
4             Plaintiff,          )
                                  )   Las Vegas, Nevada
5        vs.                      )   April 5, 2016
                                  )   9:02 a.m.
6   DANIEL JAMES BARNES,          )
                                  )   Day 2
7             Defendant.          )
    _____)

8                      TRANSCRIPT OF PROCEEDINGS

9              BEFORE THE HONORABLE JAMES C. MAHAN
            UNITED STATES DISTRICT COURT JUDGE AND A JURY

10

11  APPEARANCES:

12  For the Government:

13          ALLISON HERR
            CRISTINA SILVA
14          Assistant U.S. Attorneys
            District of Nevada
15          333 Las Vegas Boulevard So.
            Las Vegas, Nevada 89101
16

    For the Defendant:
17

            LUCAS GAFFNEY
18          JAMES A. ORONOZ
            Oronoz, Ericsson & Gaffney LLC
19          1050 Indigo Drive, Suite 120
            Las Vegas, Nevada 89145
20

21

22

23  Court Reporter:  Katherine Eismann, CSR, CRR, RDR

24                  (702)431-1919  eismann.csr@gmail.com

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

1              (Tuesday, April 5, 2016, 9:02 a.m.)

2                         --oOo--

3                P R O C E E D I N G S

4        (Jury out.)

5            THE COURT:  All right.  Thank you.  You may be

6    seated.

7            We are in session outside the presence of the jury.

8            MS. SILVA:  Good morning, Your Honor.

9            THE COURT:  Good morning.

10           MS. SILVA:  Cristina Silva and Allison Herr on behalf

11   of the United States.

12           We do have our victim here who was arrested on a

13   material witness warrant.  We would like to call her out of

14   order as a result of her learning her mother passed away this

15   morning.  We would like to have her testimony terminate, so she

16   can get out of here.

17           That being said, we are making an oral motion for the

18   material witness warrant that was issued for her to be quashed

19   at the termination of her testimony.

20           THE COURT:  That will be the order of the Court then.

21           MS. SILVA:  Thank you, Your Honor.

22           THE COURT:  So her mother passed away, is that --

23           MS. SILVA:  Yes, Your Honor.

24           THE COURT:  All right.  So we will tell the jury.  I

25   mean, I intend to tell the jury that, why she's being called

1  out of order.

2           MS. SILVA:  Understood.

3           THE COURT:  Any objection to that?

4           MR. GAFFNEY:  No objection, Your Honor.  As long as

5  we're not going tell the jury why she's going to be on and off

6  the stand as quickly as possible in that her mom passed away, I

7  have no problem with calling her now.

8           THE COURT:  That's exactly what I'm going to do, is

9  that's why we need to get her on and get her off, is because

10  her mother died.  Is any objection to that?

11          MR. GAFFNEY:  No, Your Honor.

12          THE COURT:  All right.

13          MS. SILVA:  And I won't ask any additional questions.

14  We'll just let the jury know what's happening.

15          THE COURT:  I'm sorry?

16          MS. SILVA:  I won't ask her -- I won't ask her any

17  additional questions about that.

18          THE COURT:  No.  I mean, that's just -- that's why.

19  That's why she's being called out of order.  Okay?

20          MS. SILVA:  Yes, Your Honor.  Thank you.

21          MR. GAFFNEY:  I'm sorry, Your Honor.  Just so we are

22  clear, we are not going to tell the jury she's being called out

23  of order because her mother passed away; right?

24          THE COURT:  Yes.

25          MR. GAFFNEY:  We are not going to tell the jury that?

1          THE COURT:  Are we going to tell the jury that?  That
2     was your question.  I answered it, and I said "Yes."

3          MR. GAFFNEY:  Oh, okay.

4          THE COURT:  You did not understand yes?

5          MR. GAFFNEY:  Oh, well, to that I would have an
6     objection.

7          THE COURT:  Why is that?

8          MR. GAFFNEY:  Well, I don't want to give her some
9     sort of undue sympathy due to this circumstance.  I mean, I
10    think we can put her on and get her off quickly without having
11    to tell the jury why.

12         THE COURT:  Just say, "She's being called out of
13    order.  Never mind why."

14         MR. GAFFNEY:  Well, that would be my preference.

15         THE COURT:  Just don't tell them.  They don't need to
16    know.  They are just the jury; right?

17         MR. GAFFNEY:  Well, I don't think that they
18    necessarily are going to wonder why she's being called out of
19    order.

20         THE COURT:  You don't think so.  "Why is she being
21    called out of order?  Why are we doing this?  We had the other
22    woman.  What happened?  Is she going to be called back?"

23         MR. GAFFNEY:  Well, we can tell them that we need to
24    get her on off the stand quickly without telling them why.

25         THE COURT:  So just let them wonder why.  Let them

1    think, "Gee, I wonder why?  I wonder if -- if what?"  You know,

2    let them wonder then.  Is that your solution?

3         MS. SILVA:  Perhaps, Your Honor, in the alternative

4    is just a death in the family.  If that will appease --

5         THE COURT:  Okay.  We will be in recess.  We will be

6    in recess.  Your objection is noted for the record.

7         (Recess, 9:05 a.m.  Resumed 9:08 a.m.  Jury in.)

8         THE COURT:  Do the parties stipulate to the presence

9    of the jury and the alternates?

10        MS. SILVA:  Yes, Your Honor.

11        MR. GAFFNEY:  Yes, Your Honor.

12        THE COURT:  All right.  All right.  Ladies and

13   gentlemen, we are going to go out of order a little bit this

14   morning.  We are going to call a witness who has a family

15   emergency, where she needs to get on and testify and then leave

16   the stand.  So, we'll call her out of order then.

17        MS. SILVA:  Thank you, Your Honor.  The government

18   calls Jasmin Madison.

19        THE COURT:  All right.  Come forward and be sworn,

20   please, ma'am.  Right up here on my left, your right.

21                          JASMIN MADISON,

22   having been duly sworn, was examined and testified as follows:

23        COURTROOM ADMINISTRATOR:  State your full name and

24   spell it for the record.

25        THE WITNESS:  Jasmin Madison, M-A-D-I-S-O-N.

Jasmin Madison - Direct

1          MS. SILVA:  May I proceed, Your Honor?

2          THE COURT:  Yes, ma'am.  Whenever you are ready.

3                    DIRECT EXAMINATION

4    Q.   Good morning.  Miss Madison, how old are you?

5    A.   I am now 18.

6    Q.   And back in the spring, so between February and May of

7    2013, how old were you?

8    A.   15.

9    Q.   Okay.  I have a few questions for you, and I have a

10   tendency to talk fast.  So if I am speaking too fast, just let

11   me know.  Okay?

12   A.   (Nods head.)

13   Q.   Back in the spring of 2013, do you recall meeting somebody

14   later known to you as YD?

15   A.   Yes.

16   Q.   Okay.  And do you see that person in the courtroom here

17   today?

18   A.   Yes.

19   Q.   Okay.  Can you please point him out and identify him by an

20   article of clothing he's wearing?

21   A.   He's right there.

22   Q.   What color of shirt is he wearing?

23   A.   Like a blue flannel shirt.

24   Q.   What color?

25   A.   A blue.

Jasmin Madison - Direct

 1   Q.   What else is he wearing?

 2   A.   I can't really see.

 3   Q.   You can stand up.  Is he wearing anything else?

 4   A.   A red striped tie.

 5        MS. SILVA:  Okay.  Let the record reflect the witness

 6   has identified the defendant.

 7        THE COURT:  She pointed the defendant out, and the

 8   record will show she identified him.

 9        MS. SILVA:  Thank you, Your Honor.

10   Q.   How did you meet YD?

11   A.   I met him through his bottom.

12   Q.   And what was his bottom's name?

13   A.   Amber.

14   Q.   Where did you meet Amber?

15   A.   On Boulder.

16   Q.   When you say Boulder, do you mean Boulder Highway here in

17   Las Vegas, Nevada?

18   A.   Yeah.

19   Q.   Okay.  When you met her, where were you when you met her

20   exactly?

21   A.   Crossing the street from the Arizona Charlie's.

22   Q.   Okay.  And at some point after meeting her, did she take

23   to you meet YD?

24   A.   They came to pick me up, YD and Amber.

25   Q.   Okay.  And how did they pick you up?

Jasmin Madison - Direct

1    A.    In a car.

2    Q.    Do you recall what color of car it was?

3    A.    A white Chevy.

4    Q.    Okay.  A white Chevy.  Did it have two doors or four

5    doors?

6    A.    Four.

7    Q.    Okay.  And when they picked you up, where did they pick

8    you up from?

9    A.    Boulder.

10   Q.    And where did you go?

11   A.    To the Motel 6 down on the Strip.

12   Q.    And what happened when you got to the Motel 6 down on the

13   Strip?

14   A.    I took a shower.  Amber did my hair, and YD went to go get

15   me a pair of shoes, because he was going to put me down that

16   night.

17   Q.    When you say "put me down that night," what do you mean?

18   A.    Like put me on a blade to go work.

19   Q.    And you just said the word "blade."  What is -- is there

20   another name for the word blade?

21   A.    Track.

22   Q.    Okay.  And is "tracks" a place where prostitutes work?

23   A.    Yes.

24   Q.    Okay.  Once you got to the motel room and Amber did your

25   hair, did anyone take pictures of you?

Jasmin Madison - Direct

1    A.    No, not that night, because they found out I was really

2    tired, so they let me sleep in.  And then they came to pick me

3    up the next morning --

4    Q.    Okay.

5    A.    -- to go down.

6    Q.    And you said "to go."  Where were you going?

7    A.    To Boulder to blade.

8    Q.    Okay.  And did you work that day?

9    A.    Yeah.

10   Q.    Did you catch any dates?

11   A.    Uh-huh.

12   Q.    Do you recall how many dates you caught that day?

13   A.    I only caught one.

14   Q.    Okay.  And did you get money from performing the date?

15   A.    Yeah.

16   Q.    What did you do with the money?

17   A.    I gave it to YD.

18   Q.    Okay.  After you worked the blade that day, what happened

19   next?

20   A.    We went to California.

21   Q.    Okay.  Before you went to California, did anyone take

22   pictures of you?

23   A.    No, I didn't start posting until I went to California.

24   Q.    Okay.  So, it's your recollection that you then go to

25   California?

Jasmin Madison - Direct

1   A.   Can you repeat that, please?

2   Q.   It's your recollection that you then go to California?

3   A.   Hum.  Yeah.

4   Q.   And how did you get to California?

5   A.   We drove.

6   Q.   And was it in the same white Chevy?

7   A.   Yes.

8   Q.   Okay.  And where did you go in California?

9   A.   Modesto, Merced.

10  Q.   So is it fair to say you went to Modesto and Merced?

11  A.   Yes.

12  Q.   Let's focus first on Modesto.  What did you do when you

13  got to Modesto?

14  A.   Well, Amber had a date, so the trick, as they use -- the

15  clients had booked her a room.  And we waited until she got

16  done, and then we just stayed in the room that she turned the

17  date in until we got our own room down there.

18  Q.   And when you say "we," who are you referring to?  Is that

19  you, YD, and Amber?

20  A.   Yeah.

21  Q.   Okay.  Did you work that first night in California?

22  A.   No.

23  Q.   Okay.  The next day, what did you do?

24  A.   We went to go get some clothes, so I can start working.

25  And then he put me down on a certain area of the blade.

Vol. 2 - 144

Jasmin Madison - Direct

1    Q.   And this blade, are you referring to the blade in Modesto?

2    A.   Uh-huh.

3    Q.   Okay.  And do you recall about how long you were in

4    Modesto working?

5    A.   About a week.  It wasn't that long.

6    Q.   It wasn't that long, is that what you said?

7    A.   Yeah.

8    Q.   Will you do me a favor?  If you will pull that

9    microphone -- it moves -- a little closer to you, so we could

10   hear you.  Thank you so much, Jasmin.

11        When you were working the blade, did you catch dates?

12   A.   No, not really.  It was mostly off the Internet.

13   Q.   Okay.  And do you recall what site on the Internet you

14   were catching dates from?

15   A.   RedBook.

16   Q.   Okay.  How do you know that you were catching dates off

17   RedBook?

18   A.   Because Amber was the one answering the phone calls.

19   Q.   Okay.

20   A.   And setting up them.

21   Q.   Do you recall, at some point, someone taking pictures of

22   you to be put on RedBook?

23   A.   Yeah.

24   Q.   Who took those pictures?

25   A.   Amber.

1    Q.   And do you recall what she took those pictures with?  Like

2    what?  Was it a phone, a camera, an iPad?

3    A.   A tablet.

4    Q.   A tablet?  And what kind of pictures were they?

5    A.   Ones in lingerie.

6    Q.   Okay.  Were you also naked in some of the pictures?

7    A.   Uh-huh.

8    Q.   Okay.  Did you actually see the -- the RedBook ad that you

9    were posted on?

10   A.   (Nods head.)

11   Q.   I see you nodding your head.  Is that --

12   A.   Yes.

13   Q.   -- "yes"?  Okay.  Thank you.  So you were in Modesto, and

14   you caught dates off of myRedBook.  Did you make money off

15   those dates?

16   A.   Uh-huh.  Yes.  Sorry.

17   Q.   Thank you.  That's okay.  You are being recorded.

18           So when you got the money from those dates, who did

19   you give the money to?

20   A.   YD.

21   Q.   And I know it's been a couple years, but do you recall how

22   many dates you caught?

23   A.   I don't remember.  Sorry.

24   Q.   Okay.  That's okay.  From Modesto, did you go somewhere

25   else?

1    A.   Merced?

2    Q.   And in Merced, did you work as a prostitute?

3    A.   Yes.

4    Q.   Did you catch any dates?

5    A.   A few.

6    Q.   And did you make money off those dates?

7    A.   Yes.

8    Q.   Okay.  Again, who did you give the money to when you

9    finished with your dates?

10   A.   YD.

11   Q.   Okay.  Do you know what YD did with the money?

12   A.   No, I didn't really pay attention to that.

13   Q.   Okay.  Did you ever give the money to Amber?

14   A.   No.

15   Q.   All right.  How did you communicate with YD?

16   A.   Through text mostly.

17   Q.   Did you have a cell phone?

18   A.   Yes.

19   Q.   Okay.  Was it a smart phone?  Like, what kind of phone was

20   it?

21   A.   It was one of them Obama phones.  The flip phones.

22   Q.   Flip phones?  Okay.  What about Amber?  How did you

23   communicate with her?

24   A.   Mainly calls.

25   Q.   At some point after going to California, did you come back

Jasmin Madison - Direct

1    to Las Vegas?

2    A.    Yes.

3    Q.    And where did you go when you came back to Las Vegas?

4    A.    The Arizona Charlie's on Boulder Highway.

5    Q.    Okay.  And what happened when you got to the Arizona

6    Charlie's on Boulder Highway?

7    A.    He put us down and I just left.

8    Q.    Okay.  When you say "he" put us down, are you referring to

9    YD?

10   A.    YD.

11   Q.    Okay.  And "put you down," does that mean you and Amber

12   went back to work?

13   A.    Uh-huh.

14   Q.    Is that a yes?

15   A.    Yes.

16   Q.    Okay.  And did you make any money when you came back to

17   Las Vegas?

18   A.    No, because I left.  I got locked up.

19   Q.    Okay.  You left.  Where did you leave and go to?

20   A.    Tropicana.

21   Q.    And why did you leave?

22   A.    Because I didn't want to do it no more.

23   Q.    When you say "do it," what do you mean?

24   A.    Prostitute.

25   Q.    Do you recall the exact dates that everything you just

Jasmin Madison - Direct

1   testified to, like, occurred?  Like, do you recall this

2   happening, you know, from April 1st to May 30th?  Or is it fair

3   to say you don't recall the exact dates?

4   A.   I don't recall the exact dates.

5   Q.   Okay.  And do you recall giving a statement to

6   Detective -- you know him as Rich -- Detective Rich back in

7   2013?

8   A.   Yes, I do.

9   Q.   Okay.  And do you recall in that interview with him, that

10  you did give some dates?

11  A.   Going over them, yeah.

12  Q.   Okay.  Is it possible that as you sit here today and as

13  you sat back then, that maybe you got some of the dates wrong?

14  A.   No.

15  Q.   Do you think you were right?

16  A.   Yeah.

17  Q.   Okay.  As you sit here today, you don't remember the exact

18  dates?

19  A.   No.

20  Q.   Okay.  And when you interviewed with Detective Rich, did

21  that happen several months after you met YD and Amber?

22  A.   No, it -- when I got picked up is right before -- right

23  after I left them.

24  Q.   Okay.  So do you recall that being sometime in the spring

25  or in the summer?

Jasmin Madison - Direct

1    A.    The summer.

2             MS. SILVA:  Just one moment, Jasmin.  Court's

3    indulgence.

4    Q.    Amber [sic], I have just a few more questions for you.

5    Were you originally interviewed by -- do you see Detective Rich

6    here in the courtroom?

7    A.    Uh-huh.

8    Q.    Did you talk to him first or second?

9    A.    He was second.

10   Q.    Okay.  So did you talk to somebody else first?

11   A.    Yeah.

12   Q.    And when I say "somebody else," another detective?

13   A.    Yeah.

14   Q.    And was that several months before you ended up speaking

15   to this detective?

16   A.    I think so.  Yeah.

17   Q.    Okay.  Is it fair to say you don't recall?

18   A.    Yeah, I really don't.

19   Q.    Okay.  Do you recall when you spoke to the detective

20   that's in the courtroom, whether or not you did a photo lineup

21   with him?  You looked at pictures and identified people?

22   A.    Yeah, I did.

23   Q.    Okay.  There's a binder there in front of you.  Do you see

24   that binder?

25   A.    Yes.

Jasmin Madison - Direct

1   Q.   Could you open it?  And there's a tab.  And do you want to

2   turn to tab 12.

3          Okay.  If you could, just take a look at the

4   documents that are in tab 12.  And you can turn the pages, and

5   when you are done, just take a look at me.  Do you recognize

6   those?

7   A.   Yeah.

8   Q.   Is that a copy of the photo lineup, at least one of them

9   you did with Detective Rich Leung back when you interviewed

10  with him?

11  A.   Yes.

12         MS. SILVA:  Permission to admit Government's Exhibit

13  No. 12.

14         THE COURT:  Any objection to number 12?

15         MR. GAFFNEY:  No, Your Honor.

16         THE COURT:  Thank you.  Same will be admitted and may

17  be published.

18      (Exhibit 12 admitted.)

19         MS. SILVA:  Thank you, Your Honor.

20  Q.   Jasmin, is that your handwriting that's on the screen

21  there?

22  A.   Yeah.

23  Q.   Okay.  And is it fair to say it says "Number 4 is YD"?

24  A.   Yes.

25  Q.   All right.

1            Thank you, Mr. Oaks.

2            THE COURT:  It should be on your screens as well.  Is

3  your screen fixed today?

4            MS. SILVA:  Oh, okay.  Great.  Thank you.

5  Q.   And is that also your handwriting in the circle of the

6  person you identified as YD?

7  A.   Yes.

8  Q.   All right.  Did you do a second photo lineup with the same

9  detective to identify Amber?

10  A.   Yes.

11  Q.   All right.  And if you could turn to the next tab, tab 13,

12  and take a look at that.  Do you recognize those documents?

13  Just take a look through them.

14  A.   Yeah.

15  Q.   And did you -- is that your handwriting?

16  A.   Uh-huh.

17  Q.   And did you pick somebody out of the lineup?

18  A.   Yes.

19            MS. SILVA:  Permission to admit Government's Exhibit

20  No. 13.

21            THE COURT:  Any objection to Exhibit 13?

22            MR. GAFFNEY:  No, Your Honor.

23            THE COURT:  Thank you.  The same may be admitted and

24  may be published.

25            MS. SILVA:  Thank you, Your Honor.

1      (Exhibit 13 admitted.)

2   BY MS. SILVA:

3   Q.   Again, Jasmin, is this your handwriting?  And it says "I

4   choose number 42 as Amber"?

5   A.   Yes.

6   Q.   Okay.  And did you make that circle and sign underneath

7   number 2?

8   A.   Yes.

9   Q.   All right.  When you were first interviewed, do you

10  remember telling one of the detectives that you knew somebody

11  named Cory?

12  A.   Who?

13  Q.   Someone named Cory?

14  A.   (Shakes head.)

15  Q.   No?

16  A.   I don't remember.

17  Q.   Do you remember what name, other than Amber, Amber used?

18  Did she go by a different name?

19  A.   Yes, she did.

20  Q.   What name was that?

21  A.   I don't remember.

22  Q.   You don't remember.  But you remember she had a different

23  name?

24  A.   Yes.

25  Q.   Okay.

Jasmin Madison - Direct

1          MS. SILVA:  Court's indulgence.

2     Q.   My last few questions here, Amber [sic].  If you could

3     turn to the same book in front of you.  I believe it's

4     government tab 7.

5     A.   Okay.

6     Q.   Do you see photographs in there?

7     A.   Yes.

8     Q.   Okay.  And do you recognize those to be pictures of text

9     messages between yourself and YD?

10    A.   Yes.

11    Q.   Okay.  And could you just flip through them and verify

12    that those are text messages you remember exchanging with him?

13    A.   Yes.

14    Q.   Okay.  I'm going to show you, when they are on the screen.

15    It says "To YD.  Hey.  I real went to get some money, but I'm

16    not feeling gud at all, Daddy."

17          Why did you call him Daddy?

18    A.   That's what we were supposed to call him.

19    Q.   When you say "we're supposed to call him," what do you

20    mean by that?

21    A.   Me and Amber.

22    Q.   Okay.  Did he tell you that?

23    A.   No, Amber did.

24    Q.   Okay.  Is that fair to say that that's -- is that a rule?

25    A.   Yes.

Jasmin Madison - Direct

1  Q.   All right.  When you are working as a prostitute, are you

2  sometimes given rules to follow?

3  A.   Yes.

4  Q.   And Amber just told you about that one.  Were there other

5  rules you were given?

6  A.   Not to talk to no other black men.

7  Q.   And who told you that?

8  A.   They both did.

9  Q.   And when you say "they both did," are you referring to YD

10  and Amber?

11  A.   And Amber.

12  Q.   Okay.  Do you know who put the ad for RedBook on the

13  Internet?

14  A.   Amber.

15  Q.   Okay.  Did you see her do it?

16  A.   Uh-huh.

17  Q.   Okay.  Do you know if anyone else put that ad on RedBook?

18  A.   Sometimes YD would repost.

19  Q.   Okay.  And when you say "repost," what do you mean by

20  that?

21  A.   Repost the ad.  Redo it.

22  Q.   Okay.  And why would he redo it?

23  A.   Because sometimes we would be on the blade working.

24  Q.   Okay.  Do you know if he reposted the ad when you got to a

25  new city?

Jasmin Madison - Cross

1  A.   No.   Sometimes like the -- the ad would get flagged or --

2  so he had to repost another one.

3  Q.   And how do you know the ad would get flagged or he had to

4  repost?

5  A.   He'll let you know.

6           MS. SILVA:  Thank you, Jasmin.  I have no more

7  questions for you.

8           THE COURT:  All right.

9           MS. SILVA:  The attorney might have some questions

10 for you.

11          THE COURT:  Cross-examination.

12          MR. GAFFNEY:  Thank you, Your Honor.

13          THE COURT:  Yes, sir.

14                   CROSS-EXAMINATION

15 BY MR. GAFFNEY:

16 Q.   Good morning, Jasmin.

17 A.   Good morning.

18 Q.   Can I call you Jasmin?  Is that okay?

19 A.   Yes.

20 Q.   I'm Lucas Gaffney.  You probably figured out that I am

21 representing Daniel Barnes.  You can call me Luke.  I am not

22 trying to beat you up.  I am not trying to embarrass you.

23          THE COURT:  Do you have any questions for her?

24          MR. GAFFNEY:  Yes, I do have some questions, Your

25 Honor.

Jasmin Madison - Cross

1  Q.   My questions are going to be pertaining a lot to the

2  statements you've made in the past and the timeline of events.

3  Okay?  I'm going to try to get you out of here as quickly as

4  possible.

5            You originally testified in front of the grand jury

6  in this case on September 3rd, 2013.  Do you recall that?

7  A.   Yes.

8  Q.   And when you gave your testimony, you remember that you

9  were put under oath; right?

10  A.   Yes.

11  Q.   And you swore to tell the truth; right?

12  A.   Yes.

13  Q.   Okay.  And you tried to be truthful; correct?

14  A.   Yes.

15  Q.   And at the time that you testified, you were residing in

16  juvenile hall?

17  A.   Yes.

18  Q.   And that's because you had been arrested for soliciting

19  prostitution previously?

20  A.   Yes.

21  Q.   And after you were arrested in August of 2013, you were

22  interviewed by Detective Leung.  You know him as Richard Leung;

23  right?

24  A.   Uh-huh.

25  Q.   Detective Rich?

Jasmin Madison - Cross

1   A.   Yes.

2   Q.   He's here in the courtroom today?

3   A.   Yes.

4   Q.   And that occurred -- and you had several conversations

5   with Detective Leung; correct?

6   A.   Yes.

7   Q.   Is that right?  You had -- and those conversations took

8   place over a couple of weeks.  Is that fair to say?

9   A.   Yeah.

10  Q.   And when you had these conversations with him, you are

11  alone in a room?

12  A.   Yes.

13  Q.   And at one of these sessions, there was a recording

14  device, and he recorded one of your interviews; right?

15  A.   Yes.

16  Q.   All right.  And that -- if you recall, if I told you that

17  occurred on August 26, 2013, would you have any reason to

18  dispute that?

19  A.   No.

20  Q.   But you and Detective Leung had several conversations

21  before he turned the tape-recorder on; right?

22  A.   Uh-huh.

23  Q.   And he asked you about your personal history?

24  A.   Yes.

25  Q.   He asked you about your experiences as a prostitute?

Jasmin Madison - Cross

1   A.   Yes.

2   Q.   And while working as a prostitute, did you work for

3   somebody named Maserati?

4           MS. SILVA:  Objection, Your Honor.  Beyond the scope

5   and direct and irrelevant.

6           THE COURT:  Well, it's cross-examination.  I will

7   allow it.  Go ahead.

8           MR. GAFFNEY:  Thank you, Judge.

9   Q.   And Detective Leung, he asked you about other pimps that

10  you had worked for; right?

11  A.   Yes.

12  Q.   He asked you about other pimps that you knew; correct?

13  A.   Yes.

14  Q.   And then he asked you about Daniel, Mr. Barnes, and Amber

15  Marquardt; right?

16  A.   Yes.

17  Q.   He asked you about going to California?

18  A.   Yes.

19  Q.   And you had talked to the detective about where you had

20  stayed in California; right?

21  A.   Yes.

22  Q.   You talked to him about posting ads online?

23  A.   Yes.

24  Q.   You talked about the details of what happened during the

25  time you spent with Mr. Barnes and Miss Marquardt?

Jasmin Madison - Cross

1   A.   Yes.

2   Q.   And all of these conversations, all of these topics you

3   discussed with him before he turned the tape-recorder on and

4   recorded your official interview; right?

5   A.   Yes.

6   Q.   Now, at the time you were arrested in August 2013, you

7   were working for a pimp by the name of Maserati?

8           MS. SILVA:  Objection, Your Honor.  This violates a

9   pretrial motion.

10          MR. GAFFNEY:  Your Honor, yesterday the detective

11  testified that she had been solicited -- or she was arrested

12  for soliciting prostitution.  My position is that opened the

13  door to me asking these questions about her prior experiences

14  as a prostitute.

15          THE COURT:  Except, well, I am concerned about the

16  pretrial order.  I don't think it necessarily violates the

17  order.  I will let you go to a limited extent into that but not

18  into much detail.

19          MR. GAFFNEY:  Okay.  Thank you, Your Honor.

20          THE COURT:  I think that's what the order envisions

21  as well.

22          MR. GAFFNEY:  Correct.

23  Q.   Okay.  You -- okay.  So at the time of your arrest in

24  2013, August of 2013, you were working for a pimp named

25  Maserati; right?

Jasmin Madison - Cross

1   A.   I don't remember.

2   Q.   You don't remember?

3   A.   (Shakes head.)

4   Q.   Would it refresh your recollection to take a look at one

5   of your previous statements?

6   A.   (Nods head.)

7   Q.   Yes?  Okay.  Hold on just a minute.

8            MR. GAFFNEY:  Your Honor, may I approach?

9            THE COURT:  Is that marked as an exhibit?

10           MR. GAFFNEY:  It is not.  This would be her grand

11   jury testimony from September 3rd, 2013.

12           MS. SILVA:  I have a copy, Your Honor.

13           THE COURT:  All right.  Go ahead.

14           MR. GAFFNEY:  Thank you, Judge.

15   Q.   Miss Madison, if you could read to yourself just the

16   bottom of page 3 and then the top of page 4.  And then look up

17   at me when you are done.

18           Okay.  Have you read it?

19   A.   (Nods head.)

20   Q.   Does that refresh your recollection?

21   A.   Yes.

22   Q.   Okay.  So in August of 2013 when you were arrested, you

23   were working for a pimp named Maserati; correct?

24   A.   Yes.

25           THE COURT:  That misstates her testimony.

Jasmin Madison - Cross

1          MR. GAFFNEY:  I'm sorry.

2    Q.   At the time of your arrest in August, you were working for

3    a pimp named Maserati?

4          THE COURT:  That misstates her testimony.

5          MR. GAFFNEY:  Can I see the grand jury transcript?

6          THE COURT:  There's water there.  Oh, you have got

7    water.

8          THE WITNESS:  Thank you.

9          MR. GAFFNEY:  I'm sorry, Judge.  Are you looking at

10   page 3 and 4?

11         THE COURT:  I am not looking at anything.  I don't

12   have it in front of me.

13   BY MR. GAFFNEY:

14   Q.   Okay.  On September 3rd, 2013, when you testified in front

15   of the grand jury, did you testify that during the time of your

16   arrest, you were working for a pimp named Maserati?

17   A.   Yes.

18   Q.   And you testified that you originally you had met Maserati

19   on Boulder Highway; correct?

20   A.   Yes.

21   Q.   And you testified that that's the same place you met

22   Amber, was on Boulder Highway; right?

23   A.   Yes.

24   Q.   And you testified that you had started working with

25   Maserati in the spring of 2013; right?

Jasmin Madison - Cross

1   A.   Yes.

2   Q.   And that would have been sometime in March or April of

3   2013?

4   A.   Yeah.

5   Q.   And that's close in time to when you met Mr. Barnes and

6   Miss Marquardt; right?

7   A.   Yes.

8   Q.   And when working for Maserati, you learned of certain

9   rules you were supposed to abide by as a prostitute; is that

10  right?

11  A.   Yes.

12  Q.   You knew to give Maserati all of your money?

13  A.   (Nods head.)

14  Q.   Is that a yes?

15  A.   Yes.

16  Q.   You know that you are not supposed to look another pimp in

17  the eyes?

18  A.   Yes.

19  Q.   You know that you are not supposed to talk to other pimps;

20  right?

21  A.   Yes.

22  Q.   You were also, during that time, in contact with a pimp

23  named Quiet?

24  A.   Who?

25  Q.   Quiet.

Jasmin Madison - Cross

1    A.    Quiet?  I don't remember that.

2    Q.    You don't recall?  Would it refresh your recollection to

3    look at your grand jury testimony?

4    A.    Yeah.

5    Q.    Okay.  And I'm looking at --

6              Oh, I'm sorry.  Your Honor, this would not be her

7    grand jury testimony.  This would be a statement made to

8    Detective Leung, October 26, 2013.  It's on page 36.

9              THE COURT:  All right.  Now what is this?

10             MR. GAFFNEY:  This is her testimony --

11             THE COURT:  What exhibit is it?  What exhibit number?

12             MR. GAFFNEY:  It is not an exhibit.  It's a

13   statement.

14             THE COURT:  How are you going to refresh her

15   recollection?

16             MR. GAFFNEY:  I'm just --

17             THE COURT:  How are you going to refresh her

18   recollection if it's not an exhibit?

19             MR. GAFFNEY:  I am impeaching her with a prior

20   inconsistent statement that she made.

21             THE COURT:  Are you impeaching her or refreshing her

22   recollection?

23             MR. GAFFNEY:  Impeaching.  Okay.

24             THE COURT:  I mean, I don't care, but if you are

25   going to refresh her recollection, it has to be admitted into

Jasmin Madison - Cross

1  evidence; doesn't it?

2          MR. GAFFNEY:  Well -- okay.  I can do that.

3          THE COURT:  Do you want me to read the rule to you?

4          MR. GAFFNEY:  No, Your Honor.

5          THE COURT:  Okay.

6  BY MR. GAFFNEY:

7  Q.   Okay.  Miss Madison, you recall giving an interview to

8  Detective Leung on August 26, 2013; correct?

9  A.   Yes.

10         MR. GAFFNEY:  Your Honor, I don't want to admit this

11 as an exhibit.  I am just going to ask her questions.

12         THE COURT:  If you are going to -- what are you going

13 to do with it?  You want to refresh her recollection?  It has

14 to be an exhibit according to rule.

15         It has to the marked as an exhibit --

16         MR. GAFFNEY:  I understand.

17         THE COURT:  -- and if it's going to be admitted, it's

18 up to the other side if they want to admit it.

19         MR. GAFFNEY:  Okay.  I understand.

20         THE COURT:  Under the rule.  All right?

21         MR. GAFFNEY:  All right.

22 Q.   Madison, do you recall --

23         I'm just going to move on.

24         Do you recall also being in contact with a pimp by

25 the name of Jackpot?

 1   A.   I don't remember.

 2   Q.   Okay.  Now, when you met Amber on Boulder Highway, do you

 3   recall that you had told her not to get into a car, because it

 4   had an undercover cop in it?

 5   A.   Yes.

 6   Q.   Okay.  And she appreciated that; right?

 7   A.   Yes.

 8   Q.   And when you met her, you told her that you were working

 9   for somebody else at the time; right?

10   A.   Yes.

11   Q.   And it was through Amber that you eventually met

12   Mr. Barnes; is that correct?

13   A.   Yes.

14   Q.   And eventually, you went to the motel -- to a motel where

15   they were staying?

16   A.   Yes.

17   Q.   And when you got there, that's when you learned the rules.

18   Is that right?  When you got to the Motel 6 is when you learned

19   the rules about working with Amber?

20   A.   Yes.

21   Q.   Okay.  And essentially, they are the same rules that you

22   learned from Maserati; right?

23   A.   Yes.

24   Q.   And Amber is -- she's there when the rules are being

25   explained; correct?

1  A.   Yes.

2  Q.   And was it during that conversation that you told Amber

3  how old you were?

4  A.   No.

5  Q.   Okay.  And then your testimony is that the next -- you

6  stayed at the motel that night.  You slept there; right?

7  A.   Not the same motel.  They drove me to another one.

8  Q.   I'm sorry?

9  A.   Not at the Motel 6.  They drove me to another one.

10  Q.   Where did they drive you to?

11  A.   The one on Boulder.

12  Q.   Okay.  But you slept there that night?

13  A.   Yes.

14  Q.   And then the next day, it's your testimony that you went

15  back out to the track, and you were working again?

16  A.   Yes.

17  Q.   And who dropped you off on Boulder Highway?

18  A.   YD and Amber.

19  Q.   And did they stick around to watch you work?

20  A.   I mean, YD was driving around.

21  Q.   So he wasn't around watching you while you were working;

22  right?

23  A.   YD was driving around watching.

24  Q.   And then when you are done, you called him?

25  A.   Yes.

Jasmin Madison - Cross

1    Q.   Okay.  And this would have been -- we're talking -- this

2    is sometime in the -- at the end of April of 2013; right?

3    A.   I don't remember the days I told you.

4    Q.   But you testified that you had engaged in one act of

5    prostitution that day; right?

6    A.   Yes.

7    Q.   And then after you finished on Boulder Highway, that's

8    when you left for Modesto?

9    A.   Yes.

10   Q.   And you stayed at a hotel in Modesto on the first night

11   you were there; right?

12   A.   Yes.

13   Q.   Now, back in 2000 -- or, I'm sorry.  September of 2013,

14   you testified that you couldn't remember the name of that hotel

15   you stayed in the first night in Modesto; right?

16   A.   Yes.

17   Q.   And you still have no recollection of that today?

18   A.   Yes.

19   Q.   And you didn't work that night, the first night you were

20   in California?

21   A.   No.

22   Q.   You testified that the next morning, this is -- you

23   testified in front of the grand jury that the next morning you

24   guys had gotten a place at the Best Western Inn in Modesto?

25   A.   Yes.

Jasmin Madison - Cross

1    Q.   And that the room was in Amber's name?

2    A.   Yes.

3    Q.   And so this is the second day that you would be in Modesto

4    that you are staying at the Best Western Inn; right?

5    A.   Yes.

6    Q.   And while you were there, you engaged in an act of

7    prostitution with a client based on this online ad; right?

8    A.   Yes.

9    Q.   And that date was -- or that act of prostitution was

10   done -- facilitated through this myRedBook advertisement;

11   right?

12   A.   Yes.

13   Q.   And that ad had pictures of you; correct?

14   A.   Yes.

15   Q.   Amber took those pictures?

16   A.   Yes.

17   Q.   And Amber took those pictures using an iPad; is that

18   right?

19   A.   Yes.

20   Q.   And Mr. Barnes, he wasn't present when those pictures were

21   being taken; was he?

22   A.   No.

23   Q.   Amber was the first person who talked to you about

24   myRedBook; correct?

25   A.   Yes.

Jasmin Madison - Cross

1    Q.   You had never heard about it before she had mentioned it

2    to you?

3    A.   No.

4    Q.   And you testified in front of the grand jury that after

5    you stayed in Modesto for a couple of days, you then went to

6    Fresno?

7    A.   No.

8    Q.   You don't -- is that a --

9    A.   Merced you mean?

10   Q.   Actually, it's Fresno.  Would it refresh your recollection

11   to take a look at your grand jury testimony?

12   A.   I don't know.

13   Q.   It would not refresh your recollection?

14   A.   You can -- yeah.

15   Q.   Okay.  Showing you -- this is going to be on page 20.  You

16   may need to read page 19 and 20 in order to get the context of

17   it.  Just look at me when you are done, please.

18        Okay.  Does that refresh your recollection?

19   A.   No.

20   Q.   You don't recall saying that?

21   A.   I mean, I probably did, but I meant Modesto -- Merced or

22   Modesto.

23   Q.   Now the testimony that you see there --

24   A.   Yes.

25   Q.   -- in the transcript, does it say that you went to Fresno

Jasmin Madison - Cross

1   after you went to Modesto?

2   A.   Yes, sir.

3   Q.   Okay.  Thank you.  But you had -- also had told Detective

4   Leung, at one point, that you went from Modesto to Merced; is

5   that right?

6   A.   Yes, sir.

7   Q.   Okay.  And I think you also told Detective Leung that you

8   indicated you had stayed at a Best Western in Merced; right?

9   A.   Yes.

10  Q.   Okay.  And you told Detective Leung that after you left

11  Modesto, you stayed in Merced for about three days; is that

12  right?

13  A.   Uh-huh.  Yes.

14  Q.   And then while you were in Merced, you'd go from the Best

15  Western Inn to the California Inn at some point; right?

16  A.   Yes.

17  Q.   And you worked at the California Inn with Amber?

18  A.   No.  YD just put Amber down there.

19  Q.   Okay.  You never stayed at the California Inn?

20  A.   No.

21  Q.   You never worked at the California Inn?

22  A.   No.  Amber was just there.

23  Q.   Okay.  Now you testified in front of the grand jury that

24  after two weeks in California, you came back to Las Vegas;

25  right?

Jasmin Madison - Cross

1    A.   Yes.

2    Q.   And you testified that in front of grand jury.  You also

3    told that to Detective Leung; correct?

4    A.   Yes.

5    Q.   And you testified that during that two-week period in

6    California, you are with Amber and Daniel; correct?

7    A.   Yes.

8    Q.   Now, you also told Detective Leung that while you were in

9    California, you engaged in about 70 acts of prostitution during

10   that two-week span.  Do you remember that?

11   A.   Yes.

12   Q.   And do you remember you told him you earned about $600 for

13   that -- for those 70 acts of prostitution?

14   A.   No.

15   Q.   You don't remember the total, or you don't remember

16   telling him that?

17   A.   I don't remember the total.

18   Q.   Okay.  And then when you got back to Las Vegas, you

19   testified that you had stayed in Arizona Charlie's; right?

20   A.   Yes.

21   Q.   And that's Arizona Charlie's on Boulder Highway?

22   A.   Yes.

23   Q.   Okay.  And that room was under Amber's name as well?

24   A.   Yes.

25   Q.   And you stayed at Arizona Charlie's with them for about

Jasmin Madison - Cross

 1  three nights; is that right?

 2  A.   When we came back to Vegas, I left the day we came back to

 3  Vegas.

 4  Q.   Okay.  Okay.  Thank you.  And you left because you didn't

 5  feel like working anymore; right?

 6  A.   Yes.

 7  Q.   At one point, you sent a text message to Amber asking her

 8  to come and get your things; right?

 9  A.   Yes.

10  Q.   Or that you wanted to retrieve your things from her;

11  right?

12  A.   Uh-huh.

13  Q.   Okay.  And you did that; didn't you?

14  A.   No.

15  Q.   All right.  And that was -- would that have been the last

16  contact that you had with Amber or Daniel?

17  A.   Yes.

18  Q.   And it was shortly after that that you were arrested for

19  soliciting prostitution; right?

20  A.   Yes.

21  Q.   And that's May 5 of 2016 [sic]?

22  A.   Yes.

23  Q.   All right.  And then you got locked up for a while; right?

24  A.   Yeah.

25  Q.   And then they put you on house arrest?

 1            MS. SILVA:  Objection, Your Honor.  Relevance.

 2            MR. GAFFNEY:  I will move on.  I will move on.

 3            MS. SILVA:  Move to strike.

 4   BY MR. GAFFNEY:

 5   Q.   Now, you testified that in April and May, you were using a

 6   Samsung flip phone; is that right?

 7   A.   Yes.

 8   Q.   And while you were with Amber and Daniel, you let Amber

 9   use your phone a couple times; didn't you?

10   A.   No.  She had her own.

11   Q.   You don't recall Amber ever using your phone?

12   A.   No.

13   Q.   You recall sometimes Daniel would send messages to you

14   that were meant for Amber?

15   A.   I don't remember.

16   Q.   Is it possible?

17   A.   Look, I don't know.  I don't remember.

18            THE COURT:  Calls for her to speculate.  You don't

19   have to answer that.

20   BY MR. GAFFNEY:

21   Q.   Your telephone that you were using back then, it was

22   capable of taking photographs; wasn't it?

23   A.   Yeah.

24   Q.   Okay.  And, in fact, you had taken a couple of photographs

25   of yourself back then?

1   A.   I don't remember.

2   Q.   Okay.  There is a binder up there with you?  There should

3   be.  There isn't.

4           Showing you what's been marked as Defense Proposed

5   Exhibit 510S, can you tell me or tell the jury what you are

6   looking at?

7           THE COURT:  You have to be on a microphone when you

8   are speaking so we can pick you up.

9           MR. GAFFNEY:  Sure.

10           THE COURT:  What is your question now?

11  BY MR. GAFFNEY:

12  Q.   Jasmin, do you have the defense proposed -- the defense

13  exhibit binder in front of you?

14  A.   Yes.

15  Q.   Okay.  And what you are looking at is Defense Proposed

16  Exhibit 510S.  The sticker is on the back.  Can you tell the

17  jury what it is you are looking at?

18  A.   Pictures of me.

19  Q.   Okay.  And are those pictures that you took of yourself?

20  A.   Yeah.

21  Q.   And do those pictures accurately reflect what you would

22  have looked like back in April and May of 2013?

23  A.   Yes.

24           MR. GAFFNEY:  Okay.  Your Honor, I would move to

25  admit the exhibit and publish to the jury.

1          MS. SILVA:  No objection, Your Honor.

2          THE COURT:  The same will be admitted.  It may be

3    published.

4      (Exhibit 510S admitted.)

5    BY MR. GAFFNEY:

6    Q.  So these were pictures that you took.  Do you see the date

7    in the information block next to the pictures?

8          Well, is it fair to say that these pictures were

9    taken in April of 2013?  Do you recall that?

10         THE COURT:  That's what she testified to.  You asked

11   her that, and she said "Yes."

12         MR. GAFFNEY:  Okay.  Court's indulgence, Your Honor.

13         THE COURT:  Yes.

14         MR. GAFFNEY:  Your Honor, I will pass the witness.

15         THE COURT:  All right.  Redirect.

16         MS. SILVA:  Just a few questions, Your Honor.

17                    REDIRECT-EXAMINATION

18   BY MS. SILVA:

19   Q.  Jasmin, Mr. Gaffney asked you a question about when you

20   told Amber how old you were.  At some point when you knew

21   Amber, did you tell her how old you were?

22   A.  Yes.

23   Q.  What age did you tell her you were?

24   A.  I told her my age.

25   Q.  Did you say you were 15 or you were 16?

1   A.   16.

2   Q.   Okay.  Previously you testified that you were actually 15?

3   A.   Yes.

4   Q.   So when you told Amber you were 16, was that a lie?

5   A.   Yes.

6   Q.   Okay.  During the course of the time that you knew YD, did

7   you tell him you were 16?

8   A.   Yes.

9   Q.   Okay.  Do you recall where you were when you told him you

10  were 16?

11  A.   We were at the Motel 6.

12  Q.   And the Motel 6, you are referring to the Motel 6 here in

13  Las Vegas, Nevada?

14  A.   Yes.

15  Q.   Was that before or after you went to California?

16  A.   Before.

17  Q.   Okay.  And where were you when you told Amber you were 16?

18  A.   We were in Cali.

19  Q.   During the time period that you knew Amber and YD or the

20  defendant, Daniel, did you have a driver's license or any form

21  of ID?

22  A.   No.

23  Q.   How did you know that the rooms or at least some of the

24  rooms in California were in Amber's name?

25  A.   Because Amber is the one that always would go get it.

Jasmin Madison - Redirect

1   Q.   I'm sorry?

2   A.   Amber is the one that would always go get the room.

3   Q.   Okay.  And do you recall that she had an ID?

4   A.   Yes.

5   Q.   Did they ever -- and they, Amber or the defendant, ever

6   ask you to get a room in your name?

7   A.   No.

8   Q.   Okay.  Do you know why they didn't ask you?

9   A.   No.

10  Q.   Just never did?

11  A.   (Shakes head.)

12          MS. SILVA:  Okay.  No further questions, Your Honor.

13          THE COURT:  All right.  Anything else?

14          MR. GAFFNEY:  No, Your Honor.

15          THE COURT:  All right.  Thank you for your time,

16  ma'am.  You may step down, and you are excused.  Any objection

17  if I excuse the witness?

18          MR. GAFFNEY:  No, Your Honor.

19          MS. SILVA:  No, Your Honor.  Thank you.

20          THE COURT:  Thank you, ma'am.  You are excused.

21  Thank you.

22          All right.  Recall the previous witness.

23          MS. HERR:  Your Honor, we recall Brysco Baker.

24                     BRYSCO BAKER,

25  having been previously sworn, was examined and testified as

Brysco Baker - Direct

1    follows:

2                 THE COURT:  I remind you, ma'am.  You are still under

3    oath.  Do you understand?

4                 THE WITNESS:  Yes.

5                 THE COURT:  All right.  Be seated.  And there's water

6    right there if you need it.

7                 All right, Miss Herr.  Whenever you are ready.

8                              DIRECT EXAMINATION

9    BY MS. HERR:

10   Q.   Good morning.

11   A.   Good morning.

12   Q.   I know we stopped about midway through your testimony

13   yesterday, so forgive me if I've asked you this question.  I'm

14   going try to start back up where we stopped at.  And I want to

15   make sure we have a little bit of context.

16               I believe you testified yesterday that initially you

17   had had some contact with Daniel via Facebook.  And that the

18   two of you had developed what you thought was sort of a

19   brother/sister kind of relationship?

20   A.   Yes.

21   Q.   At some point, did he talk to you about prostitution?

22   A.   Yes.

23   Q.   And do you recall exactly what -- what that conversation

24   was?

25   A.   It was for -- sex for money.

Brysco Baker - Direct

1   Q.   Okay.  Now, at that point, did you know that this was

2   going to be an ongoing thing, or did you think this was just a

3   one-time incident?

4   A.   One-time incident.

5   Q.   And I think you testified previously that you were in a

6   foster home at this point?

7   A.   Yes.

8   Q.   Where was your mom?

9   A.   She was in Texas.

10  Q.   Did you have any family living in the area?

11  A.   My dad, but I wasn't seeing him that much.

12  Q.   Okay.  So were you pretty much dependent on what you got

13  from the foster care family?

14  A.   Yes.

15  Q.   And that was to support you and your son?

16  A.   Yes.

17  Q.   And how old was your son at that point?

18  A.   He was two -- almost two.

19  Q.   And you were 17 at the time this happened?

20  A.   Yes.

21  Q.   Okay.  Now, I think you had already explained to us

22  yesterday that, in fact, this act took place.  Why did you

23  decide to go forward with it?

24  A.   Because I wanted to be able to provide for my son.  And

25  the foster home that I was in wasn't helping me enough.  I was

Brysco Baker - Direct

1    running low on diapers, and formula, and clothes.  And it was

2    hard to wash his clothes.  It -- just necessities that I needed

3    for him.

4    Q.    Do you recall where this occurred at?

5    A.    Turlock.

6    Q.    Okay.  You were living there?

7    A.    Uh-huh.

8    Q.    When -- after he set up this date for you, where did the

9    date happen at?

10   A.    I can't remember what city, but it was -- it was either

11   Turlock or Modesto.

12   Q.    Okay.  Do you remember the location at all?

13   A.    I don't remember the exact location.  I can't really tell

14   you where it is.  But I know it's off the freeway.  It had a

15   39.99 billboard sign that you could see off the freeway.  There

16   was a gas station across the street and a Jack in the Box.

17   Q.    Okay.  And when you say "3999," is that the address or was

18   that like the price of the room?

19   A.    The price of the room.

20   Q.    How did you get to that location?

21   A.    He drove us.

22   Q.    And when you say "us," that was you and whoever the date

23   was?

24   A.    Uh-huh.

25   Q.    So Daniel drove the two of you to this hotel?

Brysco Baker - Direct

1   A.   Yes.

2   Q.   Did Daniel go into the hotel room with you?

3   A.   Yes.

4   Q.   What happened after you got into the room?

5   A.   He was just talking to me about -- talking to me about his

6   friend or his cousin.  He just was making him seem good, and

7   trying to tell me good qualities about him, and making it seem

8   like a hookup, like an actual date.

9   Q.   Okay.  And at some point, did Daniel leave or did he stay?

10  A.   Yes, he left.

11  Q.   And do you have any idea where he was at while you stayed?

12  A.   I think he was in the car across the street.

13  Q.   Okay.  And what happened after Daniel left?

14  A.   Me and his friend, we -- we had sex.

15  Q.   Okay.  Prior to that point, had you ever been paid to have

16  sex with anyone?

17  A.   No.

18  Q.   Tell me what you remember about that experience?

19  A.   I felt humiliated.  I didn't -- it wasn't like how I

20  thought it would be.  It wasn't -- it wasn't fun.  It wasn't

21  easy.  It wasn't a date or romance.  Like it was trying to make

22  a scene.

23  Q.   Did you ever talk to Daniel about how you felt?

24  A.   Yes.

25  Q.   And what was Daniel's reaction?

Brysco Baker - Direct

1   A.   He told me that I didn't have to do it again.  That he

2   understands and that he hoped I was okay.

3   Q.   Now, did you stay in contact with Daniel after this?

4   A.   A little bit, but not like -- like that anymore.  I didn't

5   really feel comfortable talking that much until I turned 18.

6   Q.   And what happened after you turned 18?

7   A.   After I turned 18, we got a little closer again, and we

8   started talking regularly.  And I put that behind us, and I

9   just wanted to move forward and get back to the relationship

10  I -- I had with him just to have someone to talk to and stuff.

11  Q.   Now, at this point, did your sister, Amber, have any idea

12  that you were speaking with Daniel?

13  A.   Yes.

14  Q.   And what had her reaction been to that?

15  A.   She told me not to.

16          MR. GAFFNEY:  Objection.  Hearsay.

17          THE COURT:  Is it being offered to prove the truth of

18  the matter asserted?

19          MS. HERR:  No, Your Honor.

20          THE COURT:  I'm sorry.  I can't hear.

21          MS. HERR:  No, Your Honor.  I'm --

22          THE COURT:  Can you communicate with me by your mind,

23  Mr. Gaffney, or what?

24          MR. GAFFNEY:  Oh, I'm sorry.  I thought you were

25  talking to --

Brysco Baker - Direct

1        THE COURT:  Sending me some sort of secret
2   perception.  My receptor is not working.
3        MR. GAFFNEY:  I apologize, Your Honor.
4        THE COURT:  No, you don't need to apologize.  You
5   made an objection.  And then I had a question, and then you
6   just sit there.
7        MR. GAFFNEY:  I'm sorry.  What was your question,
8   Your Honor?
9        THE COURT:  I don't know.  What was the question?
10       MR. GAFFNEY:  I don't know.
11       THE COURT:  You objected it was hearsay, and I said,
12  "Is it being offered for the truth of the matter asserted?"
13       Hearsay, ladies and gentlemen, is an out-of-court
14  statement that's offered to prove the truth of the matter
15  asserted.
16       In other words, if I say, "It's raining outside."
17  And you say, "Well, how do you know?"  And I say, "Well, so and
18  so told me."  That's hearsay, because it's something I don't
19  know myself.  That's hearsay.
20       But, in fact, it's simply an out-of-court statement.
21  It's an out-of-court statement.  That's all.
22       MR. GAFFNEY:  Your Honor, I believe it was being
23  offered to show that Amber did not want Brysco talking to
24  Mr. Barnes.  So in that sense, I believe that it was being
25  offered for the truth of the matter asserted.

Brysco Baker - Direct

1        THE COURT:  Well, that's a bit of mind reading that I

2   can't indulge in.  So, overruled.

3   BY MS. HERR:

4   Q.   After you turned 18, did you remain in the foster home?

5   A.   No.

6   Q.   Where were you living at that point?

7   A.   I moved back to Merced, and I moved in with my god -- my

8   godson's parents.

9   Q.   Okay.  And during this period of time, you are still

10  talking to Daniel?

11  A.   Yes.

12  Q.   And at some point, did he again approach you about working

13  as a prostitute?

14  A.   Yes.

15  Q.   And what was your reaction at that point in time?

16  A.   I just ignored it.  We just -- I didn't want to talk about

17  it, and I didn't want to do it anymore.  And I just didn't feel

18  comfortable.

19  Q.   Did he stop asking about it then?

20  A.   No.

21  Q.   What would he do?

22  A.   It wasn't exactly asking me to do it.  He would bring it

23  up, and suggest it, and say that.  And bring up the fancy part

24  of it, the clothes, the not wanting or needing anything

25  anymore.  The "I don't have a job, so I need something."  Just

Brysco Baker - Direct

1    would make it sound really, really nice.  And I needed it,

2    because I had nowhere to go.  Sleeping on the floor.  And I

3    didn't have any money.

4    Q.   Can you give me some examples?  When you say he would

5    bring this up, in what frame of reference would he bring this

6    up?

7    A.   He would say, "Don't you -- don't you want clothes?  Don't

8    you want -- all you have to do is come with me.  We can go talk

9    to these people.  I know a few people that wouldn't mind

10   letting you have some money."

11        And they were his guy friends.  And I knew with his

12   friends, it wasn't just for free.  It was never for free with

13   them.  And my -- and I talked to my sister beforehand.  And she

14   would tell me just not do it.  It was a -- a "favor for a

15   favor" type of things.

16   Q.   At some point though, did you relent and decide to go

17   ahead and engage in some of this activity?

18   A.   Yes.

19   Q.   Approximately how long did you work for Daniel?

20   A.   Almost a year off and on.

21   Q.   During that period of time, did you feel like you had a

22   choice?

23   A.   No.  Being his friend, it wouldn't -- it wasn't really a

24   choice.  He would make it seem like it was a choice, but it --

25   it would always get brought up again.  Always talking about it

1  and always asking.  It was never just to leave it alone after

2  we said "No."

3  Q.   So, you would sometimes tell him "No"?

4  A.   Yeah.

5  Q.   And then he would continue to ask you about it?

6  A.   He would wait a while, and then he would, yes.

7  Q.   And during that period of time, what would you do with the

8  money that you earned?

9  A.   I would get my son some clothes, or get me some clothes,

10 or get me some shoes, or get food.

11 Q.   And the money that was paid to you, was that paid to

12 Daniel or was it paid directly to you?

13 A.   He would get the money.

14 Q.   So then the money that you got was money that you received

15 from Daniel?

16 A.   Yes.

17 Q.   Did you feel like you could walk away from Daniel?

18 A.   No.

19 Q.   Why?

20 A.   It wasn't fear.  It wasn't the fact that he would do

21 anything.  It was just he would always bring it up, and it

22 wasn't -- it was always pressure being around him.  It -- it

23 turned into egg shells being around him and hanging out with

24 him.

25           It would -- because the conversation would always

Brysco Baker - Direct

1    lead to that, or it would always be talked about, or we'd be

2    hanging out with people that wouldn't just give -- give me --

3    give me space and just not pester me about everything that I

4    was doing.

5                And I just didn't -- I didn't feel comfortable --

6    comfortable being around him anymore.  He would always talk

7    about it, and it just -- the pressure just kept on -- it kept

8    on building.  And being around him -- it's funny.

9    Q.   Okay.  Do you remember approximately what year this would

10   have been when you were working for him?

11   A.   About 2013 or '14.  I can't remember what year.

12   Q.   Okay.  At some point, you did stop working for Daniel;

13   correct?

14   A.   Yes.

15   Q.   How were you able to ultimately get away from him?

16   A.   I ran to my mom's house, and I hid.  And I told her not to

17   tell him where I am at.  And after he figured out that I was

18   over there, I moved in with my -- my son's godmom.  She had an

19   apartment at that time, and he didn't know where she lived.  So

20   I stayed there for a while.

21   Q.   Have you had any contact with him in the last two years?

22   A.   No.

23                MS. HERR:  I have no other questions.

24                THE COURT:  Cross-examination.

25                MR. ORONOZ:  Court's indulgence.

Kurt Overall - Direct

1          THE COURT:  Yes, sir.

2          MR. GAFFNEY:  No questions, Your Honor.

3          THE COURT:  All right.  Thank you for your time,

4    ma'am.  You may step down.

5          All right.  Next witness.

6          MR. GAFFNEY:  Your Honor, the United States calls

7    Kurt Overall.

8          THE COURT:  Come forward and be sworn, please, sir.

9    Right up here on your left.

10                        KURT OVERALL,

11   having been duly sworn, was examined and testified as follows:

12         COURTROOM ADMINISTRATOR:  State your full name and

13   spell it for the record.

14         THE WITNESS:  Kurt Steven Overall, O-V-E-R-A-L-L.

15                    DIRECT EXAMINATION

16   BY MS. SILVA:

17   Q.   Good morning, Mr. Overall.  A few questions for you.

18   Where are you employed?

19   A.   CCA, Nevada Southern Detention Center.

20   Q.   Okay.  And how long have you been so employed?

21   A.   Six years.

22   Q.   In the course of the business of CCA, are phone calls

23   recorded?

24   A.   Yes.

25   Q.   Are those calls recorded at or about the time that they

Kurt Overall – Direct

1    are made?

2    A.    Yes.

3    Q.    And are those calls then maintained as a regular business

4    record of calls coming from the CCA facility?

5    A.    Yes.

6    Q.    All right.  In the -- before you came into court today,

7    did you review two CDs purporting to contain calls from the CCA

8    facility?

9    A.    Yes.

10   Q.    And upon reviewing them, did you then initial and date the

11   CDs as having been reviewed?

12   A.    Yes.

13          MS. SILVA:  May I approach the witness?

14          THE COURT:  Yes, ma'am.

15   BY MS. SILVA:

16   Q.    Mr. Overall, I'm showing you what's been premarked for

17   identification as Government's Exhibit 19A and 19B.  Do you

18   recognize those disks?

19   A.    Yes, I do.

20   Q.    And are those the disks that you reviewed prior to coming

21   into court here today?

22   A.    Yes, they are.

23   Q.    And how do you recognize them as the disks that you

24   reviewed?

25   A.    They have my initials on it, and it's our standard

Kurt Overall - Direct

1  protocol for labeling disks.

2  Q.   Okay.  In reviewing disk 19 -- Exhibit 19A, did you

3  realize that the date on the front that was written initially

4  was actually incorrect?

5  A.   Yes, I did.

6  Q.   Okay.  And was it -- what was incorrect about it?  Was it

7  the year?  The dates?

8  A.   It was the years.

9  Q.   Okay.  Did you learn that the recordings on that

10  particular disk were made in the year 2013?

11  A.   Yes.

12        MS. SILVA:  Permission to admit Government's

13  Exhibit 19A and 19B.

14        THE COURT:  Any objection to 19A and B?

15        MR. GAFFNEY:  No, Your Honor.

16        THE COURT:  All right.  The same will be admitted and

17  may be published.

18        MS. SILVA:  Your Honor, we are going to publish these

19  through a different witness.

20        At this time, the government has no further questions

21  for this witness.  May I retrieve the exhibits?

22        THE COURT:  Yes, ma'am.

23     (Exhibit 19A and 19B admitted.)

24        THE COURT:  Cross-examination?

25        MR. GAFFNEY:  No questions, Your Honor.

 1            THE COURT:  All right.  Thank you for your time, sir.

 2   You may step down.

 3            THE WITNESS:  Thank you.

 4            THE COURT:  All right.  Next witness.

 5            MS. SILVA:  Your Honor, if I may step out, I believe

 6   it's going to be Mr. Thomas Radke.  If I may step out.

 7            THE COURT:  Come forward and be sworn right up here

 8   on your left my right.

 9                         THOMAS M. RADKE,

10   having been duly sworn, was examined and testified as follows:

11            COURTROOM ADMINISTRATOR:  State your full name and

12   spell it for the record.

13            THE WITNESS:  Thomas M. Radke.  T-H-O-M-A-S, Michael,

14   common spelling, M-I-C-H-A-E-L, R-A-D-K-E.

15                       DIRECT EXAMINATION

16   BY MS. HERR:

17   Q.   I apologize.  I just needed to make sure I knew what

18   exhibit I was going to ask you to look at so I could tell you

19   to flip to the right section.

20            Mr. Radke, who are you employed by?

21   A.   The Federal Bureau of Investigation, Las Vegas Division.

22   Q.   What do you do there?

23   A.   I am a computer forensic examiner.

24   Q.   And how long have you worked in that position?

25   A.   This will be my sixth year.

1   Q.   What are your job duties?

2   A.   My job duties include digital examination of digital

3   evidence items, computer items, cell phones, Macintosh

4   computers.  Any digital evidence that comes in to our division.

5   Q.   Okay.  For non-techie people like me, when you talk about

6   being a forensic examiner and looking at digital evidence, can

7   you put that in layman's terms for us and tell me what it is

8   that you are doing?

9   A.   So, basically, what we do is we -- so the computer

10  evidence comes into the division.  The data itself is usually

11  contained on the hard drive or on the cell phone device.

12  Digital memory essentially is what we are looking at.

13          So we remove the hard drives.  Or in the case of a

14  cell phone, we capture the data in a forensically sound manner

15  on a -- on an examination machine with minimal volatility.

16          And we do that in such a way to where we -- we can

17  extract the data without actually writing any data back to the

18  original evidence item.

19          MR. GAFFNEY:  Your Honor, I'm sorry for interrupting.

20  We did not receive a notice of expert witness.  I believe that

21  he is going into specialized knowledge that's going to be used

22  to assist the jury in understanding the evidence that's going

23  to be presented, and so we would object to this witness.

24          MS. HERR:  Your Honor, I don't believe this qualifies

25  as expert testimony.  He's not giving any opinion on anything.

Thomas M. Radke - Direct

1  He's simply explaining his job duties, and he will act as a

2  percipient witness as to actions that he took.

3         THE COURT:  All right.  Lay people can be expert

4  witnesses as well or can testify as to matters arising within

5  their experience or expertise.  So I'm going to overrule the

6  objection and permit him to testify.

7  BY MS. HERR:

8  Q.   Just to summarize quickly, basically, what you do is you

9  look at computers, and you look at phones and devices that

10  attach to computers and phones.  Is that a fair summary?

11  A.   Yes, ma'am.  That's correct.

12  Q.   Okay.  Now, what kind of experience or training does -- do

13  you have in order to know how to look at phones?

14  A.   We have a substantial amount of education as part of our

15  basic training.  We have over 300 hours as part of our standard

16  training package.

17         In addition to those 300 hours, we specialize in each

18  individual type of examination.  So, for instance, the 300

19  hours would include Windows-based computers.  And then I would

20  also need to be certified in cell phone examinations to be able

21  to look at cell phone evidence.

22  Q.   As part of that background and that training you just

23  mentioned, does part of that include extracting information

24  from Apple cell phones or Apple tablets?

25  A.   Yes, ma'am.  It does.

Thomas M. Radke - Direct

1  Q.   And is there a preferred method that you use when you are

2  trying to extract that kind of data?  Do you have, like, a

3  particular program that you like to use or --

4  A.   There isn't one magic program that extracts everything.

5  So typically what I usually do is I will start out with what we

6  call a logical extraction, which that gathers the majority of

7  the data that is currently on the phone.

8        It doesn't do real well with deleted items.  In that

9  case, we use what we call a file system extraction.  And the

10 file system extraction actually will recover more data.

11       A lot of it depends on what the case agent is looking

12 for.  And usually I like to run multiple tools against the item

13 so that, number one, I know that I've gotten as much as I can

14 off the device.

15       And number two, every agent prefers it in a different

16 format.  So I usually run multiple tools for that reason.

17 Q.   Okay.  Now, to direct your attention to the reason why you

18 are specifically here today, at some point, did you receive a

19 request, from Special Agent Jim Mollica, asking you to review

20 an Apple iPad?

21 A.   I did.

22 Q.   If you would turn to Exhibit 18 in front of you.  I am

23 hoping that there's going to be a disk there.

24 A.   Yes.  I've got it.

25 Q.   And I am also going to hand you another exhibit, which

Thomas M. Radke - Direct

1  does not currently have an exhibit tab on it, but it is

2  Exhibit 20.

3         Can you tell me if you recognize Exhibit 20?

4  A.   I do recognize it.

5  Q.   Is that the iPad that you were asked to assist with?

6  A.   Yes, it is.

7  Q.   I'm not going to ask you to take it out and show this to

8  us.  But normally, when you receive a request from someone and

9  then you are looking at a piece of evidence, what type of means

10 do you use to match that up and make sure that what you are

11 examining is, in fact, the same thing that has been requested

12 of you to examine?

13 A.   Typically, part of our standard process, the evidence

14 resides in our evidence control unit.  So the agent would

15 collect the evidence and then would submit it into our evidence

16 control unit.  And a strict chain of custody is followed at

17 that point.

18        When the request comes in, the agent specifically

19 asks for certain evidence item numbers to be examined.  And

20 that's in the request that I receive.

21        In this case, this particular item was listed, and

22 then I went into evidence control to check the item out.  And I

23 actually would sign the chain of custody over from our evidence

24 control unit.

25        While it's in my possession and upon completion of

Thomas M. Radke - Direct

1    the exam, it would go back into evidence control.  And at that

2    point, I would release it back in with my signature on it.

3    Q.    Okay.  And are there serial numbers that are on most of

4    these devices, so that you can match them up and make sure that

5    we are all looking at the same iPad?

6    A.    Yes, there is.

7    Q.    Now, in this case, is that the iPad that you were asked

8    to perform an extraction on?

9    A.    Yes, it is.

10   Q.    And when you performed that extraction, was it successful?

11   A.    It was.

12   Q.    Did that generate some sort of a report?

13   A.    Yes, it did.  It generated -- each tool, a digital report

14   is -- is generated for each forensic tool that I used.  So in

15   this case, there were several forensic tools that were used.

16   Each one produced a digital report, and it was in HTML format.

17   Q.    And did you subsequently then reduce those reports on to a

18   CD or a DVD?

19   A.    So typically, part of our process is once the extraction

20   is 100 percent complete, then I would actually take that

21   extraction, and I would burn it onto digital media.

22          In this case, it was a DVD-R that I burned it on to.

23   Typically, I will make several copies of this.  So I will take

24   the original copy.  It will go into our evidence control with a

25   chain on it.  That's our original master copy.

Thomas M. Radke - Cross

1          And then I will also burn typically one to however

2     many copies the agent wants.  And in this particular case, the

3     case agent asked me for four copies.  So I created four copies.

4          So they have the one copy that went into evidence

5     control, and then there were four additional copies that I

6     created.  And those copies were handed to -- directly to the --

7     to the case agent upon completion.

8     Q.    And looking specifically at Government Exhibit 18A, is

9     that one of the copies that you made?

10    A.    Yes, it is.

11    Q.    And how are you able to recognize that as being one of

12    those copies?

13    A.    Part of our -- part of my training and part of our

14    standard operating procedures, as a forensic examiner, is I am

15    required to initial each disk that I create.  And this has my

16    initials on it along with the date that I created it.

17          MS. HERR:  Your Honor, I would move to enter into

18    evidence Exhibit 18A.

19          THE COURT:  Any objection?

20          MR. GAFFNEY:  No, Your Honor.

21          THE COURT:  Thank you.  Same will be admitted.

22     (Exhibit 18A admitted.)

23          MS. HERR:  I have no other questions.

24          THE COURT:  Cross-examination.

25

1                        CROSS-EXAMINATION

2    BY MR. GAFFNEY:

3    Q.   Good morning.

4    A.   Good morning.

5    Q.   Were -- based on -- were you asked to look for any

6    specific pictures on this iPad?

7    A.   Not specifically.  I was asked to extract certain items

8    from the iPad.

9    Q.   And based on your extraction of the iPad, you can't tell

10   how many people may have had access to this iPad; can you?

11   A.   While it's in my possession, I was the only person that

12   had access to it.

13   Q.   Let me try to rephrase.  You can't tell how many users or

14   how many people may have used the iPad by looking at your

15   extraction data; right?

16   A.   The only thing that I can -- that I can basically testify

17   to, is the fact that the user accounts that were on the device.

18   But the answer is no, I cannot.

19   Q.   Okay.  So if somebody had, say, the password to the

20   iPad, they would have access to it?

21   A.   That's possible.

22   Q.   And you -- based on your extraction, you can't tell who

23   took what photo that's found on the iPad or in your data

24   extraction?

25   A.   Typically, the report does contain GPS coordinates from

1    the photos.  So if it were taken with a camera, it will

2    actually contain the GPS coordinates of the photo.

3    Q.   But you can't put the iPad in a specific individual's

4    hand and say that that person took this picture?

5    A.   That's correct.

6              MR. GAFFNEY:  Okay.  No more questions.

7              THE COURT:  All right.  Anything on redirect?

8              MS. HERR:  Nothing further, Your Honor.

9              THE COURT:  Thank you for your time, sir.  You may

10   step down.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  Ladies and gentlemen, let's

13   take our morning recess at this time.

14             During this recess, I again admonish you not to

15   discuss this case among yourselves or with anyone else, not to

16   listen to, read, or watch any report of or commentary on the

17   trial by any person connected with the trial or by any medium

18   of information, including without limitation newspaper,

19   television, radio or the Internet.

20             And you are not to form or express an opinion on any

21   subject connected with this case until it's finally submitted

22   to you under instructions from me for your deliberations.

23             So we will be in recess for 10 minutes.

24        (Recess, 10:26 a.m.  Resumed 10:40 am.  Jury in.)

25             THE COURT:  Do the parties stipulate to the presence

1    of the jury and the alternates?

2                MS. HERR:  Yes, Your Honor.

3                MR. ORONOZ:  Yes, Your Honor.

4                THE COURT:  All right.  Thank you.

5                MS. HERR:  The government calls Amber Marquardt.

6                THE COURT:  All right.  Amber Marquardt.

7                MS. SILVA:  Your Honor, she's in transport.  It's

8    going to take just a minute.

9                THE COURT:  Oh, all right.

10               THE DEFENDANT:  Excuse me, Your Honor.  May I address

11   the Court?

12               THE COURT:  No.  No.  Talk to your attorney.

13               When you say a few minutes, what is it?  Five

14   minutes?

15               MS. SILVA:  Your Honor, I apologize.  We thought she

16   was all the way up here, but she's not.  They went down to get

17   her, so it will take a few minutes.

18               THE COURT:  I understand.  What is a few minutes?

19   Four to five minutes?

20               MS. SILVA:  Four to five minutes.

21               THE COURT:  Why don't we -- let's go out and be

22   comfortable again rather than just sit here for five minutes.

23   Let's go back, and we will being back in five minutes.

24               Okay?  So we will be in recess.

25               MS. SILVA:  Thank you, Your Honor.

Amber Lynn Marquardt - Direct

1          (Recess 10:42 a.m.  Resumed 10:50 a.m.  Jury in.)

2               THE COURT:  All right.  Thank you.  You may be

3     seated.

4               Will the parties stipulate to the presence of the

5     jury and the alternates?

6               MS. HERR:  Yes, Your Honor.

7               MR. GAFFNEY:  Yes, Your Honor.

8               THE COURT:  All right.  Thank you.

9               All right, sir.  You may proceed.

10                   AMBER LYNN MARQUARDT,

11    having been duly sworn, was examined and testified as follows:

12              COURTROOM ADMINISTRATOR:  State your full name and

13    spell it for the record.

14              THE WITNESS:  Amber Lynn Marquardt,

15    M-A-R-Q-U-A-R-D-T.

16              THE COURT:  Whenever you are ready, Miss Herr.

17                   DIRECT EXAMINATION

18    BY MS. HERR:

19    Q.   Good morning.

20    A.   Good morning.

21    Q.   Is it okay if I refer to you by Amber today?

22    A.   Yes.

23    Q.   Do you know someone by the name of Daniel Barnes?

24    A.   I do.  Yes.

25    Q.   And can you tell me if he's here in the courtroom today?

Amber Lynn Marquardt - Direct

1    A.   He is.

2    Q.   Can you point him out for the jury and describe an article

3    of clothing that he's wearing?

4    A.   I can't see him.

5    Q.   You can stand up if you need to.

6    A.   He's right there in the white T-shirt.

7              MS. HERR:  Your Honor, may the record reflect that

8    she's identified the defendant?

9              THE COURT:  The record will reflect that she's

10   identified the defendant.

11   BY MS. HERR:

12   Q.   And were you originally charged as a codefendant in this

13   case?

14   A.   Yes.

15   Q.   And at some point, did you enter a plea to the charge or

16   charges?

17   A.   Yes.

18   Q.   And at this point, are you currently waiting to be

19   sentenced?

20   A.   I am.

21   Q.   And as you stand here today, do you know what sentence you

22   are going to receive?

23   A.   I do not.

24   Q.   The agreement that -- or this plea agreement that you

25   reached, did that call upon you -- or did that give the right

1  of the government to call you to testify as a witness?

2  A.   Could you rephrase that, please?

3  Q.   Certainly.  As part of that plea agreement that you

4  reached in this case, was there a requirement that I could ask

5  you to testify today?

6  A.   Yes.

7  Q.   Did that agreement require you to give any particular

8  testimony?

9        In other words, did it spell out what you needed to

10 talk about today?

11 A.   No.

12 Q.   Did it tell you to do anything other than provide truthful

13 testimony?

14 A.   No.  I'm supposed to tell the truth.

15 Q.   Has anyone from the government asked you to provide any

16 testimony other than to give truthful testimony?

17 A.   No, just truthful testimony.

18 Q.   Okay.  Were you promised that you would receive any type

19 of -- or any particular sentence if you testified?

20 A.   No, I wasn't.

21 Q.   Is it your intention to testify truthfully here today?

22 A.   It is.

23 Q.   Tell me, at this point, are you here today voluntarily or

24 are you here today because you feel forced by the government to

25 testify?

Vol. 2 - 204

Amber Lynn Marquardt - Direct

1   A.   Voluntary.

2   Q.   Why do you want to be able to testify?

3   A.   Because it's the right thing to do.

4   Q.   Okay.  Let's start at the beginning.  And tell me how it

5   is that you met Daniel?

6   A.   I was 15 years old, and I was on the run from my mom.  I

7   ran away from my house.

8   Q.   Okay.

9   A.   And I met Daniel on a Greyhound bus.

10  Q.   Do you remember where you were going on the bus?

11  A.   No place in particular.  Wherever the bus stopped.

12  Q.   Okay.  So you were a runaway, and you met on a bus.  Tell

13  me what caught your attention about that?

14  A.   About what?  About him?

15  Q.   He was another passenger on the bus or --

16  A.   He was another passenger on the bus.  Yes.  He was another

17  passenger getting on the bus, and I saw him and he saw me.

18  Q.   Okay.  Did he approach you or did you approach him?

19  A.   We both started talking on the bus.

20  Q.   And what kind --

21  A.   As a mutual thing.

22  Q.   Okay.  And at some point, did he suggest that you go with

23  him up to Reno?

24  A.   Yeah.

25  Q.   Do you recall, at that point in time, why you were going

1  to Reno or what the circumstances were?

2  A.   He made it sound appealing.  I have never been to Reno.

3  So he was going there.  So I had no place to go, so I figured

4  I'd go with him.

5  Q.   And at that point, I think you indicated you were 15 years

6  old?

7  A.   I was.

8  Q.   Do you remember how old Daniel was?

9  A.   Maybe 19.

10  Q.   Okay.  When you talked about going to Reno together, did

11  you think that had anything to do with going to work for him or

12  becoming a prostitute?

13  A.   No.

14  Q.   What did you think was going to happen if you just hung

15  out with him for a while?

16  A.   Not really sure.  Just figured that he had money, and he

17  would be able to take care of me, so my intention was to go

18  with him, and I'd be taken care of.

19  Q.   Okay.  And at some point, did you, in fact, actually go to

20  Reno?

21  A.   I did.

22  Q.   And tell me what happened after you got there?

23  A.   We arrived.  And he had some Ecstasy on him, and he asked

24  me if I ever tried it.  And I told him I had tried to use

25  Ecstasy.  Lying though.  Trying to fit in, I guess.  And that's

Amber Lynn Marquardt - Direct

1   when he gave me an Ecstasy pill, and --

2   Q.   And tell me how you felt after you took this pill?

3   A.   Not myself.  Out of body experience.  Just not myself.

4   Q.   And was that the first time you had ever taken that

5   particular drug?

6   A.   Yes.

7   Q.   And you indicated you were trying to fit in.  You just

8   wanted to think that -- did you think -- you wanted him to

9   think that you had already used those kind of drugs before?

10  A.   Yeah.

11  Q.   What happened after you took those drugs?

12  A.   We met up with one of his friends and drove around Reno

13  for a while.  And then we ended up going to one of his friend's

14  hotel room.

15  Q.   And once you got to that hotel room, at some point, were

16  you asked to perform some sexual acts?

17  A.   Yes, I was asked.

18  Q.   And who asked you or who suggested that you should do

19  that?

20  A.   Him and his friends.  And they were offering different

21  prices of money and so on and so forth.  And I -- I denied it a

22  couple times until I finally gave in.

23  Q.   Now, when you initially -- you said you denied.  What was

24  your reaction when -- was this out of the blue, or was this

25  something you expected to happen?

1   A.   It was out of the blue.  Nothing I expected at all.

2   Q.   And as you are saying, no, you don't want to do this,

3   what's Daniel's reaction?

4   A.   Him and his friends were all, you know, shooting numbers,

5   different prices and stuff for me to give oral sex.  So he was

6   just in on it with everyone else, I guess.

7   Q.   Okay.  And at some point, did you, in fact, have to

8   perform oral sex?

9   A.   Yes, to one of his friends.

10  Q.   And did you make that decision or did somebody else make

11  that decision?

12  A.   It was more so after being asked so many times, I just

13  gave in.

14  Q.   Okay.

15  A.   And then being under the influence of Ecstasy, you know, I

16  was vulnerable.

17  Q.   And do you remember anything specifically about that

18  event?

19  A.   Yeah.  I had to give oral sex to one of his friends in

20  front of everyone.

21  Q.   And do you remember how many people were present?

22  A.   Maybe five.

23          THE COURT:  There are tissues right here if you need

24  one.

25

Amber Lynn Marquardt - Direct

1    BY MS. HERR:

2    Q.   That's okay if you need a minute.  There should also be

3    some water in the pitcher.

4    A.   (Shakes head.)

5    Q.   Did Daniel know that you felt this way?

6    A.   (Shakes head.)  I don't know.

7    Q.   Did you -- did Daniel, at some point, ask you to continue

8    to perform prostitution acts?

9    A.   Yes.

10   Q.   Now, the first incident that you told us about, was there

11   money that was exchanged for that?

12   A.   $100.

13   Q.   And was that money given to you or did that go to Daniel?

14   A.   To Daniel.

15   Q.   At that point, had you ever engaged in sex for money?

16   A.   Never.

17   Q.   Why didn't you leave him at that point?

18   A.   I don't know.

19   Q.   After that incident, did you start working as a prostitute

20   for Daniel?

21   A.   Yes.

22   Q.   Do you remember about how long you worked for him?

23   A.   Many years.

24   Q.   And were you in Reno the entire time?

25   A.   I was in Reno for a few months until about January or

1  February.  And in February, we moved to a different location,

2  and I was arrested in Sacramento for prostitution.

3  Q.   Okay.

4  A.   And after that, after I did my time, I ended up getting

5  released back to my mom.  And then I ran away back to him and

6  continued to live the life in the streets.

7  Q.   Okay.  Why did you return to Daniel do you think?

8  A.   Because I was convinced that I loved him.

9  Q.   Now when you mentioned that you got arrested in

10  Sacramento, did Daniel get arrested as well?

11  A.   I don't remember.

12  Q.   Do you remember how much time you had to serve?

13  A.   I don't remember.

14  Q.   During the time that you were working for him, do you have

15  any idea, on average, about how much money you would make in a

16  week?

17  A.   A few thousand.

18  Q.   Okay.  And in order to earn that kind of money, can you

19  estimate for us about how many sex acts you would have to

20  perform in a week?

21  A.   In a week?  Too many to count.

22  Q.   If it's your -- so explain to me what a typical day would

23  be for you while you were working for him?

24  A.   I would work day and night.

25  Q.   And when you talk about working day and night, you are

1    talking about having to act as a prostitute at that point?

2    A.   I would have to work as a prostitute throughout the day,

3    throughout the night, and in many different locations

4    throughout California, back to Reno, performing sexual acts

5    every time.  That's it.  And go to sleep.  Take some drugs,

6    drink, smoke some weed, and get back to it again.  It was a

7    24-hour cycle moving to different places.

8    Q.   And why were you part of the life?  What was the

9    attraction for you?

10   A.   The money and the fact that me and him -- I felt like we

11   were in it together.  And I really felt like I loved him, so I

12   continued it.

13   Q.   Okay.  And the money that you talk about, did you get to

14   keep that money?

15   A.   No.

16   Q.   What would happen to it?

17   A.   He would hold it.  He would keep it, because it was safe

18   that way he would say.  That way I wouldn't be able to be

19   robbed by other pimps or johns.

20   Q.   Could you, at various points, ask him for money?

21   A.   I have.

22   Q.   Okay.  And would he typically give you money?

23   A.   No.

24   Q.   Who had control of determining where you were going or how

25   many customers you were seeing?

Amber Lynn Marquardt - Direct

1  A.   He -- he would -- we would talk about different places and

2  stuff, but he would know different locations where money is

3  being made most.  So we would travel.  As far as how many

4  people I would perform these acts to, there wasn't a specific

5  number.  It's more so just keep on getting the money until

6  there isn't any left to get.

7  Q.   Okay.  Was it just you and Daniel alone, or were there

8  other people who worked with you?

9  A.   There were other females as well.  Not all the time, but

10 some of the times.

11 Q.   Okay.  And during those times that there were other women

12 who were involved, were you considered to be in charge of them

13 or were they equal in status to you?

14 A.   We would work together.  We would all work together.

15 Since I was his main girl, I was considered his bottom bitch.

16 Excuse my French.  So all of us girls, we all worked together.

17 Q.   Okay.

18 A.   Whenever we had other girls.

19 Q.   And when you refer to yourself as being a bottom, are

20 there special responsibilities that you have when you are a

21 bottom or when you are the main girl?

22 A.   Just to keep on bringing in money.

23 Q.   Okay.  Now, at some point, you did actually leave Daniel

24 for a period of time; is that correct?

25 A.   Yeah.

Amber Lynn Marquardt - Direct

1   Q.   Do you remember why you decided to leave at that point?

2   A.   I was tired.  I was tired of everything.  Going to jail.

3   Being in juvenile hall multiple occasions.  Doing time after

4   time after time after time behind this lifestyle.  And there

5   was another woman who was in his life from the time I got

6   locked up in 30 days.  And that made me angry, and I ended up

7   leaving him.

8   Q.   Okay.  Now even though you had left him, did the two of

9   you still stay in contact with one another?

10  A.   Yes.

11  Q.   And how would you communicate with each other?

12  A.   Telephone.

13  Q.   And while you would have these phone calls, what were you

14  talking to each other about?

15  A.   Just many different things.  I was -- I had a child then,

16  you know, and I would just talk about different stuff that's

17  going on in my household.

18  Q.   Did he ever ask you to come back?

19  A.   Yeah.

20  Q.   And what was your response?

21  A.   I would say "No."  For a while, it sounded good, you know,

22  because we had a history together.  So I thought that -- you

23  know, it just sounded good.  But I didn't want to go back the

24  to that lifestyle, so it was like a -- I was back and forth

25  wanting to go back to him but not wanting to go back to him.

Amber Lynn Marquardt - Direct

1  Q.   And did Daniel just ask you once to come back, or did he

2  ask you multiple times?

3  A.   A few times.

4  Q.   Now, approximately -- talking about this first period of

5  time that you were with him, about how long altogether did you

6  stay with him working with him?

7  A.   Before I left him the first time or --

8  Q.   Before you left him the first time.

9  A.   Three, four years.

10  Q.   And then you were away from him for another period of

11  time.  Do you recall about how long that period was?

12  A.   Maybe five, six years, I think.

13  Q.   Okay.  And during part of the time that you were

14  separated, were you also under sentence as a result of things

15  that had happened with Daniel?

16  A.   What do you mean?

17  Q.   In other words, you had indicated that you got arrested a

18  few times.  Do you know -- as you sit here today, do you recall

19  how many times you have been arrested?

20  A.   Over 10 times as a juvenile.

21  Q.   Okay.

22  A.   And I think three times as an adult, and one time with

23  him, and then this case as well.

24  Q.   At some point, you did decide to come back to him; is that

25  right?

1    A.   Yes.

2    Q.   Why did you decide to move back to California and be

3    around him?

4    A.   At first it was because my children -- my two daughters

5    lived in California, and I wanted to be closer to them.

6    Q.   At some point, did you find out that your sister had been

7    approached by him?

8    A.   Yes.

9    Q.   How did you find out about that?

10   A.   I found out because I guess he found her on Facebook

11   through a mutual acquaintance.  I later found out that he had

12   his cousin drive from LA, while I was living in Minnesota, and

13   he had her perform sexual acts to his cousin because my sister

14   needed money.

15   Q.   How did you feel when you found that out?

16   A.   How did I feel when I found that out?

17   Q.   Yes.

18   A.   Angry and more so protective of her.

19   Q.   And did that influence your decision to move back to

20   California?

21   A.   It played a part to it.  Yes, a significant part.

22   Q.   And explain to me in what way you were hoping to help your

23   sister by moving back?

24   A.   Maybe if I got in the picture, he would leave her alone.

25   Q.   Do you remember when you started, approximately when it

1    was that you started working -- you went back to work for

2    Daniel?

3    A.    Maybe in April, I believe.  March or April.

4    Q.    And when did you move back to California?

5    A.    In November of 2012.

6    Q.    Okay.  And between November of 2012 and about April of

7    2013, do you remember if you were working at a regular 9:00 to

8    5:00 kind of place?

9    A.    No.  I was looking for employment, and I was looking for

10   schooling.  Because I was in college in Minnesota, so I was

11   trying to find a college where my classes would have been able

12   to be transferred, but I was never able to find a job or

13   school.

14   Q.    And were you in contact with Daniel at that point?

15   A.    Yes.

16   Q.    Was it still just by telephone or were you actually seeing

17   him?

18   A.    I was seeing him then.

19   Q.    And what impact did that have on the decisions that you

20   ultimately made to return?

21   A.    To what?

22   Q.    Seeing him face-to-face, what impact did that have on your

23   decision to return back to the life or the lifestyle?

24   A.    It was mixed feelings.  Like I said, for many years, I

25   felt like I loved him.  And so when I saw him, I felt like a

1   spark was back or something.  And it impacted me to be around

2   him more.

3   Q.   And what was going on with your sister during that period

4   of time?

5   A.   My sister was in foster care still, I believe.  And she

6   was living in the same city as he was.  I was in contact with

7   my sister.

8   Q.   Okay.  Do you know, during that period of November 2012 to

9   April 2013, was she working for Daniel?

10  A.   I don't know.

11  Q.   Do you believe your return had anything to do with the

12  termination of the relationship between your sister and Daniel?

13  A.    Yeah.

14  Q.   Now, I want to draw your attention specifically to you

15  said you came back to work with him sometime, and you thought

16  around April.  At some point, did the two of you come together

17  to Las Vegas?

18  A.    Yes, we did.

19  Q.   And was that a place that the two of you frequented

20  regularly?

21  A.   Not me.  I haven't been to Las Vegas for many years.

22  Since I was 18 years old.  I had just got my driver's license.

23  So, no, I haven't been in Vegas.

24  Q.   Okay.  And is that part of why that particular trip stands

25  out a little bit to you?

1    A.    In a way, yeah.

2    Q.    So were you working as a prostitute at that point in time?

3    A.    I was.

4    Q.    Do you recall coming in contact with a girl by the name of

5    Jasmin Madison?

6    A.    Yes.

7    Q.    When you met her though, did you meet her by a different

8    name?

9    A.    Yazmin.

10   Q.    Yazmin?  And did she know you by the name Amber or did she

11   know you by a different name?

12   A.    Penny.

13   Q.    Okay.

14   A.    And I think Christy.

15   Q.    Did you sometimes use the name Christy?

16   A.    Yes.

17   Q.    Is that common when you're working in this kind of --

18   A.    Profession?

19   Q.    -- culture to use different names?  Yes.  Thank you.

20   A.    It's not a nice profession.  But, yes.  It is common to

21   change your name.

22   Q.    And why is that?

23   A.    Changes your identity.

24   Q.    Okay.  How did you meet Jasmin?

25   A.    I was on Boulder Highway at Arizona Charlie's at the bar,

1   and I met her there in the casino.

2   Q.   And the Boulder Highway area that you refer to, is that a

3   fairly common area or was that kind of known as a track or an

4   area here where prostitution is common?

5   A.   Yes.  It's the track.

6   Q.   Were you inside the hotel or outside the hotel when you

7   first met, if you recall?

8   A.   Inside.

9   Q.   Tell me what you remember from that initial meeting?

10  A.   I was having a drink.  And being on the streets, you know

11  who is working and who is not working.  And I just knew she was

12  working.

13          And we ended up having a conversation.  And in the

14  midst of the conversation, she brought up how her pimp was

15  beating her.  And, you know, that it wasn't a safe place.  We

16  exchanged numbers.

17          I had told her that if she needed any -- anything at

18  all, and if she wanted to get out of that situation with her

19  pimp, to give me a call.

20  Q.   Okay.  And did you tell her anything about what your

21  situation was with Daniel?

22  A.   I lied, and I said that we had a house, and we had a car.

23  And made it sound appealing in a way.  And I mentioned Daniel

24  by his nickname YD.

25  Q.   Okay.

1  A.   And I mentioned him, of course, and I told her that he

2  doesn't beat women.  That he's nice.  Stuff like that.

3  Q.   At some point, did she contact you?

4  A.   She did later on that evening.

5  Q.   Okay.  And tell me what happened after you got that call?

6  A.   We went and picked her up where she wanted us to pick her

7  up, and that was at 7-Eleven.

8  Q.   Okay.  And when you say "We went and picked her up," that

9  was you and who else?

10  A.   Daniel and one of his friends.

11  Q.   And what happened at that point?

12  A.   We picked her up, and then we went back to our hotel room

13  at Motel 6.  And she -- you could tell she's been in the

14  streets for a while, so she needed like to take a shower and

15  stuff like that.

16       And so Daniel went and bought her some new shoes

17  while me and her stayed at the room.  Him and his friend left

18  while we stayed at the room.

19  Q.   Okay.  At that point, were you just doing her a favor, or

20  was there an expectation that she was maybe going to join you

21  all and be part of your team, for lack after better word?

22  A.   It's usually like that.  When the girl comes, the -- they

23  are coming to come work with you.  So, she --

24  Q.   Were you present when Daniel talked to Jasmin?

25  A.   In some -- yeah.

Vol. 2 - 220

Amber Lynn Marquardt - Direct

1    Q.   So pretty much when you talk about at some point there

2    were four of you, and then one of the people left and there

3    were three of you, were you all inside of a hotel room is where

4    this is taking place, or were you at a different location?

5    A.   We were in the motel room.  So we were in a motel room all

6    the time.  And discussions -- she's been in the streets, so she

7    knows, you know, what to do and stuff like that as far as

8    working goes.  So it wasn't like, you know, anything new or

9    anything like that.  So --

10   Q.   Okay.  Did you talk about advertising her at all?

11   A.   Yeah.  There's websites in Las Vegas.  Daniel knows many

12   of them through other pimp acquaintances of his, which websites

13   are known in each area.  And so we spoke about getting her an

14   ad put up as soon as possible, so on and so forth.

15   Q.   Do you remember who made the decision about what site she

16   would be posted on?

17   A.   Daniel.

18   Q.   How did he communicate to you that he wanted you to place

19   that ad?

20   A.   He would just tell me.

21   Q.   Okay.  Putting an ad together, what does that require?

22   A.   Pictures, nudity, or if you have lingerie, those type of

23   pictures.  Phone number, website -- or not website.  Email.

24   And a little passage of some sort to attract the customer.

25   Q.   And did you typically write those things or would Daniel

1    write those things?

2    A.   Write the ads?

3    Q.   Uh-huh.

4    A.   I would and he would, too.

5    Q.   Do you remember specifically with regard to the ad

6    involving Jasmin, who put that ad together?

7    A.   I took the photos.

8    Q.   And the rest of the ad that dealt with the writing and the

9    advertising, who was that put together by?

10   A.   I can't remember what was written or who wrote what.  I

11   can't remember.

12   Q.   Okay.  Do you remember how you took those photos?

13   A.   With Daniel's iPad.

14   Q.   I'm going to hand to you what's been marked as

15   Government's Exhibit 20.  Can you tell me whether you recognize

16   anything about that package?

17   A.   Yeah.  This is his iPad.

18   Q.   And did you guys have -- did you typically use computers

19   or iPad, phones, things like that?

20   A.   Yes.

21   Q.   And did everybody have their own or would you share

22   devices?

23   A.   Everyone had their own.

24   Q.   So each person had one phone?

25   A.   Yeah.  And if not, then you are going to get a throwaway

 1   phone.

 2   Q.   Okay.  And do you remember if you guys had any other

 3   computer devices besides just that iPad?

 4   A.   Yeah, we had two laptops.

 5   Q.   Two laptops?

 6   A.   (Nods head.)

 7   Q.   And would those travel with you from place to place?

 8   A.   Not all -- not all of them, but sometimes the laptop and

 9   the iPad.

10   Q.   And did you change those out from time to time?

11   A.   Not the iPad.  But the laptop, yeah.

12   Q.   Okay.  Now, I'd like you, if you -- there's a white

13   booklet in front of you.  You know what?  I apologize.  That's

14   not going to be in the book.

15            I just need to show you Exhibit No. -- what's been

16   marked as Exhibit No. 8.

17            Could you turn on the overhead for me?  Because this

18   is already done in evidence.

19            Now, you mentioned while you were -- that at some

20   point, a decision was made, and there was some talk about

21   putting together an ad for her for the Internet.  Did that take

22   place in Las Vegas?

23   A.   Taking the pictures, yes, in Las Vegas.  It was put

24   together, but it wasn't like activated.  It wasn't posted in

25   Las Vegas.

1   Q.   Okay.  And those pictures that were taken, were those
2   taken by you?
3   A.   Yes.
4   Q.   And Jasmin consented and allowed you to take those
5   pictures?
6   A.   Yes.
7   Q.   Was Daniel present when the pictures were taken?
8   A.   No.
9   Q.   Did he know that you were going to take the pictures?
10  A.   Yeah, he told me to take the pictures.
11  Q.   Okay.  I'm going to show you just briefly what's
12  previously been marked as Government's Exhibit No. 8.  Do you
13  recognize this ad?
14  A.   Yeah.
15  Q.   Can you tell me what it is?
16  A.   It's Jasmin's ad.
17  Q.   And the pictures that are there at the top of the ad, are
18  these the photos that you took?
19  A.   Yes.
20  Q.   And were they taken for the purpose of this ad?
21  A.   Yes.
22  Q.   Tell me -- after you had taken these pictures, tell me if
23  you remember what you guys did next?
24  A.   About the next day, we left back to California, because we
25  were planning to go back home.  And so Jasmin came with us to

Amber Lynn Marquardt - Direct

1    California.  And that's when we took the trip out there.

2    Q.   When you say you went back to California, you were driving

3    a car?

4    A.   I was driving.

5    Q.   Okay.

6    A.   I had a license.

7    Q.   And was that a car you owned or was that a car that you

8    rented?

9    A.   It was a rental.

10   Q.   And why did you rent the car as opposed to Daniel?

11   A.   Because he didn't have a license.

12   Q.   Now, did you decide where you were going in California, or

13   was that decision made by Daniel?

14   A.   It was made by him, but we -- we had to go back to Merced,

15   so --

16   Q.   So when you say that we all went back to California, are

17   you referencing then both you, Daniel, and Jasmin?

18   A.   Yeah, and also Daniel's friend.

19   Q.   Okay.  So there were four of you originally in the car?

20   A.   Yes.

21   Q.   When you intended to go back to California, what did you

22   intend or what did you anticipate would happen once you got to

23   California?

24   A.   Nothing.  Just to start working.

25   Q.   Okay.

1   A.   Go to the next location.

2   Q.   Was there an expectation that Jasmin would be working as

3   well?

4   A.   Yes.

5   Q.   Now you mentioned that the ad didn't get posted, I think

6   is the word you used, while you were in Las Vegas.  When did it

7   get posted?

8   A.   When I was driving, Daniel was trying to post it on the

9   highway.

10  Q.   And who actually posted the ad?

11  A.   Daniel.

12  Q.   How do you happen to recall that it was Daniel as opposed

13  to you who placed the ad?

14  A.   Because he had the iPad.

15  Q.   Okay.  And this is while you were driving?

16  A.   Yes.

17  Q.   Now, to the best of your knowledge, did Jasmin actually

18  start working while she was in California?

19  A.   I mean, we -- we got dropped off on the street, so that

20  was the intent to have us both work and make money.  I don't

21  know what she brought in.  I can only account for what I had

22  made.

23  Q.   Okay.  Do you remember how many locations you stayed at

24  while you were in California?

25  A.   Three.

1  Q.   And what were those three cities, if you remember?

2  A.   Coming from Las Vegas, I had a prearranged customer set up

3  with myself in Merced.  And he purchased a hotel room.  I

4  performed my acts, and he left me the hotel room, and we stayed

5  there overnight.

6         The next day, we went to a different location in

7  Merced, a Best Value Inn or America's Best Value.  Something

8  like that.  So we were there, and we had two rooms there as

9  well.  That's when Jasmin had her hair done.  She got a little

10  fixed up.  Her ad was posted, and I was working through my ad

11  that was posted as well on RedBook.

12  Q.   Okay.  And you mentioned that you had two rooms or just

13  one?

14  A.   Two rooms.

15  Q.   And that's so that each one of you could individually be

16  working with clients?

17  A.   It was so that whenever one of us had a customer, we could

18  go to the one room.  And then whenever we didn't have a

19  customer, we would all be in one other room together.

20  Q.   Okay.  What did Daniel do while you were working?

21  A.   Either stay in the rooms, smoke some weed, write on some

22  raps, so to say politic with his friends.

23  Q.   When you talk about politic with friends, that means just

24  talking with the guys or --

25  A.   Whatever it may be that he does with his friendships.

1   Q.   How did Daniel know where the hot spots were or where to

2   take you to?

3   A.   Because he just knows these things.  He knows it from

4   other pimps, other prostitutes.  It's kind of like a ring, so

5   everyone knows, you know, where to go next, so to say.  So if

6   there's a hot spot with a lot of money being made, then he

7   would know.

8   Q.   Did you ever meet any of these other pimps?

9   A.   Not face-to-face, no.

10  Q.   But you were aware of them?

11  A.   Yeah.

12  Q.   Okay.  And about how long were you in California, if you

13  recall?

14  A.   Just a couple days.

15  Q.   Okay.  Do you remember the hotels that you stayed in?

16  A.   The one that I just said.

17  Q.   Right.  And I think I kind of interrupted you.  I know you

18  originally said you went to a first location and a client paid

19  for that hotel room.

20  A.   That one, yeah.

21  Q.   Do you remember the name of that hotel?

22  A.   I don't.  And to be honest, I don't know the client's name

23  either.  It was booked in his name.

24  Q.   Is that fairly common that places you might stay might be

25  rooms that had already been prepaid or --

1    A.   Not really.

2    Q.   -- booked by a hotel [sic]?

3    A.   Not really.

4    Q.   Okay.

5    A.   It just so happened that that client had a friend who

6    owned that hotel.  So it was more so that type of situation.

7    Q.   Okay.

8    A.   But originally, either I get a hotel in my name, or he

9    gets a hotel in his name.  Or if we have a girl, the girl gets

10   a hotel in her name.

11   Q.   The second place I think you went to you mentioned was

12   this America's Best Value Inn?

13   A.   Yes.

14   Q.   Was there another location that you went to?

15   A.   In Modesto, I was checked in at the California Inn.  It's

16   a hotel known where there's a lot of prostitution activity.

17   And Daniel booked a room for Jasmin down the street at a

18   different hotel, because she didn't have ID.

19   Q.   Okay.  Was that a surprise to you that she didn't have ID?

20   A.   Kind of, yeah.  Because usually everyone has ID.

21   Q.   Okay.  And by not having ID, how does that impact the

22   ability to get a room?  Are you required to show ID in order to

23   get a room?

24   A.   Yes.

25   Q.   After you were there -- stayed at these three hotels, you

1  returned back to Las Vegas; is that correct?

2  A.   Yes.

3  Q.   And tell me what happened after you returned?

4  A.   We returned.  And once again, we are on -- I believe it

5  was Boulder Highway again.  And Daniel had received a phone

6  call or a text message from Jasmin saying that she didn't want

7  to work anymore or something in that sort.

8        And he didn't want me to give her her belongings

9  back.  So I then contacted Jasmin to see what was going on.

10  And she said that she wanted to, you know, venture off with

11  somebody else to slow down.  Something like that.  And so she

12  didn't want to come back.

13        So I met up with her at the hotel, and I gave her her

14  belongings despite what he told me.

15  Q.   Okay.  Now, I think you mentioned that typically every

16  girl has their own phone.  When Jasmin first started working

17  for Daniel, did she have her own phone?

18  A.   To be honest, I -- I don't recall.  I recall her saying

19  that her pimp had took her phone, and she really desperately

20  needed her phone back.  At that point, I don't know if we had a

21  spare phone or if a phone was purchased for her.  But she did

22  have a phone.

23  Q.   When you switch from one pimp to another, is it common for

24  them not to let you take your property?

25  A.   Yeah.  Because you are choosing up with another pimp, so

Amber Lynn Marquardt - Direct

1    you are not going to take anything that you earned with the

2    prior pimp.

3    Q.    Okay.  Would Daniel ever point out girls that he wanted

4    you to talk to?

5    A.    Yes.

6    Q.    And is there a phrase for that when you are trying to

7    attract another girl or try to get her to choose your team?

8    A.    A phrase?

9    Q.    Is that ever referred to as "knocking" another girl or

10   trying to attract her to come --

11   A.    Yeah.

12   Q.    -- talk to you?

13   A.    Yeah.  If he saw somebody attractive or somebody who he

14   was drawn to, he would tell me about her, and tell me to stay

15   on her toes and see -- see if, you know, I was able to get her

16   on the team.

17   Q.    And what kinds of things would you do to try to get her on

18   the team?

19   A.    Sell her a dream.

20   Q.    And that's -- basically, by that you mean that you are

21   telling her about why your lifestyle is better than the

22   circumstances she's in?

23   A.    Yeah.

24   Q.    Were you ever asked to specifically recruit girls for

25   Daniel?

Amber Lynn Marquardt - Direct

1    A.    Yeah.

2    Q.    And the money that you would earn and the money that these

3    other girls who might join the team from time to time would

4    earn, where did that money go?

5    A.    To Daniel.

6    Q.    And who would then pay for your expenses?

7    A.    Daniel.

8    Q.    So if you wanted to buy clothes, how did you do that?

9    A.    Through Daniel.

10   Q.    You want to buy shoes?

11   A.    Through Daniel.

12   Q.    During the time that you were with Daniel, did he have any

13   other kind of jobs?

14   A.    He had different hustles.  No paycheck type job.

15   Q.    So nothing that he would earn a W-2, pay tax, or things

16   like that?

17   A.    No.

18   Q.    What was the primary source of income that he had?

19   A.    Through pimping.

20   Q.    Okay.  And that was primarily the money that you were

21   earning for him?

22   A.    Yes.

23   Q.    Or other girls who were working for him?

24   A.    Yes.

25   Q.    Now, I know you mentioned you were 15 when you first

1    started working for him.  Do you remember about how old you

2    were when you left him that first time?

3    A.    I was about 18 or 19.

4    Q.    And how old are you today?

5    A.    I'm 30.

6    Q.    So, how -- you were with him a total of about 15 years?

7    A.    Yes.

8    Q.    Now, is it fair to say that when you were first arrested,

9    you were trying to fight the charges?

10   A.    Yes, I was.

11   Q.    Were you able to communicate with Daniel at all about the

12   charges?

13   A.    Yes.  We had inmate-to-inmate correspondence through the

14   CCA.

15   Q.    And you would write him letters sometimes?

16   A.    Yes.

17   Q.    And did he write you letters?

18   A.    Yes.  That's how we communicated.

19   Q.    And during these letters, did you talk at all about the

20   case?

21   A.    Always.

22   Q.    What was your opinion originally on the case?

23   A.    To making it seem like Jasmin was lying about the whole --

24   whole story.

25   Q.    And as you stand here today, do you still have that same

1    opinion?

2    A.    No.

3    Q.    What was it that you originally thought she was lying

4    about?

5    A.    Nothing.  She wasn't lying about anything.

6    Q.    Was she incorrect on some of the dates?

7    A.    Yeah.  But in that lifestyle, days go by really fast.

8    Days could easily seem like weeks.  And considering her age,

9    I'm pretty sure that it's pretty common for you to forget

10   exactly how long you have been with an individual.

11   Q.    But it is your recollection that she did, in fact, work

12   for Daniel and did travel with you to California?

13   A.    Yes, she did.

14   Q.    I know I asked to you look at a particular RedBook ad

15   which you said you recognized.  At the time, is that the same

16   girl that you said was known to you as Yazmin?

17   A.    It is.

18   Q.    And when did you find out that her true name was Jasmin?

19   A.    Not until I was arrested.

20   Q.    Okay.  And when you talked about introducing Jasmin to YD,

21   is YD and Daniel one and the same person?

22   A.    Yes.  YD is his nickname.

23   Q.    And do you know what YD stands for?

24   A.    Huh-uh.

25   Q.    It's just initials that he goes by?

Amber Lynn Marquardt - Direct

1   A.   Yeah.

2   Q.   How did you know it was his intention that Jasmin would

3   work as a prostitute while she was in California?

4   A.   Because that's what --

5   Q.   I mean, was there a discussion about it?

6   A.   Yeah.  And that's -- there was a discussion about it.

7   Before we left to California, we had told her that we are going

8   to California.  And so she had agreed to go to California in

9   the sense of working.

10  Q.   And when you came back to Las Vegas, I know you mentioned

11  that Jasmin left.  Did you attempt to communicate with her

12  after she left?

13          THE COURT:  She's testified to some of that already.

14  Do you mean besides what she's already testified to?

15          MS. HERR:  No, Your Honor.  I will rephrase my

16  question.

17  Q.   You indicated that you met her to exchange clothing.  Did

18  you have any communication with her after that?

19  A.   No.

20  Q.   Were there other girls who came to work for Daniel after

21  the period when Jasmin left?

22  A.   Yes.

23  Q.   Do you recall, between the period of time when Jasmin left

24  to the period of time when you were ultimately arrested, which

25  I believe was in about September, how many girls worked for

1   Daniel?

2            MR. GAFFNEY:  Your Honor, objection as to relevance.

3            MS. HERR:  I believe it goes to Count 1, Your Honor.

4            THE COURT:  In light of the charges, it may be.

5   Overruled.

6            THE WITNESS:  Approximately three.

7   BY MS. HERR:

8   Q.   Do you know the ages of any of those three girls?

9   A.   I do not.

10  Q.   Now, I know we spoke a little bit at the very beginning

11  about the fact that you had entered into a plea deal with the

12  government.  Are you hoping that there will be a benefit from

13  you testifying?

14  A.   I hope so.

15  Q.   What are you hoping that benefit will be?

16  A.   In the judge's discretion, maybe a lighter sentence.

17  Q.   And the desire that you have or the hope that you have for

18  a lesser sentence, does that in any way -- is that a reason to

19  cause to you testify untruthfully?

20  A.   No.

21  Q.   And the testimony that you have given today is truthful to

22  the best of your recollection?

23  A.   It is.

24  Q.   Did Jasmin ever tell you how old she was?

25  A.   No.

1   Q.   Did you have any reason to believe she was under the age
2   of 18?
3   A.   No.
4           MS. HERR:  Okay.  I have no other questions at this
5   time.
6           THE COURT:  All right.  Cross-examination.
7           MR. GAFFNEY:  Your Honor, I am going to take at least
8   an hour or so.
9           THE COURT:  All right.  We might as well break for
10  lunch then.  Is that your suggestion?
11          MR. GAFFNEY:  Yes, Your Honor.
12          THE COURT:  That's a good suggestion.
13          So why don't we break 10 minutes early, it looks
14  like.  So let's come back at 1:20.  It isn't the usual time.  I
15  told you 1:30.  Let's come back a few minutes early, 1:20.
16          So during this recess, I again admonish you not to
17  discuss this case among yourselves or with anyone else, not to
18  listen to, read, or watch any report of or commentary on the
19  trial by any person connected with the trial or by any medium
20  of information, including without limitation newspaper,
21  television, radio or the Internet.
22          And you are not to form or express an opinion on any
23  subject connected with this case until it's finally submitted
24  to you under instructions from me for your deliberations.
25          So just leave your notebooks there in the seat and

1  the jury is excused.  We will be in recess until 1:20.  Show

2  the jury out.

3      (Jury out.)

4          THE COURT:  All right.  We will be in recess until

5  1:20.

6      (Recess, 11:50 a.m.  Resumed 1:25 p.m.  Jury in.)

7          THE COURT:  All right.  Thank you.  You may be

8  seated.

9          Do the parties stipulate to the presence of the jury

10  and the alternates?

11          MS. SILVA:  Yes, Your Honor.

12          THE COURT:  All right.  Mr. Gaffney, you may proceed.

13          MR. GAFFNEY:  Thank you.

14          THE COURT:  Yes, sir.

15                    CROSS-EXAMINATION

16  BY MR. GAFFNEY:

17  Q.  Good afternoon.

18  A.  Good afternoon.

19  Q.  Is it okay if I call you Amber?

20  A.  Yes.

21  Q.  Okay.  Amber, I want to talk -- I want to start by talking

22  a little bit about the proffer session you gave to the

23  government.  Do you recall that?

24  A.  I do.

25  Q.  You do not recall giving a proffer?

1    A.   No, I do.

2    Q.   Oh, okay.  Thank you.  And that occurred on October 14th,

3    2014; is that right?

4    A.   Around that time.

5    Q.   Okay.  Now, have you given any other proffers besides that

6    one proffer to the government?

7    A.   No.

8    Q.   Have you ever testified in front of the grand jury?

9    A.   No.

10   Q.   And a proffer essentially is where you sit down with the

11   US attorney, and maybe various law enforcement agents, and you

12   tell them your version of events; right?  Your version of the

13   story?

14   A.   Yes.

15   Q.   And part of the agreement that you make, for the proffer

16   session, is that you can get immunity for some of the things

17   that you tell them; right?

18   A.   Meaning?

19   Q.   Meaning if you were to not enter into a negotiation with

20   the government, they would not be able to use what you said

21   during the proffer session against you?

22              THE COURT:  If you know.

23   BY MR. GAFFNEY:

24   Q.   If you don't know, you can say you don't know.

25   A.   I don't know.  Wait.  Rephrase it again in a different

1    sentence?

2    Q.   Okay.  When you sit down with the government --

3    A.   Yes.

4    Q.   -- they have certain guarantees in place; right?

5    A.   Yeah.

6    Q.   Okay.  And one of those guarantees is that they will not

7    use what you say, during the proffer session, against you if

8    you decide not to enter into a negotiation with them?

9    A.   Yes.

10   Q.   They can use it in limited circumstances though; right?

11   A.   They can.

12   Q.   Okay.  But otherwise, you would be protected from further

13   prosecution in this case.  Is that your understanding of the

14   agreement?

15   A.   I believe so.

16   Q.   Now, you've read -- well, when you gave the proffer, you

17   were also aware that Jasmin, the alleged victim in this case,

18   had given a statement to the police; right?

19   A.   Yes, I was.

20   Q.   And you had read that statement; correct?

21   A.   I have.

22   Q.   You were aware of her version of what happened in this

23   case; right?

24   A.   Yes.

25   Q.   And, in fact, that's what got you charged; right?

Amber Lynn Marquardt - Cross

1   A.   Yes.

2   Q.   With this crime?  And fair to say that your version of

3   events differs in some way from -- in different ways from her

4   version; right?

5   A.   In what way?

6   Q.   Well, I will get into that.  But is it -- you would agree

7   that your stories do not match up completely?

8   A.   Only as the dates go.

9   Q.   Okay.  Okay.  Fair enough.  For instance, the version --

10  your version of how the two of you met is going to be different

11  than what her version was; right?

12  A.   Yes.

13  Q.   You weren't -- you didn't meet Jasmin while you were

14  working along Boulder Highway; did you?

15  A.   No, but I was on the Boulder Highway.

16  Q.   And she never -- when you first met her, you met her in

17  Arizona Charlie's; right?

18  A.   Yes, which is on Boulder Highway.

19  Q.   Well, she never pointed out an undercover to you or an

20  undercover police officer that was in a car; right?

21  A.   I don't recall so.

22  Q.   When you met her in Arizona Charlie's, that was actually

23  in a bar; wasn't it?

24  A.   Yeah.

25  Q.   And you were drinking alcohol at that bar; right?

1    A.    I was.

2    Q.    And you introduced yourself as Christy?

3    A.    Yes.

4    Q.    And is that short for Christina Snow?

5    A.    Yes.

6    Q.    Christina Snow is one of the aliases that you have used

7    before; right?

8    A.    It is.

9    Q.    It's an alias that you have used in RedBook

10   advertisements; right?

11   A.    Yes.

12   Q.    And upon meeting Jasmin, you testified that you knew right

13   away that she was a prostitute?

14   A.    Yes.

15   Q.    And you just have a sense for these things; is that

16   correct?

17   A.    Yes.

18   Q.    And when you met her, you had a conversation with her;

19   right?

20   A.    Yes.

21   Q.    Now, you would dispute that during that conversation, she

22   told you how old she was; right?

23   A.    I never asked her her age.

24   Q.    And she never told you her age; correct?

25   A.    No.

1   Q.   And, in fact, because you were in a bar, you are drinking

2   alcohol.  She's there.  You probably thought she was 21?

3   A.   Yeah.

4   Q.   Fair to say?  And you also would have no reason to believe

5   that she was a minor based on her physical appearance; right?

6   Based on her face, on her body, the way she looks, you had no

7   reason to believe --

8   A.   No.

9   Q.   -- that she was under 18?

10  A.   No.

11  Q.   And that would also be based on her demeanor; right?  The

12  way she carried herself, the things she said?

13  A.   I wouldn't say the way she carries herself, but just due

14  to the fact that she was at the bar, I stand on that.

15  Q.   Okay.  But there was nothing that happened, during that

16  conversation you had with her, that would lead you to believe

17  that she was under 18 years old; right?

18  A.   No.

19  Q.   And, in fact, you've been adamant that you never knew how

20  old she was; right?

21  A.   Right.

22  Q.   That's something you've maintained since the beginning of

23  this case; correct?

24  A.   Yeah.

25  Q.   And that's because if you knew she was a minor, you would

Amber Lynn Marquardt – Cross

1    have terminated your relationship immediately; right?

2    A.    Absolutely.

3    Q.    After you had the conversation with her at the bar, you

4    exchanged numbers; right?

5    A.    Right.

6    Q.    And at that point, you weren't trying to recruit her;

7    right?

8    A.    No.

9    Q.    You just were thinking maybe this is somebody I could work

10   alongside at that point?

11   A.    Or so help out, since she was in an abusive relationship.

12   So --

13   Q.    Fair enough?

14   A.    With her pimp.  Yeah.

15   Q.    Then she called you later that night?

16   A.    Yeah.

17   Q.    And you went and picked her up?

18   A.    Me and Daniel and his friend did, yes.

19   Q.    And then you guys went back to the Motel 6 on Tropicana;

20   right?

21   A.    Yes.

22   Q.    Okay.  And she took a shower; correct?

23   A.    Correct.

24   Q.    And then that's where you took some pictures of her using

25   the iPad; right?

1   A.   Not specifically at that hotel, no.

2   Q.   There was another hotel?

3   A.   Yeah.

4   Q.   Was that here in Las Vegas?

5   A.   Yeah.

6   Q.   Which hotel was that?

7   A.   Arizona Charlie's.

8   Q.   Okay.  So you guys went from the Motel 6 to Arizona

9   Charlie's.  And at Arizona Charlie's is where you took the

10  pictures of her?

11  A.   Yes.

12  Q.   And so obviously you had access to this iPad; right?

13  A.   Yes.

14  Q.   Was it password protected?

15  A.   No.

16  Q.   So -- okay.  And the pictures you took, those were in

17  order to create these advertisements for myRedBook; right?

18  A.   Yes.

19  Q.   And in order to do that, you needed to create a new

20  account for her; right?

21  A.   Yes.

22  Q.   All right.  And you put in your email address, into

23  that -- into her advertisement; right?

24  A.   Uh-huh.

25  Q.   And it was also your phone number that was listed in the

1    advertisement; right?

2    A.   I can't remember.

3            MR. GAFFNEY:  Okay.  Court's indulgence.

4            THE COURT:  Yes, sir.

5            MR. GAFFNEY:  Judge, may I approach the witness?

6            THE COURT:  Yes, sir.

7    BY MR. GAFFNEY:

8    Q.   Is the overhead projector on?

9            Okay.  Showing you what has been marked as

10   Government's Exhibit No. 8, can you see that?

11   A.   Yeah, I can.

12   Q.   Okay.  And you see the phone number there?

13   A.   I do.

14   Q.   And is that the phone number you were using at the time?

15   A.   Yeah, I think it was.

16   Q.   And when did you start using that phone number?  Had you

17   had it for a while before this --

18   A.   No, not a while.

19   Q.   A month?  Two months?

20   A.   Yeah, about that.  Only a couple months.

21   Q.   A couple of months.  Okay.  All right.  So a couple months

22   prior to May 2nd.  Now, so you took pictures of her on the

23   iPad at Arizona Charlie's; right?

24   A.   Right.

25   Q.   Okay.  And the government, they've never charged you with

Amber Lynn Marquardt - Cross

1   sexual exploitation of a minor for taking those pictures; have

2   they?

3   A.   No.

4   Q.   That was not one of the charges you were facing in this

5   case; is it?

6   A.   No.

7   Q.   And you had mentioned that Daniel was not present in the

8   room when those pictures were taken; right?

9   A.   No, he wasn't.

10  Q.   And so that night Jasmin slept in the room with you guys

11  at Arizona Charlie's; correct?

12  A.   That night she slept with his friend at his friend's room.

13  Q.   Okay.  But she -- okay.  And then the next day, you left

14  to California; is that correct?

15  A.   Correct.

16  Q.   Okay.  So she didn't go down to Boulder Highway and work.

17  You guys left; right?

18  A.   Yes.

19  Q.   And so that would be another place where your story --

20  your version of events diverges from her version; right?

21  A.   How?

22  Q.   That you are saying that she didn't go down to Boulder and

23  work as a prostitute the day after you met her?

24  A.   I don't -- it's been a couple of years.  I don't remember

25  exactly if she or I went to Boulder Highway prior to us leaving

1    back to California.  It's been a few years, so I don't

2    remember.

3    Q.   Okay.  Court's indulgence.

4         Okay.  Now, you recall me talking about the -- the

5    proffer that you gave; correct?

6    A.   I do.

7    Q.   And the proffer -- have you ever seen a copy of your

8    proffer, a transcribed statement or the transcription of your

9    proffer?

10   A.   No, I never asked for it.

11   Q.   Okay.  If I told you that in your proffer session, you had

12   said that you left for California the very next day and didn't

13   go down to Boulder Highway, would you have any reason to

14   dispute that?

15   A.   No.

16   Q.   Now, when -- when -- during the time you spent at Arizona

17   Charlie's that first night that she was with you, as far as you

18   know, there were no conversations between her, Jasmin, and

19   Daniel about, say, the rules of prostitution; is that right?

20   As far as you can recall?

21   A.   To remember conversations, it's pretty hard after a few

22   years.  I don't know.

23   Q.   If I told you that during your proffer session, you said

24   that you were not aware of any conversations between Jasmin and

25   Daniel, where Daniel was explaining the rules to Jasmin, would

1    you have any reason to dispute that?

2    A.    No.

3    Q.    And obviously, you are aware of her prior experience as a

4    prostitute; right?

5    A.    Yeah.  Just by the conversation that she had with me.

6    Q.    And so you would agree that at the time, it was your

7    belief that she was probably already -- that she was already

8    aware of these rules; right?

9    A.    Yeah.

10   Q.    And you also would assume that she was already well

11   acquainted with the culture that went along with being a

12   prostitute?

13   A.    Yes.

14   Q.    When you left Las Vegas, you testified the first place you

15   went was Merced, California; right?

16   A.    Yes.

17   Q.    Your first stop was not in Modesto, California?

18   A.    It was not.

19   Q.    And you did not commit an act of prostitution in Modesto

20   on that first night after you left?

21   A.    On the first night, we went to Merced.

22   Q.    Okay.

23   A.    And that's where we dropped off his friend.  She said in

24   her statement that we dropped him off in Modesto, and that was

25   incorrect.  It was in Merced.

1   Q.   Thank you.  Now, that night in Merced, you testified that

2   you had stayed in a room that was paid for by a client?

3   A.   Yes.

4   Q.   Was the room under your name?

5   A.   No, it wasn't.  It was under my client's.

6   Q.   And then the next day, the second day you are in

7   California, that's when you traveled to the California Inn;

8   right?

9   A.   No, we were still in Merced.  We were in Merced, and

10  that's wherein she got her hair done, and that's when we had

11  our two rooms.

12  Q.   Okay.  But eventually, you end up traveling to the

13  California Inn; right?

14  A.   Yes.

15  Q.   And the California Inn is located where?

16  A.   In Modesto, California.

17  Q.   And you stayed there for a night; right?

18  A.   I did.

19  Q.   You rented one room; right?

20  A.   Only myself.

21  Q.   And as far as you know, she never worked at the California

22  Inn alongside you; right?

23  A.   No, she worked at a different hotel.

24  Q.   And again, you never saw her ID?  Her identification?

25  A.   No.

1    Q.   Now, after you stayed at the California Inn, you stayed at

2    America's Best Value Inn.  Do you remember that?

3    A.   I think it -- those were switched.  It was Merced first

4    and then Modesto.

5    Q.   Okay.

6    A.   Because when you are at Modesto, that's when she had

7    clothes, and her hair done, and so on and so forth.

8    Q.   America's Best Value Inn, where is that located?

9    A.   In Merced.

10   Q.   Is that where you stayed the first or second night you

11   were in California?

12   A.   Yeah.

13   Q.   And then you traveled from America's Best Value Inn to the

14   California Inn in Modesto.  Is that your testimony?

15   A.   Modesto?  Yes.

16   Q.   And then eventually -- well, how long were you in

17   California with Jasmin and Daniel?

18   A.   Only a couple days.

19   Q.   It wasn't two weeks; was it?

20   A.   It was not.

21   Q.   And the purpose for coming back to Las Vegas, that was to

22   drop Jasmin off?

23   A.   Yes.  And I think we were coming to work.  I can't -- I

24   don't think we would drive all the way to Las Vegas just to

25   drop somebody off.

1    Q.    Okay.

2    A.    Because at that time, she was still working with us, so --

3    in California to Las Vegas, we would still work together.

4    Q.    Okay.  And so but when you get back to Las Vegas, she

5    decides to leave; right?

6    A.    Correct.

7    Q.    And then after she leaves, she sends you a text message

8    asking you if she could retrieve her things?

9    A.    She spoke to Daniel first.

10   Q.    But ultimately, you also get a text message; right?

11   A.    I get a text.

12   Q.    You remember that; don't you?

13   A.    I do.

14   Q.    And eventually, she came and she collected her stuff;

15   right?

16   A.    Yes.

17   Q.    And that was the last time you saw her?

18   A.    Yes.

19   Q.    And -- okay.  Now, let me switch gears a little bit.

20         Prior to this case, you have been through the federal

21   criminal justice system before; haven't you?

22   A.    I have.

23   Q.    And prior to this case, you actually have experience with

24   how plea agreements work; right?

25   A.    Yes.

Amber Lynn Marquardt - Cross

1  Q.   You pled guilty in another federal case; right?

2  A.   Yes.

3  Q.   In fact, you pled guilty to conspiracy to commit bank

4  fraud and credit card fraud; right?

5  A.   I did.

6  Q.   And that was back in 2010?

7  A.   2009.

8  Q.   Okay.  But your actual -- your plea took place in 2010.

9  Do you recall that?

10 A.   Yes.

11 Q.   And that's for using stolen credit cards basically; right?

12 A.   Yes.

13 Q.   And Mr. Barnes was not involved in that; was he?

14 A.   He was not.

15 Q.   In fact, you weren't living with him?

16       MS. HERR:  Objection.  This is improper cross, Your

17 Honor.  He's certainly entitled to ask about her record, but I

18 think we've gone over that.

19       THE COURT:  Well, I will give him the latitude.  Go

20 ahead.

21       MR. GAFFNEY:  I am almost done with the line of

22 questioning.

23 Q.   But in that case, originally, you were charged with a lot

24 more crimes than just one count of conspiracy; weren't you?

25 A.   What do you mean "a lot more crimes"?

1   Q.   Well, there were -- there was more than just one count,

2   one offense that you were charged with.  You pled to one.  You

3   pled to one count.  But originally, you were charged with a lot

4   more counts; weren't you?  Does that make sense?

5   A.   I pled guilty to a conspiracy to -- for the credit card

6   fraud.

7   Q.   Okay.  But originally, you were charged with a total of 10

8   crimes; right?

9   A.   I don't recall.

10  Q.   Okay.  Well, but that was another case where you took a

11  plea in order to avoid doing a lot more jail time than you were

12  originally facing; right?

13  A.   Well, I was guilty of that crime.  So, yes, I pled guilty.

14  Q.   Now, in this case, you were originally charged, in a

15  superseding indictment, with one count of transportation of a

16  minor for prostitution; right?

17  A.   Yes.

18  Q.   You were also charged with trafficking of a child; right?

19  A.   Yes.

20  Q.   And those sentences or those offenses carry very

21  significant sentences; don't they?

22  A.   They do.

23       MS. HERR:  Objection, Your Honor.  Discussion

24  regarding sentencing is within the sole purview of the Court

25  and is, I think, inappropriate to be discussing in front of the

1   jury.

2           THE COURT:  Except he said "possible."  I will allow

3   it.

4           MR. GAFFNEY:  Your Honor, it goes to bias.

5           THE COURT:  I know.  I understand.

6           MR. GAFFNEY:  Thank you.

7           THE COURT:  I will allow it.  Go ahead.

8   BY MR. GAFFNEY:

9   Q.   With those charges, they carried a sentence of 10 years to

10  life; didn't they?

11  A.   They do.

12  Q.   A minimum of 10 years; right?

13  A.   Yes.

14  Q.   All right.  And on October 20th, 2014, you pled to just

15  one count of transportation of a minor; right?

16  A.   Yes.

17  Q.   And under the plea agreement, the government has promised

18  not to bring any additional charges arising --

19  A.   They have never promised me anything.

20  Q.   Okay.  In the plea agreement, it talks about the

21  government saying they will not bring any additional charges

22  based on your negotiation; right?

23  A.   I pled guilty to the one count.

24  Q.   Would it refresh your recollection to see a copy of your

25  plea agreement?

1          THE COURT:  Well, she's not saying she can't remember

2    anything.

3    BY MR. GAFFNEY:

4    Q.   Well, she's -- can you -- can you remember what the terms

5    of your negotiation were?  Specifically this term?

6          THE COURT:  Well, it's not exactly a memory test.

7    What is your question?

8    BY MR. GAFFNEY:

9    Q.   My question is whether the government promised they would

10   not bring additional charges when she entered into this

11   negotiation.

12         THE COURT:  Do you recall that at all?

13         THE WITNESS:  No.

14   BY MR. GAFFNEY:

15   Q.   Okay.  So would it refresh your recollection --

16         THE COURT:  It might.  It might not.  You have a

17   chance with that question.

18         MR. GAFFNEY:  Well, if I could refresh her

19   recollection with the plea agreement.

20         THE COURT:  That's something different; isn't it?

21         MR. GAFFNEY:  Are you saying I can't refresh?

22         THE COURT:  No, I didn't.  I said that's something

23   different.

24   BY MR. GAFFNEY:

25   Q.   Okay.  Do you recall whether, in your plea agreement,

1    there is a provision which says the government will not bring

2    any additional charges based on the acts, the circumstances, or

3    the facts of this case if you enter into the negotiation?

4    A.    Yes.

5    Q.    Are you saying, "Yes," you do remember that provision?

6    A.    Yes.  Once I pled guilty to that one count, no more

7    charges were going to be pled.

8    Q.    Okay.  Thank you.

9    A.    Against me.

10   Q.    And under the deal that you made with the government, is

11   it -- it's your understanding that the government is also going

12   to recommend to the sentence -- or recommend to the Court that

13   the judge sentence you under that 10-year minimum; right?

14   A.    I'm not sure about all of that.  All I know is that my

15   sentencing relies on the judge's discretion.  That's it.

16   Q.    So you are not aware of a provision in your plea agreement

17   that says the government --

18            THE COURT:  Asked and answered.  Asked and answered.

19   BY MR. GAFFNEY:

20   Q.    All right.  So, potentially, you are getting a break for

21   what's called 5K cooperation; right?

22   A.    Yes.

23   Q.    You are familiar with that term "5K cooperation"?

24   A.    Yes.

25   Q.    And that means that you are a cooperating witness for the

Amber Lynn Marquardt - Cross

1   government; correct?

2   A.   I am.

3   Q.   And it's your hope that in cooperating with the

4   government, you will potentially get less jail time; right?

5   A.   That's my hope.

6   Q.   And it's in their sole discretion whether to recommend to

7   the Court that you get less jail time; isn't it?

8   A.   Yes.

9   Q.   And that's going to be based upon you testifying to a

10  version of events that they agree with?

11  A.   With -- with a testimony or without a testimony, I believe

12  that's what's going to happen.

13  Q.   Let me put it this way.  Well, let me re-ask the question.

14  Well, let me rephrase the question.

15          Your testimony here today can directly affect how

16  much or how much longer you stay in prison; right?

17  A.   I'm not sure about that.

18  Q.   You are not sure about that?

19  A.   Uh-huh.

20  Q.   You are not sure whether your testimony today can affect

21  whether you spend in excess of a decade in prison, or you get

22  to go home early?  That's your testimony?

23  A.   It can.

24  Q.   It can.  Your testimony here today can affect your

25  sentence; right?

Amber Lynn Marquardt - Cross

1   A.   Possibly.

2   Q.   And that's if the government finds the information you

3   provide to be useful for them?

4            MS. HERR:   Objection.   Asked and answered.

5            THE COURT:   That misstates her testimony.

6            MR. GAFFNEY:   Okay.   I will move on.

7            THE COURT:   Well, her testimony was that the judge

8   decides.   Is that right?

9            THE WITNESS:   Yes.

10  BY MR. GAFFNEY:

11  Q.   Well, you had testified, on direct examination, about some

12  correspondence that you had written between -- or to

13  Mr. Barnes; right?

14  A.   I have had communication with him.

15  Q.   And you testified that a lot of those -- a lot of those

16  letters had to do with this case; right?

17  A.   Correct.

18  Q.   Have you seen those letters since you sent them?

19  A.   I have.

20  Q.   Okay.   You probably talked to the US attorneys about that;

21  right?

22  A.   With my attorney present, yes.

23  Q.   Okay.   And you are aware that -- well, in some of that

24  previous correspondence, you indicated that essentially Jasmin

25  is a liar; right?

1  A.   Yeah, because I was thinking that they were monitoring our

2  mail.

3  Q.   Okay.  And you also indicated that, in one of your

4  letters, you were never in Modesto; right?

5  A.   I possibly would have said that.

6  Q.   Okay.

7  A.   I was trying to make it seem like she was lying to get --

8  to get us out of trouble.

9  Q.   Okay.  But you were committing these things to writing and

10 then sending them to Mr. Barnes; right?

11 A.   Yeah, and I was lying in those letters.

12 Q.   Okay.  Let's talk about a few more things that you said.

13 You also said that you were never with her; right?  You were

14 never with Jasmin?

15 A.   In the letters, yes.

16 Q.   You indicated that she had never given you any money to

17 give to Daniel; right?

18 A.   In the letters, yes.

19 Q.   And in the letters, you also indicate that you thought it

20 was your belief the only way they would have a case is if you

21 go along with Jasmin's lies; right?

22 A.   Yes.

23 Q.   And you also --

24 A.   Which they weren't lies.  I just wanted to say that for

25 the record.

1    Q.    Okay.  You also indicated that you never brought her

2    across state lines.  You never brought Jasmin across state

3    lines; right?

4    A.    Yes, I said that.

5    Q.    You also said that you were never at any hotels in

6    California or Vegas; right?

7    A.    Uh-huh.

8    Q.    And you also said that she was never with you for three

9    weeks; right?

10   A.    In the letters, I said that.

11   Q.    Now, in the letters, you also indicated that you believed

12   your lawyer was pressuring you to tell a version of events that

13   would match up with Jasmin's?

14   A.    I said many things in the letters.

15   Q.    It's a yes or no question.

16   A.    Yes, I did.

17   Q.    Do you remember that letter?

18   A.    Yes.

19   Q.    And you indicated that your attorney was pressuring you to

20   back up Jasmin's story; right?

21   A.    Yes.  Which that was a lie.

22   Q.    Okay.  And you also indicated that your attorney was

23   trying to get you to say certain things; right?

24   A.    Yes.

25   Q.    He was trying to get you to say that you were with Jasmin

1    for two or three days; right?

2    A.    I wrote that.  Yes.

3    Q.    And that Daniel gave her condoms; right?

4    A.    And that Daniel gave her condoms?

5    Q.    You were saying that your attorney was pressuring you to

6    say Daniel gave Jasmin condoms?

7    A.    It's possible.  Yes.

8    Q.    And you also said that your attorney was pressuring you to

9    say that Daniel was giving her instructions; right?

10   A.    I believe so.

11   Q.    Okay.  But obviously your opinion has since changed;

12   correct?  Since sending those letters?

13   A.    My opinion?

14   Q.    Your beliefs about Jasmin and this case.

15   A.    I have known the truth the whole time.

16   Q.    Okay.  But your opinion -- what you said in the letters,

17   you changed -- that opinion or those beliefs, they changed at

18   some point; correct?

19   A.    Yeah, as soon as I cut him off.

20   Q.    Well, and it also coincides with when you entered into

21   your plea agreement; didn't it?

22   A.    I lost communication with him before I entered into my

23   plea agreement -- or let me rephrase that.  I didn't lose

24   communication.  I stopped communication.

25   Q.    When did you stop communication?

1   A.   Before entering into my plea agreement.

2   Q.   Okay.  And your plea agreement, you entered into that on

3   October of 2014; right?

4   A.   In October.  Yes.

5   Q.   Okay.  And when was the last written correspondence that

6   you sent him?

7   A.   I don't recall.  September maybe.

8   Q.   Okay.  So a month before?

9   A.   Possibly.

10   Q.   Okay.  Now, one of the things that you told the government

11   during -- well, actually, you testified to was that one of the

12   reasons you reunited with Mr. Barnes was to protect your

13   sister; is that right?

14   A.   One of the reasons.  Yes.

15   Q.   And that's because you were concerned about her; right?

16   A.   Yes.

17   Q.   And as you sit here today, that's still your position?

18   A.   Yes.

19   Q.   But in fact, you actually assisted Mr. Barnes or assisted

20   your sister in committing acts of prostitution after she turned

21   18; didn't you?

22   A.   What happened to my sister with Daniel was when she was

23   before -- before she turned 18.

24   Q.   Okay.  But I'm talking about after she turned 18.

25   A.   And I was in a whole different state.

Amber Lynn Marquardt - Redirect

1   Q.   Oh, okay.  Well, you've posted ads for her on

2   myredbook.com; haven't you?

3   A.   After she was 18, what happened after then, yes.

4   Q.   But you were involved in that; weren't you?

5   A.   Yes.

6   Q.   Okay.  And that ad -- one of those ads, they included your

7   phone number; correct?

8   A.   Maybe.

9         MR. GAFFNEY:  Your Honor, I will pass the witness.

10        THE COURT:  All right.  Redirect.

11        MS. HERR:  Yes, Your Honor.

12                  REDIRECT-EXAMINATION

13  BY MS. HERR:

14  Q.   Now, the defense attorney was asking you some questions

15  about how old you thought that Jasmin was.  And I know you

16  mentioned that you met her in a bar, and so I think he made

17  some -- had a line of questioning there about would that make

18  you think that she was 21.

19        Is it typical, when you meet other working girls,

20  that you ask them how old they are?

21  A.   No.

22  Q.   Is it fair to say that in your line of work, the less you

23  know the better?

24  A.   Yes.

25  Q.   Now, over the course of time that Jasmin was with you and

Amber Lynn Marquardt - Redirect

1    Daniel, did you have an opportunity to see her with her hair

2    wet?

3    A.    Her hair wet?

4    Q.    Uh-huh.

5    A.    Yeah.

6    Q.    Did you ever have an opportunity to see her with her

7    makeup off?

8    A.    Yes.

9    Q.    Is it fair to say that most women look a little different

10   when we have our makeup on versus when we have our makeup off?

11   A.    Very much so.

12   Q.    And did you have an opportunity to speak and interact with

13   her over the course of this period of time that you were with

14   her?

15   A.    Yeah, we did.

16   Q.    And Daniel would have that same opportunity to speak with

17   her and talk to her; correct?

18   A.    Yes.

19   Q.    In your opinion, did she appear mature to you or immature

20   to you?

21   A.    Not fully mature, but you can't expect that from a lot of

22   girls on the streets.  So I don't --

23   Q.    Okay.  At the time that she was working with you, I

24   believe you said you -- you are 30 now.  So you would have been

25   somewhere around 27, 28?

Amber Lynn Marquardt - Redirect

1  A.   Yeah, 27.

2  Q.   At that point, did you think she was the same age you were

3  or did you assume that she was younger?

4  A.   No, I was assuming that she was around my age.  Just a

5  little younger though, like early 20s.

6  Q.   Okay.  Now, as the bottom, is one of your jobs to cover

7  for your boss?

8  A.   To cover for him?

9  Q.   Uh-huh.

10  A.   Yes.

11  Q.   So, for instance, in this case, you would want to do what

12  was possible to maybe divert attention away from him while

13  you're working?  Or if you saw maybe vice detectives coming,

14  you would try to make sure that you didn't draw attention to

15  Daniel?

16  A.   I -- I would warn him.

17  Q.   Okay.  And in the course of the letters that you wrote to

18  him, was part of your motivation, in writing letters and

19  talking about potential defenses -- was that part of trying to

20  cover for him and take responsibility?

21          MR. GAFFNEY:  Objection.  Leading.

22          THE COURT:  It is leading.  Rephrase the question.

23  BY MS. HERR:

24  Q.   When you wrote -- do you recall the letters -- at least

25  some of the letters that you wrote to him?

1   A.   I do.

2   Q.   Do you recall, in the course of writing those letters, did

3   you ever suggest potential defenses?

4   A.   Yes.

5   Q.   And in making those suggestions, what was your motivation?

6   A.   For us both to get free.  And I was -- like I said, I was

7   thinking that they were monitoring our letters, our

8   communication with each other.  So I was trying to more so make

9   it seem like Jasmin was lying, so that no -- those letters

10  would, so to say, prove both of our innocence.

11  Q.   Okay.  When you are talking about letters being monitored,

12  that's because you were in some pretrial detention?  Fair to

13  say?

14  A.   Yes.

15  Q.   Okay.  And do the guards review your mail when it leaves

16  or comes into the facility?

17  A.   Well, because it's a federal facility, I automatically

18  assumed that they were monitoring our mail considering that we

19  are codefendants.

20  Q.   Okay.

21  A.   But I don't know if it's normal for them to do that or

22  not.  I just assumed that.

23  Q.   But that was what -- the assumption that you were working

24  under, was that things were going to be monitored?

25  A.   Yes.

Amber Lynn Marquardt - Redirect

1  Q.   Okay.  Then just so I'm clear, so your thought was if you

2  put statements in those letters, that information would then be

3  learned by the government, so to speak?

4  A.   Yeah.  Like, it would divert the government's attention,

5  thinking that -- that everything was a lie, if I pointed out

6  flaws in the case, like her dates and different places.

7       Like she mentioned we were at a Best Western, and we

8  were never at the Best Western.  We were at the American Best

9  Value Inn.  So there were some holes in her case, so I tried to

10  more so divert those holes and make it seem like we are

11  innocent, and she's just making up a whole story.

12  Q.   Okay.  And as you stand here today, you agree that there

13  are still some dates that don't quite match up?

14  A.   I do agree.  Yeah.

15  Q.   But do you believe that she, in fact, spent time with the

16  two of you?

17  A.   I know she did.  I was there with her.

18  Q.   Now, I'd like to turn your attention to Exhibit 10 in

19  front of you.  I'm sorry.  There should be a white binder.

20  A.   I don't have a binder.

21  Q.   I apologize.  I have it.  I will bring it right up.

22  A.   What am I looking for?

23       THE COURT:  Exhibit 10.

24  BY MS. HERR:

25  Q.   If you could open up to Exhibit 10, there should be a

1    number 10 tab.

2    A.    Uh-huh.

3    Q.    First of all, do you have any recollection of Daniel ever

4    using Facebook?

5    A.    Yes.

6    Q.    Did you ever use Facebook?

7    A.    Yes.

8    Q.    Did you and Daniel have separate accounts?

9    A.    Yes, we did.

10   Q.    And do you have any recollection of what Daniel's profile

11   name was or -- or the name that he used?

12   A.    Pay Da Boy Kash.

13   Q.    Okay.  Looking at Exhibit 10, and then if you will

14   continue to turn, it should be page 12 of 12.  It should be the

15   last page in the exhibit.

16         MR. GAFFNEY:  Your Honor, this is beyond the scope of

17   cross-examination.  I never mentioned Facebook.

18         THE COURT:  But the subject -- I don't know if we are

19   coming up on the subject.  I can't tell.

20         MS. HERR:  Your Honor, I just have one other question

21   to ask her in this particular regard.

22   Q.    Do you recognize that particular photo?

23   A.    I do.

24   Q.    And is that a photo of you and Daniel?

25   A.    It is.

Amber Lynn Marquardt - Redirect

1  Q.  Do you know if there are any photos of Jasmin that are

2  located on Facebook?

3  A.  I'm not sure.

4  Q.  How do you feel about Daniel now?

5        MR. GAFFNEY:  Objection.  Relevance.

6        THE COURT:  Well, you went into it some on cross.  I

7  will allow it.

8        THE WITNESS:  How do I feel about him?

9  BY MS. HERR:

10  Q.  Uh-huh.  Are you still in love with him?

11  A.  No.

12  Q.  When you wrote letters to him in jail, how would you

13  address those letters?

14  A.  Daddy.

15  Q.  And why did you refer to him as your daddy?

16  A.  Because that's what he wants me to call him.

17        MS. HERR:  Your Honor, that will conclude our

18  testimony.

19        THE COURT:  All right.  Anything on recross?

20        MR. GAFFNEY:  No, Your Honor.

21        THE COURT:  All right.  Thank you, ma'am.

22        Why don't we take a recess.  Ladies and gentlemen,

23  during this recess -- let's take our 10-minute recess.

24        During this recess, I again admonish you not to

25  discuss this case among yourselves or with anyone else, not to

Amber Lynn Marquardt - Redirect

1    listen to, read, or watch any report of or commentary on the

2    trial by any person connected with the trial or by any medium

3    of information, including without limitation newspaper,

4    television, radio or the Internet.

5             And you are not to form or express an opinion on any

6    subject connected with this case until it's finally submitted

7    to you under instructions from me for your deliberations.

8             So let's take -- we will be in recess 10 minutes.

9        (Recess, 2:05 p.m.  Resumed 2:16 p.m.  Jury in.)

10            THE COURT:  All right.  Thank you.  You may be

11   seated.

12            All right.  Call your next witness.

13            MS. SILVA:  The government calls Special Agent James

14   Mollica.

15                        JAMES MOLLICA,

16   having been duly sworn, was examined and testified as follows:

17            COURTROOM ADMINISTRATOR:  State your full name and

18   spell it for the record.

19            THE COURT:  Parties stipulate to the presence of the

20   jury and the alternates?

21            MS. HERR:  Yes, Your Honor.

22            MR. GAFFNEY:  Yes, Your Honor.

23            MS. SILVA:  Yes, Your Honor.

24            THE COURT:  All right.  Thank you.

25            THE WITNESS:  My name is James Mollica,

James Mollica - Direct

1  M-O-L-L-I-C-A.

2          MS. SILVA:  May I proceed?

3          THE COURT:  Yes, ma'am.  Excuse me.  Yes.

4          MS. SILVA:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6  BY MS. SILVA:

7  Q.   Good afternoon, Special Agent Mollica.  Where are you

8  employed?

9  A.   I am employed with the FBI.  I have been an FBI agent for

10  over 12 years now.  I am currently assigned to the Las Vegas

11  field office where I have been here working since August of

12  2010.

13  Q.   In the course of your employment with the FBI,

14  specifically, in the last five years, were you assigned to a

15  particular task force?

16  A.   Yes.  I was assigned to the Innocence Lost Tax Force.

17  Q.   And what is the Innocence Lost Tax Force?

18  A.   The Innocence Lost Task Force is responsible for

19  investigating crimes against children, such as when juveniles

20  are sex trafficked, pandered.  Things like that.

21  Q.   Okay.  In the course of your assignment to the Innocence

22  Lost Task Force, how many cases have you been involved in that

23  involved child exploitation and child prostitution?

24  A.   I personally had probably at least 15 to 20 cases.  I have

25  probably been involved in many more.

James Mollica - Direct

1    Q.   I'm going to turn your attention to this particular case.

2    How did you become involved in the case against the defendant?

3    A.   Actually, Rich Leung came to me with the case.  He said,

4    "I have this case.  This victim who is cooperating with us, and

5    I'd like to you meet her."

6    Q.   Okay.  And after speaking with Detective Leung, what did

7    you do next?

8    A.   A speaking with Leung, we coordinated.  I went down, and I

9    met Jasmin.  Rich actually does a great job for me.  He just

10   says, "Hey.  This is my buddy, Jim.  He's with the FBI."

11          I'm usually dressed down, so I go meet the girls.

12   And their first question is, "Are you really an FBI agent?"

13   And I explained to them, "Yes."

14          And then, you know, I tried to build them up.  I talk

15   to them.  I ask them what they want to do with their future.  I

16   tell them how proud I am of them for coming forward, and, you

17   know, working with us and stuff like that.

18   Q.   Okay.  You just referred to "Rich."  Is that Detective

19   Leung?  Is that one and the same?

20   A.   Yes, Detective Leung.

21   Q.   And when you say "Jasmin," are you referring to Jasmin

22   Madison, the victim in this case?

23   A.   Yes.

24   Q.   Where did you speak with her?

25   A.   I spoke with her at the Juvenile Hall Detention Center.

James Mollica - Direct

1  Q.   After speaking with Jasmin, were you involved in
2  transporting her to testify before the grand jury?
3  A.   Yes.
4  Q.   Okay.  And also, in the course of this investigation early
5  on, did you review some of the evidence that the detective had
6  put together before you signed onto the case?
7  A.   Yes.
8  Q.   What was that evidence?
9  A.   Evidence such as motel records, a cell phone report.  Also
10 Madison's transcripts from her interview with Rich and some of
11 the photo lineups.
12 Q.   Okay.  Once you reviewed that information and interviewed
13 Jasmin, did you conduct further investigation?
14 A.   Yes.  We conducted the logical further investigation to
15 follow up some things, and we did some search warrants and
16 things like that.
17 Q.   All right.  I'm going to walk through that a little bit.
18 Let's start with search warrants.  You said you did a search
19 warrant.  What did you do a search warrant on?
20 A.   I did two search warrants for this case.  I did a search
21 warrant to Facebook for paydaboy.kash, and I also did a search
22 warrant on a white iPad.
23 Q.   And did you receive any information pursuant to that
24 search warrant?
25 A.   Yes, I did.

James Mollica - Direct

1    Q.   Focusing first on Facebook, what did you receive?

2    A.   Facebook, you submit the search warrant to them after the

3    judge signs it.  And then they email you back the whole

4    Facebook page.  It's sent on a secure email.  I'm the only one

5    that can access it.  It's only available for 30 days.  I

6    received that.  It's a PDF report.  It's over 700 pages long.

7    Q.   Okay.  And once you received that PDF report, what did you

8    do with it?

9    A.   I reviewed the contents of it.

10   Q.   Okay.  And at some point, did you burn a copy of that

11   report onto a CD?

12   A.   Yes, I did.

13   Q.   Okay.  If you could please turn to the book in front of

14   you to Government's Exhibit -- what's been premarked as

15   Government's Exhibit 17A.

16   A.   Yes.

17   Q.   Do you recognize that CD?

18   A.   Yes, I do.

19   Q.   How do you recognize it?

20   A.   I recognize the writing on it.  It's my writing.

21   Q.   Okay.  And is that a copy of the Facebook return you

22   received pursuant to that search warrant?

23   A.   Yes.

24          MS. SILVA:  Permission to admit Government's

25   Exhibit 17A.

James Mollica - Direct

1          THE COURT:  Any objection to Exhibit 17A?

2          MR. GAFFNEY:  No, Your Honor.

3          THE COURT:  Exhibit 17A will be admitted and may be

4    published.

5        (Exhibit 17A admitted.)

6    BY MS. SILVA:

7    Q.  Actually, if you could then turn to Government's

8    Exhibit 17B.

9    A.  Yes.

10   Q.  If you could take a moment and review that.

11   A.  Yes.  These are various posts and photographs that I found

12   on his Facebook page.  It was kind of indicative of

13   prostitution.

14   Q.  And are these excerpts specifically from that CD of the

15   full Facebook search warrant return?

16   A.  Yes.

17          MS. SILVA:  Permission to admit Government's

18   Exhibit 17B.

19          THE COURT:  Any objection to 17B?

20          MR. GAFFNEY:  No, Your Honor.

21          THE COURT:  Same will be admitted.

22        (Exhibit 17B admitted.)

23          MS. SILVA:  May I publish it to the jury?

24          THE COURT:  It may be published.

25          MS. SILVA:  Thank you.

James Mollica - Direct

1    Q.   Special Agent Mollica, please explain to the jury what we

2    are looking at on this page 1 of 19, which is the excerpt from

3    the Facebook return?

4    A.   Yes.  At the top is the registered name.  That's

5    paydaboy.kash@facebook.com, and the email address associated

6    with the account is paydaboycash@gmail.com.

7         If you scroll down a little bit more, this is the

8    telephone number that was associated with the account.  That's

9    (209)354-0792.  And it says it was a cell phone that was last

10   verified on 5/16 of 2013.

11   Q.   Okay.  And what does the return indicate as the current

12   city?

13   A.   Merced, California.

14   Q.   Okay.  Is it fair to say that the printout from the

15   Facebook search warrant return is a plain text printout of the

16   content of the Facebook page?

17   A.   Yes.

18   Q.   So it's not going to look like what an individual would

19   expect when they open the Internet page of Facebook?

20   A.   No.

21   Q.   Okay.  Turning to page 2 of 19, I want to focus on

22   specifically the highlighted text.  What does that say?

23   A.   It was a post by Pay Da Boy Kash at Motel 6.  It says,

24   "Vice done shook up my work.  Made it impossible for a pimp to

25   eat its Gucci.  Tho Finns post these ads, 2 girl special.  Any

James Mollica - Direct

1    body wanna manakin?"

2    Q.   Based on your experience, specifically your work with

3    cases involving child prostitution, when he writes "vice," what

4    do you think that means?

5    A.   Vice is the detectives that go out and investigate the

6    prostitution crimes.

7    Q.   Okay.  And then focusing on "post these 2 -- post these

8    ads 2 girl special," what does "2 girl special" mean based on

9    your training and experience?

10   A.   That's just probably one of the ads that he probably

11   posted with two girls trying to lure more clients.

12   Q.   Okay.  Turning to page 3 of 19, there are several posts

13   that are highlighted.  I want to focus on the last two on the

14   screen at this time.

15            Starting here, "Spread it out.  That's how you get a

16   stack out on each one!"

17            Based on your training and experience as well --

18   specifically in prostitution-related cases, but as law

19   enforcement, what does "stack" mean?

20   A.   Stack is an amount of money, usually a thousand dollars or

21   so.

22   Q.   Okay.  Is there a phrase commonly known as a "stack on

23   deck"?

24   A.   Yes.

25   Q.   Okay.  And what does a "stack on deck" mean?

James Mollica - Direct

1    A.   That's means how much money he's claiming to get out of

2    each girl.

3    Q.   Okay.  And then moving down to the last highlighted phrase

4    here, "I got one in SF, two in San Jose, and one in Walnut

5    Creek."

6            In reviewing these messages, was did you interpret

7    that to be?

8    A.   Oh, that is the person he's speaking with is saying that

9    he's got a female prostitute in San Francisco, two in San Jose,

10   and one in the Walnut Creek area.

11   Q.   Okay.  Based on your training and experience in

12   investigating these types of cases, are there times when pimps

13   communicate with each other about the prostitutes that they are

14   working?

15   A.   Yes.  In this particular case, it seemed like this person

16   Jalil Latif was inquiring with Daniel Barnes what he should do

17   with his girls.  And Barnes was providing him guidance on, you

18   know, "Spread them out.  That way they are not stepping on each

19   other's toes, and you can make more money."

20   Q.   Moving to page 4 of 19.  On this page, are there

21   additional communications between Daniel Barnes/Pay Da Boy Kash

22   and Jilil Latif?

23   A.   Yes.

24   Q.   All right.  I'm going to point one out here.  Excuse me.

25   One down.  "Man, these bitches I got fighting with each other.

James Mollica - Direct

1    Hella drama.  Part-time" -- is that "hoeing"?

2    A.    Yes.

3    Q.    "Inconsistent money.  Bitches is a headache, mane!"

4              Who is that to and who is that from?

5    A.    That's to Pay Da Boy Kash, Daniel Barnes, and that's from

6    Jalil Latif.

7    Q.    And is there a response from Pay Da Boy Kash?

8    A.    Yes.  He responds, "It ain't easy!"

9    Q.    Okay.  And the next communication, what does that read?

10   A.    It reads, "That's what I'm learning.  It's a full-time

11   job.  I need some auto status type bitches.  Feel me?  These

12   hoes need a day care center."

13   Q.    And what does Pay Da Boy Kash respond with?

14   A.    Pay Da Boy Kash --

15   Q.    Excuse me.  What's the next communication?

16   A.    The next communication is from Jalil Latif again.  He

17   said, "You was right about bringing hoes outta the area.  All

18   of them from Sac."  Based on my knowledge, I would say that's

19   Sacramento.

20   Q.    Okay.  And how does Pay Da Boy Kash respond?

21   A.    He says, "Decide and concour!"

22   Q.    Is that -- conquer, are you reading that phonetically?

23   You believe that to be conquer?

24   A.    Yes.

25   Q.    Okay.  What is the last communication on this page?

James Mollica - Direct

1   A.   The last communication is kind of a question.   "So I don't

2   want the hoes liking other, right?   That's what one P told me."

3          Based on my training and experience, I understand

4   that to mean pimp.   "The goal is for them not to like each

5   other.   To compete."   Daniel Barnes responded --

6   Q.   And this is on page 5 of 19.

7   A.   "In away, but they need to know they're on the same team.

8   If you post them in different cities, you get different money,

9   and they don't step on each other's toes."

10          "Post them" referring to the ads on the Internet.

11  Q.   And you sat here and heard the testimony from Detective

12  Petrulli, as well as Amber Marquardt and Jasmin Madison, about

13  prostitutes working together being referred to as "teams."

14          In your training and experience, is that a term

15  you've also heard when prostitutes work together for a

16  particular pimp?

17  A.   Yes.

18  Q.   And how does Latif respond to that last post?

19  A.   He responds, "oh, Okay.   That's what I been doing.   They

20  all feeling San Jose.   So I'm just putting them at different

21  hotels out there.   One is in sober living.   I bout to cut her

22  ass off."

23  Q.   As part of this return, did you also get status updates

24  that were posted by Pay Da Boy Kash?

25  A.   Yes.

1   Q.   Okay.  And I'm just going to highlight a few of those.  If

2   you could turn to page 6 of 19.

3   A.   Yes.

4   Q.   Would you please read the highlighted section?

5   A.   Yes.  He posted, "I got white girl for sale."

6   Q.   And turning to page 7 of 19.

7   A.   He posted, "Just knocked some more work in Vegas.  Super

8   thick redbone and you bitches, you bitch niggas step it up.

9   Eeww!"

10  Q.   And what is the date of that post?

11  A.   That is June 2nd, 2013.

12  Q.   And what about the second highlighted section?

13  A.   That is May 29th, 2013.  It says, "You would never believe

14  some old ratchet tried to get out of pocket wit a pimp for

15  pimping out her daughter.  Not knowing who she was getting at,

16  bitch check my trap stats.  You can pay my pimping as well.

17  Know dat."

18  Q.   And I'm going to scroll down just a bit to this last post

19  I am pointing out here.  What is the date on this posting?

20  A.   That is May 16, 2013.

21  Q.   And does it indicate at that time he's in Redwood City?

22  A.   Yes.

23  Q.   Okay.  If we could please -- were there also pictures that

24  came back as part of this Facebook search warrant return?

25  A.   Yes, there were.

James Mollica - Direct

1    Q.   All right.  What does this appear to be a picture of and

2    what does it say at the bottom?

3    A.   I recognize that to be Daniel Barnes.  He's driving.  And

4    at the bottom it says, "On I-5 northbound with my P game.

5    Getting richer and stronger."  And I think some of it might

6    have got cut off.

7              "P game," as I stated before, based on my training

8    and experience is the pimp game.

9    Q.   Okay.  Now, were there -- you said there were over 700

10   pages on this return?

11   A.   Yes.

12   Q.   Was that everything from personal messages to status

13   updates?

14   A.   Yes.

15   Q.   Anything else?

16   A.   There was also various photographs.

17             MS. SILVA:  Okay.  Your Honor, may we have a brief

18   sidebar?

19             THE COURT:  Sidebar.

20        (Sidebar.)

21             MS. SILVA:  Your Honor, you did rule on a motion in

22   limine that we weren't allowed to talk about money.  However,

23   in light of the testimony that has come out between Jasmin and

24   Amber, and they would give him the cash and the money, I would

25   like to publish this to the jury as part of the Facebook search

James Mollica - Direct

1   warrant return.

2          THE COURT:  I'm sorry.  What --

3          MS. SILVA:  From the Facebook search warrant return.

4          MS. HERR:  I think the earlier concern, Your Honor,

5   was it wasn't tied together.  There were photos of money, but

6   we couldn't tie those together as to that they were his or --

7          MS. SILVA:  The result of prostitution.  Given the

8   testimony that's come forward, we would like to submit this as

9   potential evidence of money he received as a pimp.

10          MR. GAFFNEY:  Well, Your Honor, I think we still have

11   the same problem.  Just because you see him holding some money,

12   that doesn't mean it's the product --

13          THE COURT:  That's the problem.  I mean, it may show

14   him with money --

15          MR. GAFFNEY:  Right.

16          THE COURT:  I mean, you can infer anything from that.

17          MR. GAFFNEY:  Right.

18          THE COURT:  And it's just not -- it's not tied to

19   this activity.  I mean, other than -- I mean, let's face it.

20   Realistically, where did he get this?  Playing penny poker?

21   No.  I'm sure he got it from these activities, but there's a --

22   you know, it's not evidence.

23          MR. GAFFNEY:  Right.  And --

24          THE COURT:  You understand?  It's not evidence of

25   anything relevant.  It just shows him with a bunch of money.

1          MS. SILVA:  Well, we did charge him with maintaining

2     and harboring.  And the charge itself, to maintain and harbor,

3     would be to receive the money to maintain them.

4          THE COURT:  Well, I understand.  But there's evidence

5     of that.  This just shows him with money.  I mean, you know,

6     that's all it is.

7          MS. SILVA:  Understood, Your Honor.

8          THE COURT:  Okay.  It's just -- but if there were

9     women hanging all over him, and he's got money.  I mean,

10    half-naked women, and he's got money.  Okay.  Then maybe

11    something like that, although that would be inflammatory, too.

12    But this just shows him with some money, you know.

13         MS. SILVA:  Understood.

14         MR. GAFFNEY:  Thank you, Your Honor.  There was

15    actually just one other quick issue I wanted to mention.  The

16    government intends to play some jail calls.

17         THE COURT:  Intends to play what?

18         MR. GAFFNEY:  Intends to play some jail calls from

19    Mr. Barnes.  One of them I thought was going to be redacted to

20    keep out certain statements.  And they are Mr. Barnes talking

21    to a third-party saying, "When I get out, I'm going to strangle

22    you," or "I am going whip your ass."

23         I believe that that is character evidence that's

24    404(b) evidence.  And so I would object to bringing in this --

25    I think it was a jail call from December 21st, 2014.

1          MS. SILVA:  Uh-huh.

2          MR. GAFFNEY:  On those grounds.  And I don't --

3          MS. SILVA:  During the course of that phone call, he

4    talks about -- the woman he is talking to, he -- she talks

5    about how she ran into Brysco at the Walmart, which we believe

6    to be the Brysco that testified here today.  And he also admits

7    to being, quote, "a pimp in distress," which is why we want to

8    introduce that particular case.

9          THE COURT:  But his objection goes, as I understand,

10   to the violence.

11         MR. GAFFNEY:  The violence kind of -- it's really

12   close in time to these other statements they are trying to

13   admit, and that's the problem we have.

14         MS. SILVA:  Perhaps before we play those calls, Your

15   Honor, if I could just have a quick break to make sure I get it

16   narrowed down even further.

17         THE COURT:  And again, it's like with the money.  I

18   mean, I'm sure you can infer whatever you want to.  But it's

19   just not evidence for the jury that they can -- I don't want

20   them -- giving them an inference, and who knows what they are

21   going to do with it.  It's got to be evidence.  I mean, that's

22   what evidence is.  Right?

23         MR. GAFFNEY:  Uh-huh.

24         THE COURT:  I mean, it's always prejudicial to one

25   side or the other.  But it shows something.  This just shows

1  he's threatening people.

2          MR. ORONOZ:  Pimp in distress.

3          THE COURT:  Am I clear?

4          MR. ORONOZ:  Yes.  Thank you, Judge.

5          MS. SILVA:  We can play three and four, and then we

6  can probably take a break and I can narrow that down.

7      (End of sidebar.)

8          MS. SILVA:  May I resume?

9          THE COURT:  Yes, ma'am.  Please.

10  BY MS. SILVA:

11  Q.  Special Agent Mollica, when we broke off, we were talking

12  about the volume that you received from the Facebook search

13  warrant return?

14  A.  Yes.

15  Q.  I want to talk a little bit about a few additional posts.

16  Focusing on this post here, from 7/9 of 2013, could you please

17  read that to the jury?

18  A.  "You'll never have to leave your suite except to go on an

19  outcall if you choose.  You don't have to do nothing you don't

20  fill comfortable with doing, and you get to shop every day if

21  you choose."

22  Q.  Based on your training and experience in investigating

23  these type of case, what is an "outcall"?

24  A.  Outcall is when a john or a trick contacts the prostitute.

25  The prostitute will travel to the john or trick wherever he is.

James Mollica - Direct

1   Q.    Okay.  And who -- who is posting this or sending this

2   message and who is he sending it to?

3   A.    Pay Da Boy Kash is sending it to Kaitlyn Davidson.

4   Q.    Is it fair to say you don't know who Kaitlyn Davidson is?

5   A.    I do not.

6   Q.    Okay.  On this page alone, that being page 13 of 19 from

7   the Facebook return, does there appear to be a lot of

8   communication from Pay Da Boy Kash to Kaitlyn Davidson?

9   A.    Yes.  Based on the exchange of the posts, it appears that

10  Pay Da Boy Kash, Daniel Barnes, is trying to recruit Kaitlyn

11  Davidson to be a prostitute.

12  Q.    And why do you say that?

13  A.    Well, we just talked about the outcall, and he's trying to

14  entice her based on, you know, shopping.

15  Q.    And I want to go back one page to page 12 of 19, for

16  example.  Is he talking about here "a thousand dollars plus --

17  or a thousand plus a night."  What did you interpret that to

18  be?

19  A.    That means that she's going to make a thousand dollars a

20  night, and she can make more.

21  Q.    And on this page, are there additional communications back

22  and forth between Pay Da Boy Kash and a Kaitlyn Davidson?

23  A.    Yes, there are.

24  Q.    All right.  In reviewing the Facebook search warrant, did

25  you encounter multiple communications between Pay Da Boy Kash

1  and recipients that appeared to have female names?

2  A.   Yes.

3           THE COURT:  That last page was page 12 of 19, it

4  says.  Right?

5           MS. SILVA:  Yes, Your Honor.

6           THE COURT:  I thought you said page 5 of --

7           THE WITNESS:  It was page 12 of 19 and page 13 of 19.

8           THE COURT:  Okay.  For the record.

9  BY MS. SILVA:

10  Q.   I want to move forward to page 16 of 19.  Focusing on the

11  second and third communication -- actually, second, third, and

12  fourth communication, what is the exchange here and who is

13  sending what?

14  A.   Kaitlyn Davidson is inquiring about "What's in Seattle."

15  And Pay Da Boy Kash, Daniel Barnes, responds, "Lots of guys who

16  pay for sexy girls like you, clubs and bars."

17           She responded back, "Not 21 yet."

18           "Well, you'll still have a lot of fun I promise."

19  And he wrote begin, "Hair done.  Nails done.  Everything did!"

20  Q.   Do you know if "Hair done, nails done, everything did" is

21  from a song?

22  A.   Yes.

23  Q.   All right.  Is that a song from popular music today?

24  A.   Yes.  Little old right now though.

25  Q.   Okay.  All right.  Moving forward to page 17 of 19.  What

James Mollica - Direct

1    is happening in this exchange, and who does Pay Da Boy Kash

2    appear to be communicating with?

3    A.   Pay Da Boy Kash appears to be communicating with a female

4    named Erica Johnson.  And he starts off, "What it do love.

5    Couldn't help but notice a fly, yet sexy diva."

6              And she writes back, "I'm 15."

7    Q.   And after she writes back, "I'm 15," does he continue to

8    communicate with her?

9    A.   Yes, he does.  He say, "Wow, and married?"

10             She writes back, "See you old ass pervert."

11             And he writing back, "Not old.  30 years young.

12   Respect your elders.  You the one acting like you grown.  LOL."

13   Q.   And I want to move forward to page 18 of 19.  Are there

14   additional communications between Erica Johnson and Pay Da Boy

15   Kash?

16   A.   Yes, there are.

17   Q.   Okay.  You indicated that you also obtained additional

18   records in the course of your investigation.  Did you and your

19   fellow investigators receive records relating to certain motels

20   in California?

21   A.   Yes.

22   Q.   All right.  If you could please turn to what's been

23   premarked for identification as Government's Exhibit No. 14,

24   15, and 16, and review those.

25   A.   Yes.  I recognize these as the records that we obtained

James Mollica - Direct

1    from California, and America's Best Value Inn, and the Motel 6.

2              MS. SILVA:  Your Honor, at this time, the government

3    would move for admission of Government's Exhibit Nos. 14, 15

4    and 16, pursuant to Federal Rule 902(11).  We did provide

5    notice and the business records certifications to opposing

6    counsel.

7              THE COURT:  All right.  Any objection to Exhibits 14,

8    15 and 16?

9              MR. GAFFNEY:  I would submit it on my previous

10   objection, Your Honor.

11             THE COURT:  All right.  Overruled, and they can be

12   admitted.

13             MS. SILVA:  Okay.  Thank you.

14        (Exhibits 14, 15 and 16 admitted.)

15             MS. SILVA:  Permission to publish to the jury.

16             THE COURT:  Yes, you may publish.

17             MS. SILVA:  Thank you.

18   Q.   Turning first to Government's Exhibit 14, Special Agent

19   Mollica, what is this a record of?

20   A.   This is a receipt -- two receipts from California Inn for

21   Amber Marquardt.  One receipt was date in, May 10th, 2013, date

22   out, May 11, 2013.  The next one down, Room 124, was date in,

23   April 30th, 2013, and date out, May 1st, 2013.

24   Q.   Okay.  Let me ask you this question, Special Agent

25   Mollica.  When you obtained these records, how do you obtain

James Mollica - Direct

1   these records?

2   A.   Through subpoena or sometimes the motels will give them to

3   us.

4   Q.   Okay.  And in this case, did these records come from --

5   for all of these records, did these come from the motel or

6   hotel themselves?

7   A.   Yes.

8   Q.   Okay.  And did you specifically subpoena a particular date

9   range?

10  A.   Yeah, we -- particularly the time around when the

11  juvenile, Jasmin Madison, was with the subject, Daniel Barnes.

12  Probably we would ask for April and May of 2013.

13  Q.   And why would you focus on April and May of 2013?

14  A.   Because we are trying to corroborate her story, and figure

15  out where they were staying, and just prove where they were at.

16  Q.   And at the time that you sent the subpoenas for these

17  motel records, what evidence did you have to suggest that the

18  time frame that Daniel Barnes, Amber Marquardt, and Jasmin

19  Madison were together were between April and May of 2013?

20  A.   Based on the telephone data from the cell phone that we

21  got from her, communications started on or about April 28th and

22  they went through, I believe, May 3rd, 2013.

23  Q.   All right.  If we could turn to Government Exhibit 15.

24  A.   I recognize these as records from America's Best Value Inn

25  in Merced.

1          THE COURT:  These are not showing up.  Here they are.

2          MS. SILVA:  Here they are, Your Honor.  I'm just

3    putting them up.

4    Q.    Are these the same multi-paged documents, Special Agent

5    Mollica?

6    A.    Yes, it is.

7    Q.    Six of six pages?

8    A.    Yes.

9    Q.    I'm going to look at page 1 of 6 here, and what is the

10   date of this particular receipt?

11   A.    The date of this, the room was rented to Amber Marquardt.

12   It was on May 2nd, 2013.

13   Q.    Okay.  And what phone number was listed for Amber

14   Marquardt?

15   A.    The (209)354-6449.

16   Q.    Okay.  Turning to page 2 of 6, what is the date of this

17   receipt?

18   A.    This is May 7th, 2013.  Again, it's Amber Marquardt

19   renting the room using telephone number (209)354-6449.  Date in

20   was May 7th, 2013.  Date out was May 9th.

21   Q.    Okay.  Looking at page 3 of 6, again, what is the date on

22   this receipt?

23   A.    May 26th, 2013.

24   Q.    Okay.  And again, it's in the name of Amber Marquardt?

25   A.    Yes.  Same phone number.  Date in, May 26th.  Date out,

1  May 28th, 2013.

2  Q.   Looking at page 4 of 6, what is this a receipt of?

3  A.   This is an America's Best Value Inn registration card.  It

4  was for the May 7th, 2013.

5  Q.   Okay.  And finally, page 5 of 6?

6  A.   Registration card for the May 7, 2013.

7  Q.   And on each of these, is it again the same phone number

8  for Amber Marquardt?

9  A.   Yes.

10  Q.   Is page 6 of 6 the certification of business records,

11  Special Agent Mollica?

12  A.   Yes, it is.

13  Q.   Thank you.  If you could turn to Government's Exhibit 16,

14  please.

15  A.   Yes.  I recognize these as the records of Motel 6 in Las

16  Vegas on Dean Martin Drive.

17  Q.   All right.  And this is a two-page record?

18       THE COURT:  Again, it's not showing up on the screen.

19  BY MS. SILVA:

20  Q.   Oops.  There we go.  Too close.

21  A.   Two pages of receipts, and then the certification of

22  business records.

23  Q.   Okay.  Looking at page 1 of 3, what is the address for

24  this Motel 6?

25  A.   5085 South Dean Martin Drive, Las Vegas, Nevada, 89118.

James Mollica - Direct

1   Q.   And who is the -- excuse me.  The name -- the guest's name

2   for this particular receipt?

3   A.   Daniel Barnes, and the stay was from May 3rd, 2013, to

4   May 4th, 2013.

5   Q.   Okay.  And how was the room paid for?

6   A.   Room was paid for with cash.

7   Q.   Okay.  Is that in the amount of $71.67?

8   A.   That's correct.

9   Q.   All right.  Moving to page 2 of 3.

10  A.   Again, it's the same Motel 6.  The guest is Daniel Barnes,

11  from May 30th, 2013, to May 31st, 2013.  The total charge was

12  $44.79, and he paid in cash again.

13  Q.   Sorry.  Let me go back to that.  What is the address for

14  Daniel James Barnes listed on this receipt?

15  A.   230 East 11th Street, Merced, California, 95341.

16  Q.   Based on your investigation of this case, did you have

17  information that Daniel Barnes was a resident of Merced?

18  A.   Yes.

19  Q.   Or was a registered resident of Merced?

20  A.   Yes.

21  Q.   And how did you obtain that information?

22  A.   I believe through the California Motor Vehicle driver's

23  license information.

24  Q.   After reviewing those hotel receipts, did that -- what did

25  that do to further the investigation in the matter?

1    A.   You know, that kind of corroborated Jasmin's story that

2    they were in California and came back to Las Vegas.  It also

3    corresponded the GPS on the vehicle for Courtesy Rental that

4    they started in Las Vegas, went to California, and came back to

5    Las Vegas.

6    Q.   I want to talk about the Courtesy rental car records.  You

7    heard the owner testify yesterday about those records.  Did you

8    review those records during the course of your investigation?

9    A.   Yes, I have.

10   Q.   Okay.  And what about those records -- you said they

11   corroborated.  How did they corroborate the information you had

12   about when Jasmin was with Daniel Barnes and Amber Marquardt?

13   A.   Based on the text messages when we believe that she did

14   have contact with Daniel Barnes, it started in Las Vegas.  They

15   went to California, and then again they came back to Las Vegas

16   within that seven-day period from April 28th, 2013 through

17   May 3rd, 2013.

18   Q.   Okay.  If you could please turn to Government's Exhibit

19   No. 11, to page 1 of that exhibit that's been previously

20   admitted.  What color of car was rented by Amber Marquardt on

21   April 23rd, of 2013?

22   A.   It was a white Chevy Malibu.

23   Q.   And do you recall Jasmin Madison's testimony earlier today

24   about what kind of car she was picked in -- what color of car

25   she was picked up in by Daniel Barnes and Amber Marquardt?

James Mollica - Direct

1  A.   Yes.  She described it as a white Chevy four-door, and

2  Malibus are four-door vehicles.

3  Q.   And turning to page 2 of that same document -- that same

4  exhibit -- excuse me -- Government Exhibit No. 11.  Again, the

5  out date, April 30th, the in date, May 7th, 2013.  What color

6  and what make of vehicle was rented to Amber Marquardt?

7  A.   Again, it was a white Chevrolet Malibu.

8  Q.   Okay.  In your review of the GPS tracking that was

9  provided as part of the subpoena returned from Courtesy rental

10  car, based on a plain review of that, did it appear that the

11  vehicle was moving between California and Las Vegas?

12  A.   Yes.

13  Q.   And based your review of those records, did it appear that

14  there was a significant amount of miles put on the vehicles

15  each time it was rented out?

16  A.   Yes.

17  Q.   Okay.  And based solely on your knowledge of the distance

18  between Las Vegas and California, was the mileage consistent

19  with a back-and-forth journey?

20  A.   Yes.  There was a lot of miles put on the vehicle each

21  time.

22  Q.   In the course of your investigation, did you obtain a

23  birth certificate to verify Jasmin Madison's age?

24  A.   Yes.  I did obtain a birth certificate from California.

25  Q.   Okay.  And how did you obtain that birth certificate?

James Mollica - Direct

1    A.   I requested it through our task force officers out in the

2    San Bernardino county office.

3    Q.   Okay.  If you could please turn to what's been premarked

4    for identification as Government's Exhibit No. 3.

5            Is that a copy -- and if you could pull it out,

6    Special Agent Mollica, and verify there's a seal on that

7    document?

8    A.   Yes.  There's a raised seal at the bottom and I recognize

9    that to be the original document that I received.

10           MS. SILVA:  Your Honor, I would move to admit

11   Government's Exhibit No. 9 under Rule 902(1) as a document

12   under seal.

13           THE COURT:  Any objections?

14           MR. GAFFNEY:  I'm sorry, Your Honor.  Give me just a

15   second.

16           No objection.

17           THE COURT:  Thank you.  Same will be -- what number

18   is this now?

19           MS. SILVA:  Government's Exhibit No. 3.

20           THE COURT:  3?

21           MS. SILVA:  Yes, Your Honor.

22           THE COURT:  3 will be admitted and may be published.

23           MS. SILVA:  Thank you, Your Honor.

24        (Exhibit 3 admitted.)

25

1    BY MS. SILVA:

2    Q.   Special Agent Mollica, what does that indicate the date of

3    birth to be for Jasmin Marie Madison?

4    A.   Date of birth is September 24th, 1997.

5    Q.   Sorry.  September 24th?

6    A.   Sorry.  September -- oh, September 23rd, 1997.

7    Q.   Okay.  All right.

8            MS. SILVA:  Okay.  All right.  Your Honor, I am ready

9    to proceed, but it's almost 3:00.  If it's a natural breaking

10   point, the government would request to take a break at this

11   time.

12           THE COURT:  I'm sorry?

13           MS. SILVA:  I have additional things to present, but

14   it's almost 3:00.  If we could take a break at this time, the

15   government would certainly appreciate that.

16           THE COURT:  Do you need to take a break?

17           THE WITNESS:  Your Honor, I want to make sure

18   everything is set for the next set of exhibits.

19           THE COURT:  All right.  It's a little early, but we

20   will take an afternoon break then at this time.

21           During this recess, I again admonish you not to

22   discuss this case among yourselves or with anyone else, not to

23   listen to, read, or watch any report of or commentary on the

24   trial by any person connected with the trial or by any medium

25   of information, including without limitation newspaper,

James Mollica - Direct

 1   television, radio or the Internet.

 2              And you are not to form or express an opinion on any

 3   subject connected with this case until it's finally submitted

 4   to you under instructions from me for your deliberations.

 5              So we will be in recess for 10 minutes.

 6      (Recess, 2:56 p.m.  Resumed 3:11 p.m.  Jury in.)

 7              THE COURT:  All right.  Thank you.  You may be

 8   seated.

 9              All right.  I remind you, sir, you are still under

10   oath.

11              Parties stipulate to the presence of the jury and the

12   alternates?

13              MS. SILVA:  Yes, Your Honor.

14              MR. GAFFNEY:  Yes, Your Honor.

15              THE COURT:  All right.  Thank you.  You may proceed.

16              MS. SILVA:  Thank you, Your Honor.

17   Q.   Special Agent Mollica, we were walking through the

18   additional investigation you conducted in relation to this

19   case.

20              During the course of the investigation, did you

21   review phone calls made by the defendant?

22   A.   Yes, I have.

23   Q.   Okay.  And, in the course of reviewing those phone calls,

24   let me ask you this question.  Were those phone calls recorded?

25   A.   Yes, they are.

James Mollica - Direct

1   Q.   All right.  And you saw Kurt Overall testify earlier as a

2   custodian of records, and he identified some CDs with some

3   calls on them.

4          Are those the calls you reviewed in the course of

5   your investigation?

6   A.   Yes, it was.

7   Q.   In the course of reviewing those phone calls, did you

8   uncover a few calls that were of an evidentiary value?

9   A.   Yes, I did.

10         MS. SILVA:  Okay.  Your Honor, I am going to play --

11  these calls are 15 minutes long.  I am going to play an

12  introduction and go to a relevant part, so we are not listening

13  to all 15 minutes for the record.

14         THE COURT:  All right.

15         MS. SILVA:  The first phone call --

16         THE COURT:  Have the defense attorneys heard this?

17  Have you heard the tape?

18         MR. GAFFNEY:  I have, Your Honor.  Thank you.

19         THE COURT:  All right.

20  BY MS. SILVA:

21  Q.   Special Agent Mollica, I want to direct your attention to

22  a call from November 26 of 2013.  Did you review that call

23  before coming into court here today?

24  A.   Yes, I did.

25         (Recording being played.)

1    BY MS. SILVA:

2    Q.   Special Agent Mollica, during the course of that phone

3    call, is it fair to say you don't know the female voice on that

4    phone call?

5    A.   Yes, I don't know who that is.

6    Q.   Did you hear the name "Amber" referenced?

7    A.   Yes.

8    Q.   During the course of reviewing the jail calls that you

9    heard, in the course of this investigation, was Amber regularly

10   brought up by Daniel Barnes?

11   A.   Yes.

12   Q.   And let me walk through how you know these calls are the

13   ones made by Daniel Barnes.  How do you obtain the calls made

14   by Daniel Barnes?

15   A.   I go through CCC -- I'm sorry.  CCA of Southern Nevada.

16   We send them a subpoena, and then they send me the jail calls

17   for Daniel Barnes.  Daniel Barnes is required to put in a pin

18   number.  And then the preamble, when they say "You have

19   received a collect call from," he says "Daniel" and then a --

20        (Recording being played.)

21   BY MS. SILVA:

22   Q.   Probably the next one.

23   A.   So I know it's Daniel.  I know Daniel has also let other

24   people use his pin, and I recognize when another inmate is on

25   there speaking and it's not Daniel.

James Mollica - Direct

1  Q.   And do you regularly re-subpoena the phone calls, so you
2  are regularly getting the most up-to-date phone calls?
3  A.   Yes.  When we submit the subpoena, they initially send us
4  year to date from when they landed in CCA, Southern Nevada, to
5  the date of the subpoena.  And then after that, we receive the
6  calls once a month.
7          MS. SILVA:  Thank you.  I am going play the next
8  call.
9          THE COURT:  What's the date of the next call?
10         MS. SILVA:  The date of the next call is November 29,
11 2013.
12     (Recording being played.)
13 BY MS. SILVA:
14 Q.   Special Agent Mollica, what did we just hear Daniel Barnes
15 say?
16         THE COURT:  We heard it.  He doesn't need to repeat
17 it.  We heard it ourselves.
18         MS. SILVA:  Understood, Your Honor.  I just want to
19 make sure the jury heard that.
20 Q.   I am going to play one more call for you, Special Agent
21 Mollica.
22 A.   Okay.
23 Q.   And the date of this call is December 21st, 2013.
24     (Recording being played.)
25

James Mollica - Direct

1    BY MS. SILVA:

2    Q.    Special Agent Mollica, I am sorry.  I have one more call

3    for you.  This is also from November 26, 2013.

4              THE COURT:  The last one, was that December 21st or

5    November 21st?

6              MS. SILVA:  December 21st.

7              THE COURT:  December.

8              MS. SILVA:  Yes, Your Honor.

9              THE COURT:  This is November --

10             MS. SILVA:  26, 2013.

11             THE COURT:  Okay.

12             MS. SILVA:  Thank you.

13         (Recording being played.)

14             MS. SILVA:  Thank you, Your Honor.

15   Q.    Special Agent Mollica, in this last phone call, there is

16   reference to a "she" and "getting arrested."  Do you know who

17   Daniel Barnes was with when he was arrested?

18   A.    Yes.  On September 14th, 2013, he was with Amber Marquardt

19   when he was arrested.

20   Q.    And where were they when they were arrested?

21   A.    Santa Rosa, I believe.

22   Q.    Were they at a particular location?  A house, a motel, a

23   hotel?

24   A.    They were at a hotel.

25   Q.    Okay.  And in the course of the investigation, were items

James Mollica - Direct

1  of electronic devices seized from both Daniel Barnes and Amber

2  Marquardt?

3  A.   Yes.

4  Q.   Were one of those items an iPad?

5  A.   Yes, it was.

6        MS. SILVA:  May I approach, Your Honor?

7        THE COURT:  Yes, ma'am.

8  BY MS. SILVA:

9  Q.   Is that one of the items that was seized from Daniel

10  Barnes during the course of this investigation?

11  A.   Yes.

12  Q.   And how do you recognize it?

13  A.   I recognize it.  I have seen it before.  And also on the

14  outside of the packaging, we opened it up, and I sealed it back

15  up on November 21st, 2014, and put my initials on it.

16  Q.   And what is this?

17  A.   This is a white iPad.

18        MS. SILVA:  Permission to admit Government's Exhibit

19  No. 20.

20        THE COURT:  I'm sorry.  What about Exhibit 20?

21        MS. SILVA:  Permission to admit it, Your Honor.  It's

22  been marked but not admitted.

23        THE COURT:  Any objection to Exhibit 20?

24        MR. GAFFNEY:  No, Your Honor.

25        THE COURT:  Exhibit 20 may be admitted and published.

James Mollica - Direct

1           MS. SILVA:  Thank you.

2           (Exhibit 20 admitted.)

3    BY MS. SILVA:

4    Q.   Earlier, you heard testimony from Mr. Radke about the

5    forensic examination that was done or that he conducted from

6    that iPad.  Did you receive the results of that forensic

7    examination?

8    A.   I did.

9    Q.   All right.  And did you review the results of that

10   examination?

11   A.   I did.

12   Q.   All right.  If could you please turn to what's been

13   premarked for identification as Government's Exhibit 18B as in

14   boy.  What is Government's Exhibit 18B?

15   A.   This is a page that we removed from the IPEX report.  It's

16   got current open pages and book marks on it.  This was

17   significant to me because current open pages, it was

18   classifieds, myredbook.com.  That's where they were posting

19   their ads.

20          Also, underneath that, there was the bookmarks and

21   bookmarked was Pay Da Boy Kash Facebook.

22   Q.   Okay.  And when you say IPEX exam, is that the type of

23   exam that Mr. Radke conducted on the iPad?

24   A.   Yes.  That was one of the four various reports that he

25   provided.

James Mollica - Direct

1   Q.   And is it fair to say that's page one of 18B?

2   A.   Yes.

3   Q.   Could you please review pages 2, 3, 4 and 5 of 18B.

4   A.   I also recognize these.  One is contacts, and it's listed

5   as Pay Da Boy Kash.  This was a significant to me because it --

6   Q.   Before we go in to that, you do recognize them?

7   A.   I do.  Yes.

8   Q.   Okay.  And what do they -- are they fair and accurate

9   copies of information provided to you as a result of that

10  forensic examination by Mr. Radke?

11  A.   Yes.

12           MS. SILVA:  Permission to admit Government's

13  Exhibit 18B.

14           THE COURT:  Any objection to 18B?

15           MR. GAFFNEY:  No, Your Honor.

16           THE COURT:  Thank you.  The same may be admitted and

17  can be published.

18           MS. SILVA:  Thank you, Your Honor.

19      (Exhibit 18B admitted.)

20  BY MS. SILVA:

21  Q.   Looking at page 1 of 18B, Special Agent Mollica, if you

22  could --

23           Mr. Oaks, if you would turn on the Elmo for me,

24  please.  Thank you.

25           All right.  You just testified regarding the

1    currently open pages.  Could you please circle what you were

2    testifying regarding the myredbook.com on the screen there?

3    You can just touch the screen and circle it.

4    A.   It's not coming up yet.  Is it off?

5            COURTROOM ADMINISTRATOR:  It's not coming up?  Is it

6    up on anybody's screen?  It is?  But not yours.

7            THE WITNESS:  No.

8            COURTROOM ADMINISTRATOR:  Can you turn yours off and

9    on?

10           THE WITNESS:  I can see it on hers.

11   BY MS. SILVA:

12   Q.   Well, I will tell you what.  I am just going to point to

13   it.

14   A.   Yes, if you're pointing to the top one --

15   Q.   If I point to it, can you see it there?

16   A.   Yes.

17   Q.   And if I scroll my finger down, is that the Facebook

18   address --

19   A.   Yes.

20   Q.   -- that you testified regarding?

21   A.   Uh-huh.

22   Q.   Turning to page 2 of 18B, what does this appear to be?

23   A.   This is found in the contacts.  And again, it's Pay Da Boy

24   Kash.  It was significant to me, because birthdate 10/9/1982,

25   that's the birthday of Daniel Barnes.  Also significant to me

1    was the telephone number listed (209)354-0792.

2    Q.   And why is that phone number significant to you?

3    A.   That was the telephone number that Jasmin Madison was

4    contacting Daniel Barnes on.

5    Q.   And did you learn that from reviewing the Cellebrite

6    report as well as the cell phone?

7    A.   Yes.

8    Q.   Turning to page 3 of 18B, what is this?

9    A.   These were in the notes section of the report.  I found

10   raps that -- where Daniel Barnes was writing out his raps, and,

11   basically, singing about how -- rapping about how he was a pimp

12   and things of that nature.

13   Q.   All right.  And, in fact, for example, in this printout,

14   does it discuss -- specifically discuss pimping in this rap?

15   A.   Yes.

16   Q.   Okay.  Turning to page 4 of that exhibit, is this an

17   additional rap you found?

18   A.   Yes.

19   Q.   All right.  In the course of reading through there,

20   there's various phrases.  For example, "So I strive for da

21   cheddar."

22        Based on your training and experience, with these

23   type of cases, what does "cheddar" or "cheddah" tend to mean?

24   A.   Money.

25   Q.   All right.  And what is written in these two sentences

James Mollica - Direct

1    here?  "To send a white bitch to Mars"?

2    A.   Yes.  "Really, wit this pimpin'.  Sit her down instant.

3    Put her on a flight.  Watch her sore like a kite."

4    Q.   And finally, page 5 of that excerpt.  If you could read

5    the fourth line or the fourth and fifth lines.

6    A.   Fourth line is "Pimpin's my occupation.  Imma

7    professional."

8    Q.   And what -- what is the date on this particular rap?

9    A.   August 12th, 2013.

10   Q.   And going back to the previous rap, what is the date on

11   that one?

12   A.   July 5th, 2013.

13   Q.   And finally --

14   A.   June 21st, 2013.

15             MS. SILVA:  Court's indulgence.

16             THE COURT:  Yes.

17   BY MS. SILVA:

18   Q.   Special Agent Mollica, I just have a few more questions

19   for you.  Turning back to the Facebook search warrant return,

20   in reviewing the pictures that you got from that return, did

21   you discover a picture of Jasmin Madison?

22   A.   Yes, I did.

23   Q.   All right.  On page 10 of 19, is this the picture of

24   Jasmin Madison you found on the defendant's Facebook page?

25   A.   Yes, I did.

1          MS. SILVA:  I have no further questions for this

2    witness.

3          THE COURT:  All right.  Cross-examination.

4          MR. GAFFNEY:  Thank you, Judge.  May I inquire?

5          THE COURT:  Yes, sir.

6                      CROSS-EXAMINATION

7    BY MR. GAFFNEY:

8    Q.   Special Agent Mollica, you are essentially the lead

9    investigator on this case; is that right?

10   A.   Co-case agent.

11   Q.   Okay.  And your other case agent would be Detective

12   Richard Leung?

13   A.   Yes.

14   Q.   And part of your job, as a case agent, is to work closely

15   with the US attorneys and to make sure they have credible

16   information they can use in their prosecution; right?

17   A.   Yes.

18   Q.   And sometimes it could be difficult to get good

19   information when you are dealing with somebody like Jasmin

20   Madison?

21   A.   She told us what her story was, and that's what we used.

22   Q.   Okay.  You testified in front of the grand jury in this

23   case not once but twice; right?

24   A.   Yes.

25   Q.   Okay.  And your testimony regarding the timeline of events

James Mollica – Cross

1  that occurred in California, that changed between the first

2  time you testified and the second time you testified; didn't

3  it?

4  A.   Yes.

5  Q.   And that's because the first time you testified, you based

6  a large part of that testimony on statements that were made by

7  Jasmin; right?

8  A.   That's correct.

9  Q.   And then you conducted further investigation; right?

10 A.   Yes.

11 Q.   You talked to Amber; correct?

12 A.   Yes.

13 Q.   And then that timeline had changed somewhat; didn't it?

14 A.   Yes.

15 Q.   And you've been working on this case since, what?  2013?

16 Is that fair to say?

17 A.   Yes.

18 Q.   And you've been working by yourself; you've been working

19 with other law enforcement agents; right?

20 A.   Yes.

21 Q.   Fair to say you're familiar with all aspects of the

22 investigation in this case?

23 A.   Yes.

24 Q.   And that includes being familiar with not only information

25 you obtained, but the information that other investigators have

James Mollica - Cross

1    obtained as well?

2    A.    Yes.

3    Q.    And so you are familiar with the information that was

4    collected by Detective Leung; right?

5    A.    Yes.

6    Q.    Am I saying that right?  Is it Leung?

7    A.    Leung.

8    Q.    Okay.  And you are familiar with the text messages that he

9    discovered in Jasmin's phone; right?

10   A.    Yes.

11   Q.    You are familiar with the Cellebrite data extraction that

12   he performed on Jasmin's phone?

13   A.    Yes.

14   Q.    And you've read through that Cellebrite report; correct?

15   A.    Yes.

16   Q.    All right.  Now, based on the text messages on Jasmin's

17   phone, you would agree that Jasmin came into contact with Amber

18   and Daniel sometime in April of 2013?

19   A.    Yes.

20   Q.    And you are aware that the earlier text message on

21   Jasmin's phone, that's allegedly from Amber or Daniel, occurred

22   on or about April 20th, 2013?

23   A.    I believe it was April 28th.

24   Q.    You are correct.  April 28th.  Right?

25   A.    I believe so.

James Mollica - Cross

1   Q.   And you are also aware that based on the GPS report from

2   Courtesy Rent A Car, that Amber and Daniel did not actually

3   arrive in Las Vegas until sometime around April 25th or 26th of

4   2013?

5   A.   I'd have to go back and refresh my recollection on that.

6   Q.   Okay.  Can you take a look at the -- the exhibit book in

7   front of you and --

8            THE COURT:  What exhibit number is that GPS report?

9            MR. GAFFNEY:  It would be under Exhibit No. 11, Your

10   Honor.

11            THE COURT:  No. 11.

12            THE WITNESS:  Yes.  The vehicle comes back to Las

13   Vegas from Merced on or about April 26th and stays here in Las

14   Vegas through April 28th.

15   BY MR. GAFFNEY:

16   Q.   Okay.  So you would agree that Jasmin did not come into

17   contact with Amber or Daniel until April 27th or April 28th of

18   2013?  Based on the information that you know during -- that

19   you obtained during the course of your investigation?

20   A.   Based on the telephone contacts.

21   Q.   Okay.  And then the next day -- this would be

22   April 29th -- they or at least the car leaves to California;

23   right?

24   A.   Yes.

25   Q.   And then they all -- or the car returns to Las Vegas on or

1    about May 3rd, 2013?

2    A.   Yes.

3    Q.   Okay.  So would you -- you would agree that those five

4    days, from April 29th to May 3rd, would be the relevant

5    timeline in regards to what happened in California?

6    A.   Yes.  Yeah.

7    Q.   And you also are aware of Jasmin's text message where she

8    requests to come and retrieve her things from Amber.  That took

9    place on April 4th, 2013; right?

10   A.   I believe that took place May 3rd, 2013.

11   Q.   Oh, I'm sorry.  You are correct.  May 3rd, 2013.  We can

12   agree on that date?

13   A.   Yes.

14   Q.   Okay.  And so you would agree that at that point -- and I

15   think you heard the testimony from Jasmin and Amber today, that

16   her relationship with Daniel and Amber ended on or about

17   May 4th, 2013?

18   A.   Yes.

19   Q.   And then the next day, May 5th, 2013, is when she actually

20   gets arrested -- Jasmin gets arrested for prostitution; right?

21   If you don't know.  That's fine.

22   A.   Yeah.

23   Q.   Okay.  But you are aware that she was arrested sometime in

24   May?

25   A.   Yes.

James Mollica - Cross

1   Q.   2013?

2   A.   Yes.

3   Q.   Okay.  Now, looking again at Exhibit No. 11, during that

4   relevant time period that we talked about, April 29th, 2013, to

5   May 3rd of 2013, do you see an entry where the car was located

6   in Modesto, California?

7   A.   No.

8   Q.   And you are aware of an investigator by the name of Vance

9   Walker; right?

10  A.   Yes.

11  Q.   He's a police officer?  He works in Merced?

12  A.   Yes.

13  Q.   He assisted you with collecting some information about

14  this case; right?

15  A.   Yes.

16  Q.   He was tasked with going to the Best Western Inn located

17  in Merced, California; correct?

18  A.   I believe that's where he went, yes.

19  Q.   And specifically, he was trying to corroborate information

20  that you had received or that -- well, information that came

21  from Jasmin about staying at the Best Western Inn Merced;

22  right?

23  A.   I believe so.  Rich dealt with him.

24  Q.   Okay.

25  A.   I did not specifically deal with Vance Walker.

1    Q.   Well, you are familiar with the records that were obtained

2    from the Best Western Inn in Merced; correct?

3    A.   Yes.

4    Q.   And those were given to you by an individual named Tiffany

5    Grist?

6    A.   Correct.

7    Q.   And those hotel registration receipts, you would agree

8    that there is no -- the records that were received from

9    Miss Grist did not show Amber, or Daniel, or Jasmin in

10   California in Merced during the relevant time period at the

11   Best Western Inn?

12   A.   I'd have to see them again to verify that.

13           MR. GAFFNEY:  Okay.  Your Honor, may I have just a

14   minute?  Court's indulgence.

15           THE COURT:  Yes.

16           MR. GAFFNEY:  Your Honor, may I approach?

17           THE COURT:  Yes, sir.  What exhibit number is this?

18           MR. GAFFNEY:  This is not an exhibit, Your Honor.

19           THE COURT:  Okay.  All right.

20   BY MR. GAFFNEY:

21   Q.   Special Agent Mollica, fair to say you have seen these

22   records before?

23   A.   Yes, I have.

24   Q.   And in looking at those records, do you see a hotel

25   registration receipt -- those are all in the name of Amber

James Mollica - Cross

1  Marquardt; right?

2           MS. SILVA:  Your Honor, I'm going to object at this

3  point as to testifying to documents not in evidence.  I have no

4  objection to moving the documents into evidence.

5           MR. GAFFNEY:  I will move them into evidence, Your

6  Honor.

7           THE COURT:  I mean, he can't testify as to the

8  contents until they are admitted anyway.

9           MR. GAFFNEY:  Okay.

10          THE COURT:  What number is this?  It's not numbered?

11  Give it next in order then.

12          COURTROOM ADMINISTRATOR:  It would be 511, Your

13  Honor.

14          THE COURT:  511?

15          COURTROOM ADMINISTRATOR:  That's the next one in

16  order.  Yes.

17          MR. GAFFNEY:  Thank you, Judge.

18          THE COURT:  511.  This will be marked then as

19  Exhibit 511, and be admitted.

20          No objection.  Correct?

21          MS. SILVA:  Correct, Your Honor.  No objection.

22          THE COURT:  All right.  511 is admitted.

23          MR. GAFFNEY:  Thank you, Judge.

24      (Exhibit 511 admitted.)

25

James Mollica - Cross

1    BY MR. GAFFNEY:

2    Q.   Looking at Defense Exhibit 511, those would appear to be

3    hotel registration receipts from the Best Western Inn in

4    Merced, California; correct?

5    A.   Yes.

6    Q.   And those would be in the name of Amber Marquardt;

7    correct?

8    A.   Yes.

9    Q.   You don't see Jasmin Madison or Daniel Barnes listed on

10   any of those; right?

11   A.   I do see Daniel Barnes listed.

12   Q.   Oh.  Do you see Jasmin Madison listed?

13   A.   I see Daniel Barnes listed.

14   Q.   Okay.  Do you see a hotel registration receipt between

15   April 29th, 2013, to May 3rd, 2013?

16   A.   I do not.

17   Q.   You are familiar with the hotel registration records

18   obtained from the California Inn; correct?

19   A.   Yes.

20   Q.   And that's located in Modesto; right?

21   A.   Yes.

22   Q.   And you are aware that those records show Amber checking

23   in on April 30th and checking out on May 1st; right?

24   A.   Yes.

25   Q.   You are also familiar with the hotel registration receipts

James Mollica - Cross

1   obtained from America's Best Value Inn, which is located in

2   Merced, California; right?

3   A.   Yes.

4   Q.   And those records indicate that Amber checked in on

5   May 2nd and checked out on May 3rd; right?

6   A.   Yes.

7   Q.   And so essentially, you were able to track at least

8   Amber's movements when she was in California; right?

9   A.   Yes.

10  Q.   And what cities she visited?

11  A.   Yes.

12  Q.   Where she stayed?  Is that -- where she stayed as well?

13  A.   Yes.

14  Q.   And you are also familiar with the hotel registration

15  receipts that were obtained from Motel 6, which is located in

16  on Dean Martin Drive; right?

17  A.   Yes.

18  Q.   And those records are in Daniel Barnes's name; correct?

19  A.   Yes.

20  Q.   And those records indicate that Mr. Barnes checked in on

21  May 3rd and then checked out on May 4th; correct?

22  A.   That's correct.

23  Q.   And fair to say you are not aware of any records

24  indicating that -- any hotel registration receipts indicating

25  that Amber or Daniel stayed at Arizona Charlie's?

James Mollica - Redirect

1  A.   No.  We checked with Arizona Charlie's, and they didn't

2  have anything for us.

3  Q.   The iPad data extraction that you reviewed, you didn't

4  find any pictures of Jasmin Madison on that iPad; did you?

5  A.   I believe I did find the same photograph that was also

6  placed on Facebook.

7  Q.   Okay.  This would be the photograph that you found on

8  Mr. Barnes's Facebook; correct?

9  A.   Correct.

10 Q.   You didn't find any pictures of the photographs that were

11 used in the myRedBook advertisement for Jasmin though; did you?

12 A.   I did not.  No.

13 Q.   And the picture of Jasmin that was on Daniel's Facebook

14 page, you don't know who took that picture; do you?

15 A.   I don't.  No.

16 Q.   You don't know when that picture was taken?

17 A.   I don't.

18          MR. GAFFNEY:  Okay.  I will pass the witness, Judge.

19          THE COURT:  All right.  Redirect.

20          MS. SILVA:  Yes, Your Honor.

21                    REDIRECT-EXAMINATION

22 BY MS. SILVA:

23 Q.   Special Agent Mollica, in your training and experience

24 investigating these type of cases, are there times where it's

25 difficult to get hotel records, or at least full and complete

1  hotel records, because individuals either do not register under

2  their name or have hotel rooms registered in other people's

3  names?

4  A.   Yes.

5  Q.   When you say "Yes," can you explain that to the jury?

6  A.   Well, as Amber testified before, sometimes the johns or

7  tricks will rent the room as payment.  And they will perform

8  the sex act, and then the john or pimp will leave them in the

9  room, so they can use the room for the rest of the night to

10 continue to serve customers.

11 Q.   Opposing counsel posed a question to you about not finding

12 some things or some listings, I believe, on the iPad?

13 A.   Yes.

14 Q.   When you received the report from the iPad, was there a

15 way to tell whether things had been deleted from it?

16 A.   Yes.  There was a lot of fragmented images, and that's

17 when they try to recover the deleted images.  And sometimes you

18 get lucky, and you get a full image or you can make out what's

19 in there.  Other times, you know, it will just be like a small

20 sliver of the top of a picture.

21       MR. GAFFNEY:  Your Honor, I have to object.  I

22 believe he's testifying as an expert in this particular area.

23       MS. SILVA:  I can clarify the question, Your Honor.

24       THE COURT:  Go ahead.

25

1   BY MS. SILVA:

2   Q.    Have you, in your training and experience in the course of

3   various investigations, reviewed reports where you have

4   received fragmented information back?

5   A.    Yes, I have.

6   Q.    In reviewing those reports, have you learned that

7   fragmented reports aren't complete?

8   A.    Yes.

9   Q.    Okay.  And how are they not complete?

10  A.    They -- it's been deleted.  Sometimes the computer saves

11  some of the image.  It's fragmented.  I only get like a small

12  top of a portion of a photo or a small bottom of a portion of a

13  photo.  I'm not getting the full image, and we've lost it.

14  Q.    Okay.  Turning to Government's Exhibit 11, the GPS

15  printout, I know these are difficult to read.

16  A.    Yes.

17  Q.    Looking at this, does it appear that the car was moving

18  from Merced to Delhi -- I think I said that correct -- to

19  Fresno, Merced, and then back and forth to Las Vegas?

20          And specifically focused on Merced, Delhi, are those,

21  if you know, both located up and down State Highway 99?

22  A.    Yes.

23  Q.    Is Modesto also located on State Highway 99?

24  A.    I believe it is.

25          MS. SILVA:  Okay.  Court's indulgence.

James Mollica - RX

1              I have no additional questions for this witness.

2              THE COURT:  Any more on recross?

3              MR. GAFFNEY:  Very briefly.

4              THE COURT:  Don't get our hopes up.

5                            RECROSS-EXAMINATION

6  BY MR. GAFFNEY:

7  Q.   Special Agent Mollica, you testified as to some of the

8  images that were fragmented.  Isn't it true that there are

9  reasons, other than somebody deleting items, that could result

10  in that fragmentation?

11              For instance, if the image itself fails to upload on

12  the device?  If there's some kind of interference with the

13  Internet connection?

14  A.   I'm not familiar if that makes fragments.  I was under the

15  impression it was deleted.

16  Q.   And are you aware that Delhi is actually a community close

17  to Merced?

18  A.   I have heard of it before.  I am not -- I don't know if

19  it's -- I have seen it on the map.  I haven't -- I don't know

20  if it's a city or, you know, county.

21  Q.   You don't know how far Delhi is from Merced; right?

22  A.   I don't know.

23              MR. GAFFNEY:  Okay.  No more questions, Judge.

24              THE COURT:  Thank you.  Anything on redirect?

25              MS. SILVA:  No, Your Honor.  Thank you.

1          THE COURT:  Thank for your time, sir.  You may step

2    down.

3          Call your next witness.

4          MS. SILVA:  Your Honor, if I may take a moment and

5    verify that all our exhibits are in evidence.

6          THE COURT:  Are you about to rest then?  Is that what

7    you are trying to tell us?

8          MS. SILVA:  Yes, Your Honor.  I am about to rest.

9          THE COURT:  All right.  Why don't we excuse the jury

10   then.  Take a 10-minute recess.  There is something we can do

11   in your absence and try to save a little time here.

12         So, I'm again going to instruct you not to discuss

13   this case among yourselves or with anyone else, not to listen

14   to, read, or watch any report of or commentary on the trial by

15   any person connected with the trial or by any medium of

16   information, including without limitation newspaper,

17   television, radio or the Internet.

18         And you are not to form or express an opinion on any

19   subject connected with this case until it's finally submitted

20   to you under instructions from me for your deliberations.

21         So, we will be in recess, let's say, for 10 minutes.

22   And show the jury out.

23      (Jury out.)

24         THE COURT:  All right.  Thank you.  You may be

25   seated.  We are in session outside the presence of the jury.

1          MS. SILVA:  May I approach, Your Honor?

2          THE COURT:  Not yet.  I am anticipating that the

3   government is going to rest here momentarily.  So let me ask --

4   pull the microphone over by Mr. Barnes, if you would.

5          MR. ORONOZ:  Yes, Your Honor.

6          THE COURT:  He needs to be right by a microphone,

7   too.  All right.  You can do Mr. Oronoz or Mr. Gaffney, either

8   one.

9          Mr. Barnes, you understand that under the

10  Constitution of the United States and the Constitution of the

11  State of Nevada, you cannot be compelled to testify in this

12  case.  Do you understand that?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Do you understand that you may, at your

15  own request, give up this right and take the witness stand and

16  testify.  Do you understand if you do so, you will be subject

17  to cross-examination by the Assistant United States Attorney.

18  And anything that you say, whether on direct or

19  cross-examination, may be the subject of fair comment when the

20  Assistant United States Attorney speaks to the jury in final

21  argument.  Do you understand?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you also understand if you do testify

24  and if you have a felony conviction in the past 10 years, the

25  Assistant United States Attorney, on cross-examination, may

1    question you about that conviction in front of the jury.  Do

2    you understand that?

3                 THE DEFENDANT:  Yes.

4                 THE COURT:  All right.  Thank you, sir.

5                 Now you can verify your -- make sure all your

6    exhibits are in, and then we will bring the jury back in like

7    eight minutes.

8                 MS. SILVA:  Yes, Your Honor.  Thank you.

9                 THE COURT:  I am trying to move this thing along.

10                MS. SILVA:  Yes, sir.

11                THE COURT:  Now, how many witnesses do you anticipate

12   you will have?

13                MR. GAFFNEY:  None.

14                THE COURT:  All right.  So we will take a bathroom

15   break then, if you will.  A restroom.  And check your exhibits,

16   and then restroom break, and we will be back in about eight

17   minutes.

18                MR. ORONOZ:  Your Honor, eight minutes?

19                THE COURT:  Yes, sir.

20                MR. ORONOZ:  All right.  Thank you.

21        (Recess 3:52 p.m.  Resumed 4:06 p.m.  Jury in.)

22                THE COURT:  All right.  You may be seated.

23                Parties stipulate to the presence of the jury and the

24   alternates?

25                MS. SILVA:  Yes, Your Honor.

1           MR. GAFFNEY:  Yes, Your Honor.

2           THE COURT:  All right.  All right.  Government?

3           MS. SILVA:  Your Honor, the government rests at this

4    time.

5           THE COURT:  All right.  You may call your first

6    witness.

7           MR. GAFFNEY:  Your Honor, at this time, the defense

8    would rest as well.

9           THE COURT:  All right.  All right.

10          Ladies and gentlemen, what we need to do is settle

11   jury instructions, which is something we need to do outside

12   your presence.  So I'm going to excuse you for the day, and

13   then we'll bring you back tomorrow morning at 9:00.  Usual

14   time.

15          So if you would come about 8:30 and have coffee and

16   doughnuts, and then at 9:00 we will bring you in.  I will give

17   you the jury instructions, and then arguments from the counsel,

18   and then it will be submitted to you for your deliberations.

19          All right?

20          So I am going to excuse you at this time.  Again,

21   leave your notebooks in your seat.  During this recess, I again

22   admonish you not to discuss this case among yourselves or with

23   anyone else, not to listen to, read, or watch any report of or

24   commentary on the trial by any person connected with the trial

25   or by any medium of information, including without limitation

 1    newspaper, television, radio or the Internet.

 2              And you are not to form or express an opinion on any

 3    subject connected with this case until it's finally submitted

 4    to you under instructions from me for your deliberations.

 5              So we will be in recess with the jury until 9:00 a.m.

 6    tomorrow morning.  All right?  And the jury is excused.

 7         (Jury out.)

 8              THE COURT:  All right.  Thank you.  You may be

 9    seated.

10              MR. GAFFNEY:  Your Honor.

11              THE COURT:  Yes, sir.

12              MR. GAFFNEY:  I had just one really quick issue.

13              THE COURT:  You need to be by a microphone though, so

14    we can make sure we've got --

15              MR. GAFFNEY:  Oh, I just have one really quick issue.

16              I should have raised this before we rested.  But I

17    would submit our Rule 29 motion and just allege that the

18    government has presented insufficient evidence to sustain a

19    conviction in this case.

20              THE COURT:  All right.  And I am going to deny the

21    motion.

22              MS. SILVA:  Thank you, Your Honor.

23              THE COURT:  Now, have you all worked on your final

24    arguments already?  How long are you going to be in final

25    argument, or you don't know yet?

1          MS. HERR:  I don't know yet, but I don't think it

2    will be long.  Like probably 10, 15 minutes.

3          THE COURT:  And you Mr. Gaffney?

4          MR. GAFFNEY:  Probably a little bit longer, but I

5    can't imagine it's going to go over, say, half hour.

6          THE COURT:  All right.  Now, would you prefer to have

7    me read the jury instructions and then you argue, or would you

8    prefer to argue, and then have me read the jury instructions?

9          MS. SILVA:  We prefer that you read the jury

10   instructions and then argue.

11         MR. GAFFNEY:  And I would prefer the same.

12         THE COURT:  That's what I always wanted when I was a

13   lawyer.  I didn't want the last words they hear to be the judge

14   droning on about the probable cause or whatever.

15         So, and that's -- so I think that's a wise decision.

16         Now, can you print those here?

17         LAW CLERK:  Yes.  They are printing now.

18         THE COURT:  So we are going to print out the jury

19   instructions.  Basically, we used the ones that you submitted.

20   And we reworked them a little bit.

21         The primary sticking point was the conspiracy, so I

22   just took the conspiracy part out of it, out of the -- if I can

23   call them standard jury instructions.  And say, "Here is what

24   conspiracy is."  The Ninth Circuit model instruction, and then

25   the rest of it you can just argue.

1           My view is that the jury instructions should be

2     points of law that the jury needs to be instructed about.  So,

3     there are some that both sides suggested that were just, I

4     thought, argumentative.

5           You can argue that to the jury, but it is not a point

6     of law that they need to be informed about.  So, just so you

7     know.  But we will get those to you.  If you would stand by,

8     you know, we will have them to you within a five minutes.  I

9     will give you a chance to review them briefly, and then we will

10    reconvene.

11          I am going ask two questions of each side.  The first

12    question, "Are there any instructions the Court has indicated

13    will be given that you object to?  Do you object to any

14    instructions the Court has indicated will be given?"

15          Do you understand?  Do you understand, Mr. Gaffney?

16          MR. GAFFNEY:  Yes.

17          THE COURT:  All right.  Second question, "Are there

18    any instructions, in addition to those the Court has indicated

19    will be given, that you would like to have me give?"

20          Do you understand?  Any additional instructions you

21    want me to give?  You understand?

22          MR. GAFFNEY:  Yes.

23          THE COURT:  So those two questions.  And then after

24    that, the jury instructions will be settled, and we can call it

25    a day.  All right?

1          MS. SILVA:  Your Honor, I just have one thing.  We

2    sent our proposed verdict form to our appellate unit just for

3    review.  We had initially submitted a proposed verdict form

4    that had special findings in light of a case that came out in

5    2015 about the reasonable opportunity to observe the minor.

6          Upon discussion with our appellate chief, we believe

7    that we no longer need special findings.  That it can just be a

8    guilty or not guilty.  And I wasn't sure where the Court fell

9    on the proposed verdict form.

10          THE COURT:  Really, the one you -- whatever you

11    think.  I mean, I -- if you say we want special findings, then

12    I would be inclined to do it.

13          MR. GAFFNEY:  And I would like the special findings,

14    for appellate purposes, so I would know exactly what the jury

15    found in the event that Mr. Barnes is convicted.

16          THE COURT:  All right.  So then I would probably be

17    inclined to go with your original instruction.  Strike that.

18    The original submission.

19          MS. SILVA:  Understood, Your Honor.  With that, I did

20    note in re-reading this -- and actually, Mr. Gaffney and I had

21    an email correspondence about this.

22          There wasn't an instruction as to whether the jury

23    had to find one, or both, or neither.  And so perhaps we can

24    tweak that in terms of the special findings, so they understand

25    that they can find one or both or --

1          THE COURT:  I mean, if you want to rework them --

2          MS. SILVA:  Yes.

3          THE COURT:  -- then show -- show Mr. Gaffney what

4   you've got, and Mr. Oronoz, and then we will talk about it in

5   the morning.

6          MS. SILVA:  Understood.

7          THE COURT:  Just before we bring in the jury.

8          MS. SILVA:  Understood.  Thank you, Your Honor.

9          THE COURT:  Okay.  Just stand by five minutes.  I

10  will bring -- we will have the jury instructions and give you a

11  chance to review them, and then we'll settle jury instructions.

12         MS. SILVA:  Thank you very much.

13         THE COURT:  Thank you.

14     (Recess, 4:13 p.m.  Resumed 4:27 p.m.  Jury out.)

15         THE COURT:  All right.  Thank you.  You may be

16  seated.

17         All right.  Let the record reflect that the Court has

18  reconvened outside the presence of the jury for the purposes of

19  settling jury instructions.

20         The record will further reflect that the Court has

21  provided to both parties copies of those instructions the Court

22  proposes to give.  Is that correct, counsel?

23         MS. SILVA:  Yes, Your Honor.

24         MR. GAFFNEY:  Yes, Your Honor.

25         THE COURT:  All right.  Who is going to handle this

1   for the government?

2           MS. SILVA:  I will, Your Honor.

3           THE COURT:  Miss Silva, does the government object to

4   any of the instructions the Court has indicated will be given?

5           MS. SILVA:  Yes, Your Honor.

6           THE COURT:  Which ones?

7           MS. SILVA:  Specifically -- they are not numbered

8   yet.  So starting with the instruction on page 21.

9           THE COURT:  So just refer to them by page number.

10  Page 21?

11          MS. SILVA:  Page 21.  Yes, Your Honor.  The top

12  refers to the defendant acted -- acting knowingly.  We believe

13  that that would be an improper instruction for Count Three.

14  That's a strict liability offense, so if she's under the age of

15  18, and he took her over there, then he should be found guilty.

16          THE COURT:  Well, slow down then.  Something -- what

17  are you saying now?  Slow down.

18          MS. SILVA:  You have indicated that you are going to

19  instruct them that the defendant acted knowingly, if you found

20  beyond a reasonable doubt that he -- Court's indulgence, Your

21  Honor.

22          THE COURT:  All right.

23          MS. SILVA:  We are objecting to the "deliberately

24  avoided learning the truth" part for Count Three.  We believe

25  that there are three elements, and knowingly isn't one of them.

1          And therefore, we would object to the knowingly

2     instruction as well as to the deliberately avoiding learning

3     the truth instruction as to Count Three.

4          We do not have an objection -- oh, yes.  So that's in

5     regards to Count Three, Your Honor.

6          We have an additional objection to the second part of

7     the instruction.

8          THE COURT:  Now, this is the model instruction?  Are

9     you just saying the first part of it with regard to Count

10    Three?

11         MS. SILVA:  Yes, Your Honor.

12         THE COURT:  That language.

13         MS. SILVA:  Yes.  We object to the deliberate

14    ignorance as it comes to Count Three.  And the reason for that

15    is --

16         THE COURT:  Well, in looking at this instruction now,

17    so you just object down to line 11 then, roughly?

18         MS. SILVA:  For this part of the instruction.  And

19    then I have a second objection to the second part of the

20    instruction.

21         THE COURT:  All right.  What's your second objection?

22         MS. SILVA:  In regards to Counts One and Two, the way

23    it's charged in the second superceding indictment and the way

24    the statutory language reads, there is a third possibility, and

25    that is the defendant had a reasonable opportunity to observe

1   the victim to determine whether or not she was under the age of

2   18.

3           THE COURT:  Now, this is the model instruction?

4           LAW CLERK:  It's based on a model instruction that

5   has a lot of "fill in the blank" in it.

6           THE COURT:  Okay.  Here it is.  This is one that I

7   thought that the government proposed.

8       (Off-the-record discussion held.)

9           THE COURT:  This looks like one that you submitted,

10  page 26 of your submission.

11          MS. SILVA:  Your Honor, we might have been unclear as

12  to what count we wanted that to apply to, and we might have --

13  I certainly apologize.

14          THE COURT:  Oh, that's all right.  Do you want to

15  strike Count Three then?  Is that it?  And with regard to Count

16  Three, just strike that.  You may find the defendant acted

17  knowingly -- in other words, strike the first four words there.

18  Is that what you are saying?

19          MS. SILVA:  I'm sorry, Your Honor.  Are we referring

20  to the first objection or from line 12 down?

21          THE COURT:  The first objection.

22          MS. SILVA:  I think we are asking -- yes.  We are

23  completely asking to strike that part from line 2 to 11.

24          THE COURT:  All of it then?

25          MS. SILVA:  Yes, Your Honor.

1              THE COURT:  You want me -- you are objecting to the
2    whole instruction?
3              MS. SILVA:  As to Count Three, but not as to Counts
4    One and Two.  We would just like to amend that.
5              THE COURT:  Listen to my question.  You want to
6    strike the first four words; is that correct?  With regard to
7    Count Three.  Strike that and leave the rest of it alone.
8              MS. HERR:  No, that's not correct, Your Honor.
9              THE COURT:  Okay.  Now, what you submitted, "You may
10   find that the defendant acted knowingly, if you find beyond a
11   reasonable doubt, that it was one, two."
12             I mean, this is taken from your own instruction that
13   you submitted.  I apologize.  My mind reading was on the fritz,
14   I guess.
15             MS. SILVA:  Fair enough, Your Honor.
16             THE COURT:  Okay.  Now, what do you want to do with
17   this one at page 21?  Do you want to strike the whole thing?
18             MS. SILVA:  Only as to Count Three.  So we want to
19   keep the count -- keep the instruction as to Counts One and Two
20   but amend it to add in "the defendant had a reasonable
21   opportunity to observe her and deliberately avoided learning
22   the truth."
23             THE COURT:  Get me the model instruction then.  How
24   is that different from the model instruction?  I mean, this is
25   taken from our own instruction that you submitted.

1          MS. SILVA:  I apologize, Your Honor.  I don't think

2     it was clear that we wanted it in regards to Count One and Two

3     and not Count Three.

4          THE COURT:  Aside from that, then we make it track

5     your instruction.  All I do is strike the first four words with

6     regard to Count Three.  That was the instruction you submitted.

7          Now I'm not saying you are bound by that.  You can

8     say, "Well, yeah.  That was a mistake.  We don't want to do

9     that."  Is that what you are saying?

10          MS. SILVA:  Yes, Your Honor.

11          THE COURT:  So you want lines two through 11 out?

12          MS. SILVA:  Yes, Your Honor.

13          THE COURT:  All right.  Any objection, Mr. Gaffney?

14          MR. GAFFNEY:  Well --

15          THE COURT:  Pardon me?

16          MR. GAFFNEY:  Yes, Your Honor.  We are okay with the

17     instruction as written.  And in our proposed instructions, I

18     referred the Court to a court case from the Supreme Court

19     called *Flores Figueroa*.

20          THE COURT:  From where?

21          MR. GAFFNEY:  From the Supreme Court, US Supreme

22     Court.  It's called *Flores Figueroa* that talks about how the

23     word "knowingly" should be applied to each of the elements that

24     follows in a criminal statute.  And so it's our position that

25     what you have here --

1          THE COURT:  But that doesn't talk about child
2    transportation.  Right?
3          MR. GAFFNEY:  That's correct.  It does not.
4          THE COURT:  Okay.  We have seen that.
5          MR. GAFFNEY:  Okay.
6          THE COURT:  So this is called deliberate ignorance.
7    "You may find that the defendant acted knowingly, if you find
8    beyond a reasonable doubt that the defendant was aware of a
9    high probability and deliberately avoided learning the truth.
10   You may not find such knowledge if you find the defendant
11   actually believed that JM was over the age of 18 or if you find
12   that he is simply careless."
13          That's the model instruction.
14          MS. SILVA:  Yes, Your Honor.  And so Count Three
15   doesn't have a knowingly instruction to it.  The statute does
16   not require knowingly.
17          THE COURT:  But forget Count Three.
18          MS. SILVA:  Okay.  As for Count Two, it does.  So
19   what we are merely asking is that we also add in "the defendant
20   had a reasonable opportunity to observe her" to track the
21   statute totally.
22          THE COURT:  Where does that come from?
23          MS. SILVA:  That comes from the statute itself and
24   the charge in the indictment that charges he knew that JM had
25   not attained the age of 18, or had a reasonable opportunity to

 1   observe JM, or recklessly disregarded the fact that JM had not
 2   attained the age of 18.
 3             THE COURT:  Is that the statute?  So you want to add
 4   one more paragraph then, beginning at line 12, and add the
 5   third one.  "He had the opportunity to observe."  Is that what
 6   you are saying?
 7             MS. SILVA:  Yes, Your Honor.
 8             THE COURT:  Why don't you write in "observation"
 9   here, Kyle.
10             All right.  Any other objections?
11             MS. SILVA:  Our second objection, Your Honor -- we
12   are going out of order here -- is to page 18.
13             THE COURT:  18?
14             MS. SILVA:  Yes, Your Honor.  And the objection is we
15   would ask for an addition to the instruction, that being that
16   it is not a defense that the defendant was ignorant of the
17   child's age.
18             If someone knowingly transports a person for the
19   purposes of prostitution or another sex offense, the
20   transporter assumes the risk that the victim is a minor
21   regardless of what the victim says or how the victim appears.
22             I am pulling that from *United States v. Taylor*.  The
23   cite is 239 F.3d 994, 997, Ninth Circuit 2001.
24             THE COURT:  *Taylor* contradicts *Flores*.  But *Flores*
25   *Figueroa* is a 2009 case.  *Taylor* is a 2001 case.

1          MS. SILVA:  As I understand, Your Honor, the *Flores*

2     case is not about specifically the transportation charge.

3          THE COURT:  But the *Flores* seems to be broadly

4     worded.  *Flores Figueroa*, a knowingly requirement when the

5     statute applies to all elements of the crime.

6          What do you want to add to this one again?  Now, I'm

7     sorry.  I am reading my notes, too.

8          MS. SILVA:  No problem, Your Honor.  That it is not a

9     defense for the defendant to be ignorant of the child's age.

10          If someone knowingly transports the minor for

11     purposes of prostitution or another sex offense, the defendant

12     assumes the risk that the victim is a minor regardless of what

13     the victim says or how the victim appears.

14          MR. GAFFNEY:  And Your Honor, I know you are trying

15     to read.  I don't mean to interrupt.

16          THE COURT:  That's all right.

17          MR. GAFFNEY:  It's our position that *Flores Figueroa*

18     does add the knowing element into these charges.  And so that

19     would essentially -- that's our position.

20          We believe that it's a Supreme Court case, it was

21     decided in 2009, and that's what governs.

22          THE COURT:  I will look at *Flores*.  Let me look at

23     that overnight then.

24          All right.  So we have taken care of your one

25     objection.  Is that true?  And this is still pending?

1              MS. SILVA:  I'm sorry, Your Honor?

2              THE COURT:  You objected to the one on page 21, and

3    we are going to handle that.

4              MS. SILVA:  Yes, Your Honor.

5              THE COURT:  This is your second objection, though;

6    right?  Any other objections?

7              MS. SILVA:  No, Your Honor.  Thank you.

8              THE COURT:  All right.  Do you request the giving of

9    any instructions in addition to those the Court has indicated

10   will be given?

11             MS. SILVA:  No, Your Honor.  Thank you.

12             THE COURT:  All right.  Mr. Gaffney, does the

13   defendant object to any instructions the Court has indicated

14   will be given?

15             MR. GAFFNEY:  Only the ones we have discussed.  And

16   then in addition, the instruction on page 22.  And it's the

17   same objection.

18             THE COURT:  All right.  You object to number 18 then.

19   You wanted to include knowingly?

20             MR. GAFFNEY:  Correct.

21             THE COURT:  And then the same thing with 21?  I'm

22   sorry.  22 rather?

23             MR. GAFFNEY:  Yes, page 22.  And it's essentially the

24   same issue we just discussed.  I would submit it on the *Flores*

25   *Figueroa* case.

1          MS. SILVA:  Your Honor, I do note that the standard

2   instruction for transportation of a minor, on the Ninth Circuit

3   website, which I believe was last updated for this particular

4   instruction in 2010, includes the *Taylor* instruction, the

5   *Taylor* case.

6          THE COURT:  Includes which instruction?

7          MS. SILVA:  The *Taylor* instruction.  That being that

8   it's not a defense to be ignorant of the -- of the victim's

9   age.  That's from 2010.

10          THE COURT:  What are you -- are you speaking now

11   about the instruction on page 22?  Is that what you are saying?

12          MS. SILVA:  If I understand correctly, Mr. Gaffney's

13   objecting to essentially the same thing.  That we don't have to

14   prove that the defendant knew.

15          THE COURT:  We are talking now about instruction 22.

16          MS. SILVA:  Right.  The victim was under the age of

17   18.

18          THE COURT:  And what are you saying now?  The model

19   instruction says what?

20          MS. SILVA:  It does provide for the instruction that

21   it's not a defense that the defendant was ignorant of the

22   child's crime -- I mean, the child's age.  Excuse me.

23          THE COURT:  22 is the model instruction.  Is that

24   what you are saying?

25          MS. SILVA:  It is encompassed in the model

1   instruction.

2           THE COURT:  It is what?

3           MS. SILVA:  It's encompassed in the model

4   instruction.

5           THE COURT:  What does that mean?  What do you mean

6   "it's encompassed in the model instruction"?

7           MS. SILVA:  It's included in the comment on the model

8   instruction, Your Honor.

9           THE COURT:  So it's not the model instruction.

10          MS. SILVA:  No, Your Honor.  Just the comment.

11          THE COURT:  It's a comment to the model instruction.

12          MS. SILVA:  Yes.

13          THE COURT:  That's what you are saying.

14          MS. SILVA:  Yes, Your Honor.

15          THE COURT:  22.  You object to 18 and 22; is that

16  right?

17          MR. GAFFNEY:  Correct, Your Honor.

18          THE COURT:  All right.  Let me look at these

19  overnight.  Then we'll talk in the morning.

20          Do you request the giving of any instruction in

21  addition to those the Court has indicated will be given?

22          MR. GAFFNEY:  No, Your Honor.

23          THE COURT:  All right.  Let me look at this.

24          MR. GAFFNEY:  And Your Honor, I do have just one last

25  housekeeping matter.

1              THE COURT:  Sure.

2              MR. GAFFNEY:  When Special Agent Mollica was on the

3    stand, I admitted an exhibit that was Defense Exhibit 511.

4              When I admitted it, the exhibit had a cover page.  It

5    was an email from the investigator to another investigator.  I

6    spoke to Miss Silva, and she agreed to remove that page from

7    the exhibit.  There was no testimony about it.

8              MS. SILVA:  That is correct, Your Honor.

9              THE COURT:  All right.  Remove that first page then,

10   the "from, to."  Is that what it is?

11             MR. GAFFNEY:  Right.  Exactly.

12             THE COURT:  Remove that, David, if you would then.

13   Is that agreeable?

14             MS. SILVA:  Yes, Your Honor.

15             THE COURT:  All right.  So we will see you at

16   9:00 tomorrow morning.

17             MS. SILVA:  Thank you.

18             MR. GAFFNEY:  Thank you.

19             THE COURT:  Oh, and email Kyle a copy.  Did you give

20   her your email address?

21             LAW CLERK:  Oh, no.

22             THE COURT:  Do that of the proposed verdict form.

23             MS. SILVA:  Yes.  Yes, Your Honor.  Thank you.

24        (Recess, 4:47 p.m.)

25

INDEX OF EXAMINATIONS

For the Plaintiff:

| Witness Name | Direct | Cross | RD | RX | Voir Dire |
|---|---|---|---|---|---|
| Jasmin Madison | 139 | 155 | 175 | | |
| Brysco Baker | 178 | | | | |
| Kurt Overall | 188 | | | | |
| Thomas M. Radke | 191 | 197 | | | |
| Amber Lynn Marquardt | 201 | 237 | 263 | | |
| James Mollica | 271 | 310 | 320 | 323 | |

PLAINTIFF'S EXHIBIT INDEX

| Exhibit No. | Marked | Admitted |
|---|---|---|
| 3 | | 297 |
| 12 | | 150 |
| 13 | | 152 |
| 14, 15 and 16 | | 290 |
| 17A | | 275 |
| 17B | | 275 |
| 18A | | 197 |
| 18B | | 306 |
| 19A and 19B | | 190 |
| 20 | | 305 |

DEFENDANT'S EXHIBIT INDEX

| Exhibit No. | Marked | Admitted |
|---|---|---|
| 510S | | 175 |
| 511 | | 317 |

1                              --oOo--

2                    COURT REPORTER'S CERTIFICATE

3

4        I, KATHERINE EISMANN, Official Court Reporter, United

5   States District Court, District of Nevada, Las Vegas, Nevada,

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8

9   Date:  April 15, 2016.

10                            /s/ *Katherine Eismann*

11                            Katherine Eismann, CSR CRR RDR

12

13

14

15

16

17

18

19

20

21

22

23

24

25